# EXHIBIT 3

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life    )
Term Parole Consideration    )        CDC Number E-89844
Hearing of:                  )
                             )
SALVATORE GRAFFAGNINO        )
_____)

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

DECEMBER 9, 2005

9:00 A.M.

PANEL PRESENT:

TOM SAWYER, Presiding Commissioner
BRUCE MITCHELL, Deputy Commissioner

OTHERS PRESENT:

SALVATORE GRAFFAGNINO, Inmate
MARY ANN TARDIFF, Attorney for Inmate
RICHARD STORMS, Deputy District Attorney
CORRECTIONAL OFFICER UNIDENTIFIED

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____    No    See Review of Hearing
_____    Yes   Transcript Memorandum

Connie Mastin                    Peters Shorthand Reporting

ii

## INDEX

|                                         | Page |
|-----------------------------------------|------|
| Proceedings ............................ | 1    |
| Case Factors ........................... | 6    |
| Pre-Commitment Factors.................. | 15   |
| Post-Commitment Factors................. | 24   |
| Parole Plans ........................... | 18   |
| Closing Statements ..................... | 48   |
| Recess ................................. | 52   |
| Decision ............................... | 53   |
| Adjournment ............................ | 65   |
| Transcriber Certification............... | 66   |

--oOo--

1

1          **P R O C E E D I N G S**

2          **PRESIDING COMMISSIONER SAWYER:**  Okay.  Thank

3    you.  This is a Subsequent Parole Consideration

4    Hearing for Salvatore Graffagnino.  Did I

5    pronounce that right?

6          **INMATE GRAFFAGNINO:**  Salvatore.

7          **PRESIDING COMMISSIONER SAWYER:**  Salvatore.

8          **INMATE GRAFFAGNINO:**  Yeah.

9          **PRESIDING COMMISSIONER SAWYER:**  Sorry.  I'm

10   so worried about the last name that I blew over

11   the first name.  G-R-A-F-I --

12   G-R-A-F-A-G-N-I-N-O.

13         **INMATE GRAFFAGNINO:**  No, Sir.

14         **PRESIDING COMMISSIONER SAWYER:**  That's not

15   correct?

16         **INMATE GRAFFAGNINO:**  No, Sir.

17   G-R-A-F-F-A-G-N-I-N-O.  Double F.

18         **PRESIDING COMMISSIONER SAWYER:**  Two Fs in

19   there.  Okay.  I'm going to put that F in there.

20         **DEPUTY COMMISSIONER MITCHELL:**  Did you say

21   two Is also?

22         **INMATE GRAFFAGNINO:**  No, Sir.

23         **DEPUTY COMMISSIONER MITCHELL:**  Just the one

24   I between the --

25         **PRESIDING COMMISSIONER SAWYER:**  I left an

26   out, right?

27         **ATTORNEY TARDIFF:**  Uh-hmm.

2

1 **PRESIDING COMMISSIONER SAWYER:** Okay. The

2 correct spelling would be G-R-A-F-F-A-G-N-I-N-O.

3 **INMATE GRAFFAGNINO:** Yes, Sir.

4 **PRESIDING COMMISSIONER SAWYER:** And

5 Salvatore is S-A-L-V-A-T-O-R-E.

6 **INMATE GRAFFAGNINO:** Yes, Sir.

7 **PRESIDING COMMISSIONER SAWYER:** Okay. Thank

8 you. CDC number E as in Edward 89844. Today's

9 date is 12/9 of '05. The time is 9:00 a.m.

10 We're located at the Correctional Training

11 Facility in Soledad. Date received is 3/19 of

12 1981. That's not correct, is it?

13 **INMATE GRAFFAGNINO:** No.

14 **PRESIDING COMMISSIONER SAWYER:** '91?

15 **INMATE GRAFFAGNINO:** 3/18/90 -- yeah, '91,

16 yes.

17 **PRESIDING COMMISSIONER SAWYER:** The crime

18 was committed in '90.

19 **INMATE GRAFFAGNINO:** Yes, Sir.

20 **PRESIDING COMMISSIONER SAWYER:** From

21 Monterey County.

22 **INMATE GRAFFAGNINO:** Yes, Sir.

23 **PRESIDING COMMISSIONER SAWYER:** For murder

24 in the second degree, case number CR6037, count

25 number one, 187 of the Penal Code. The term is

26 15 years to life. Minimum eligible parole date

27 was 10/23 of the year 2000. This hearing is

3

1    being tape-recorded.  And for purpose of voice

2    identification each of us is required to state

3    our first and last name, spelling our last name.

4    When it comes to your turn, we want you to spell

5    your last name slowly, and give us your CDC

6    number as well.  Okay.  I'll start.  Tom Sawyer,

7    S-A-W-Y-E-R, Commissioner.

8        **DEPUTY COMMISSIONER MITCHELL:**  Bruce

9    Mitchell, M-I-T-C-H-E-L-L, Deputy Commissioner.

10       **DEPUTY DISTRICT ATTORNEY STORMS:**  Richard

11   Storms, last name S-T-O-R-M-S, and I work for

12   the District Attorney's Office.

13       **ATTORNEY TARDIFF:**  What county?

14       **DEPUTY DISTRICT ATTORNEY STORMS:**  Monterey

15   County.

16       **ATTORNEY TARDIFF:**  Mary Ann Tardiff,

17   T-A-R-D-I-F-F, attorney for Mr. Graffagnino.

18       **INMATE GRAFFAGNINO:**  Salvatore Graffagnino,

19   G-R-A-F-F-A-G-N-I-N-O, E-89844.

20       **PRESIDING COMMISSIONER SAWYER:**  Okay.  Thank

21   you.  We have a correctional peace officer in

22   the room for security purposes.  The record

23   reflects you signed a BPT Form 1073, which is

24   the reasonable accommodation notice and request

25   in accordance with the provisions of the ADA,

26   Americans with Disabilities Act, 3/10 of '05.

27   You indicate on here you do not have any

4

1    disabilities.

2        **INMATE GRAFFAGNINO:**  That's correct.

3        **PRESIDING COMMISSIONER SAWYER:**  Okay.  Would

4    you pass that over and make sure it's current

5    and correct.

6        **INMATE GRAFFAGNINO:**  Yes, Sir.

7        **PRESIDING COMMISSIONER SAWYER:**  Thank you.

8    Also today you had a brief interview with your

9    attorney, and she talked about the accommodation

10   disabilities.

11       **INMATE GRAFFAGNINO:**  Yes, Sir.

12       **PRESIDING COMMISSIONER SAWYER:**  And she

13   talked about the outline of the hearing

14   procedure.

15       **INMATE GRAFFAGNINO:**  Yes, Sir.

16       **PRESIDING COMMISSIONER SAWYER:**  She talked

17   about your rights.

18       **INMATE GRAFFAGNINO:**  Yes, Sir.

19       **PRESIDING COMMISSIONER SAWYER:**  And she

20   talked about confidential material that might be

21   used in this case.

22       **INMATE GRAFFAGNINO:**  Yes, Sir.

23       **PRESIDING COMMISSIONER SAWYER:**  You and she

24   signed 12/9/05, Mary Ann Tardiff and the

25   inmate's signature on this document.  And,

26   counsel, are you waiving those items?

27       **ATTORNEY TARDIFF:**  I am.

5

1          **PRESIDING COMMISSIONER SAWYER:**  Thank you.

2     Commissioner Mitchell, is there any confidential

3     material?

4          **DEPUTY COMMISSIONER MITCHELL:**  Yes, there

5     is.  It's not going to be used.

6          **PRESIDING COMMISSIONER SAWYER:**  Thank you.

7     Okay.  We'll pass the hearing checklist marked

8     Exhibit One.  Pass it to Ms. Tardiff.  Check

9     those against -- We do have a new psych report I

10    believe.

11         **ATTORNEY TARDIFF:**  Yes.  I'll mark that.

12         **PRESIDING COMMISSIONER SAWYER:**  Thank you.

13         **ATTORNEY TARDIFF:**  I have these documents.

14    Thank you.

15         **DEPUTY DISTRICT ATTORNEY STORMS:**  I also

16    have these documents.

17         **PRESIDING COMMISSIONER SAWYER:**  Thank you.

18         **ATTORNEY TARDIFF:**  I've submitted all

19    documents.

20         **PRESIDING COMMISSIONER SAWYER:**  Will there

21    be any preliminary objections?

22         **ATTORNEY TARDIFF:**  No.  I would like the

23    Panel to note though that there is a writ

24    pending at this time, and that my client does

25    not waive any rights he may have under that

26    pending writ pertaining to the last Panel's

27    decision in '04.

6

1        **PRESIDING COMMISSIONER SAWYER:**    Okay.    Will

2    he be speaking with --

3        **ATTORNEY TARDIFF:**    Yes.

4        **PRESIDING COMMISSIONER SAWYER:**    Okay.    Would

5    you raise your right hand, sir.    Do you solemnly

6    swear or affirm the testimony you're about to

7    give in this hearing will be the truth, the

8    whole truth, and nothing but the truth?

9        **INMATE GRAFFAGNINO:**    Yes, Sir.

10        **PRESIDING COMMISSIONER SAWYER:**    Okay.    I'm

11    going to be reading from the July 2005 calendar

12    Board report, summary of crime, page one.

13            "On the evening of 10/8 of 1990

14            Jose Gonzalez was found by Monterey

15            County Sheriff's Deputies after

16            receiving a call about a possible

17            murder in the area of Rogge,

18            R-O-G-G-E, Road in Natividad,

19            N-A-T-I-V-I-D-A-D.    Jose Gonzalez

20            was found sitting in the driver's

21            seat and slumped sideways over the

22            center console of his car.    There

23            was a large amount of blood on his

24            shirt and large laceration on his

25            side of his neck.    The autopsy

26            later revealed this laceration

27            largely severed the neck muscular

7

1    attachments at the base of -- at

2    the base of the tongue.  There were

3    also multiple stab wounds.  One

4    stab wound was located on the left

5    side of the chest, and one below

6    the armpit.  There were deep cuts

7    on the left arm, cuts on both

8    hands, cuts to the mid thigh, lower

9    left leg, and wounds in the area of

10    the penis.  Gonzalez never regained

11    consciousness and died 10/10 of

12    1990 as a result of anoxic,

13    A-N-O-X-I-C, brain damage due to

14    loss of blood caused by the stab

15    wounds.  The evening of 10/7/1990

16    the inmate and his brother Joe,

17    Chuck Altemeyer, A-L-T-E-M-E-Y-E-R,

18    and two 15-year-old and 16-year-old

19    girls, names unknown, were partying

20    near the strawberry fields on Rogge

21    Road when a girl came running

22    towards them yelling for help.  The

23    girl stated that a guy had just

24    tried to rape her.  This made the

25    inmate angry.  According to

26    witnesses, the inmate stated this

27    guy is going to pay.  Soon after

8

1     the girl approached them, the man,

2     Jose Gonzalez -- the girl said that

3     he had raped her and drove towards

4     him.   Salvatore drove his --

5     Salvatore drove his vehicle towards

6     pushing Jose Gonzalez into the

7     field.   The Graffagnino brothers,

8     Joe and Salvatore, exited the

9     vehicle and began stabbing Jose

10    Gonzalez.   Mr. Altemeyer was also

11    hitting and kicking Jose Gonzalez

12    while Joe and Salvatore was

13    stabbing him.   Once they completed

14    their assault they drove to

15    Natividad Plaza where they let the

16    16-year-old girl go -- where the

17    let the 16-year-old girl with them

18    out of the vehicle.   According to

19    the 15-year-old girl, who was with

20    them, she helped Salvatore wipe the

21    blood of his sweatshirt at the

22    Quick Mart.   It was also observed

23    Joe and Salvatore wrap their knives

24    in a bloody sweatshirt and placed

25    it in the trunk of the car.   She

26    stated she went -- then went with

27    Joe to the house where he had put

9

1            the knives in a metal box behind a

2            wall.  Later on that evening

3            Salvatore, Joe, approached a friend

4            named Donny Blaylock,

5            B-L-A-Y-L-O-C-K, and stated to him

6            that they had just killed somebody.

7            They stated that the guy tried to

8            rape a girl who was with them, and

9            for that they killed him.  Blaylock

10           stated that Joe was one of them who

11           slashed the victim's next, and

12           Salvatore stabbed him under the

13           arm.  Blaylock stated that he did

14           not believe them and decided to

15           drive to the scene with Salvatore

16           to show him the murder victim.

17           Danny Blaylock later called 911.

18           The defendants were taken into

19           custody on 10/23/1990 while driving

20           a blue 1980 Mercury Cougar.  Search

21           of the vehicle and the residence

22           produced several knives, two of

23           which matched the descriptions

24           given by witnesses as the knives

25           used in the murder.  Chuck

26           Altemeyer was later taken into

27           custody at his residence.  None of

10

```
 1          the suspects admitted any knowledge
 2          of the killing.  There was no
 3          evidence provided which indicated
 4          the victim was known by any of the
 5          suspects prior to the crime.  The
 6          crime was committed in concert with
 7          brother Joe and Chuck, friend --
 8          and friend Chuck Altemeyer.  The
 9          weapons that used -- The weapons
10          that killed Jose Gonzalez were
11          described as a Rambo type knife,
12          which belonged to Joe, and a buoy
13          knife, which belong to Salvatore,
14          and bicycle fork, which was used by
15          Chuck Altemeyer to strike murder
16          victim Jose Gonzalez.  The source
17          of these documents -- source
18          documents used to compile this
19          information were the probation
20          officer's report from the Superior
21          Court Monterey County dated 3/4/91,
22          pages two through 12, and one
23          document from the Superior Court of
24          the State of California Monterey
25          County dated 12/21/1990."
26  I have your version also in print here, but can
27  you tell me what happened that night.
```

11

1    **INMATE GRAFFAGNINO:**  We were out at

2    Alexander's Ranch, a place called Rogge and

3    Natividad.  There's like -- There were a lot of

4    people out there, close to 50 people or more.

5    It was somebody's party, birthday party.  And

6    when we were leaving I offered to given Joanne

7    Trigolo (phonetic) a ride home because who she

8    was riding with was real drunk, and he wasn't

9    somebody to trust behind the wheel with her in

10   there.  Because she lived a couple blocks away,

11   I offered to give her a ride.  When me, my

12   brother, and Joanne was leaving the area, Chuck

13   Altemeyer and his girlfriend were in the car

14   behind us.  They were leaving behind us.  When

15   we pulled up on top of the other area where we

16   were partying, this girl came running out to the

17   car with a guy chasing her.  Well, when he seen

18   us stop he turned around and took off running.

19   When she come running up to the car she was

20   already missing her shoes, some of her clothes

21   were ripped, and this guy she said was trying to

22   attack her.  So I jump back in the car using the

23   car's headlights, turn and try to see where he

24   went.  He come -- He jumped back in his car,

25   which was through the field.  He come charging

26   through the road in what's called -- approached

27   our car going real fast.  My brother was out of

12

1    the car walking down the road trying to see

2    where he went.  Well, when he went racing past

3    where my brother was he almost hit my brother

4    also with his car.  So that when I, using the

5    car -- He stopped in front of us and started

6    backing up.  Using my car, I used bumper to

7    bumper, pushed him back into the strawberry

8    fields where he couldn't get out.  And I got out

9    and commenced -- was fighting with him.  I don't

10   -- I ain't sure when my brother came up, or how

11   Altemeyer came up onto the scene.  He was in a

12   different car.  But fighting with the guy, I

13   ended up pulling out my knife.

14        **PRESIDING COMMISSIONER SAWYER:**  Is that a

15   folded knife?

16        **INMATE GRAFFAGNINO:**  No, Sir.

17        **PRESIDING COMMISSIONER SAWYER:**  It was a

18   sheath knife?

19        **INMATE GRAFFAGNINO:**  Yes, Sir.  And I had it

20   on my side.  But I pulled out the knife and I

21   stabbed him.  I don't remember how many times or

22   where, but I stabbed him.  I didn't find out,

23   you know -- When my brother came up, he was

24   pulling us apart and stuff.  I don't remember

25   Chuck Altemeyer hitting the guy until, you know,

26   later on when they said that's what happened.

27   But I started to walk away from the area, and

1   that's what -- I looked back and I seen them

2   looking for something.  Well, I started walking

3   back and they said they found it, and Altemeyer

4   stood up with his hat.  I guess he dropped his

5   hat during the tussle.  Well, we all got back in

6   the cars and left.  I didn't find out until we

7   got to a Quick Stop or the Quickie Mart,

8   whatever it, on Alvin and Natividad, that my

9   brother cut the guy's throat.  But we told the

10  girl to go.  That's when Danny Blaylock showed

11  up.  Danny or Donny Blaylock, one of the two.

12  They showed up.  And what do you call it, his

13  brother was showing up too.  We went out there,

14  you know, to find out if the dude was still

15  alive.  Donny went up to the car and he said the

16  guy was still alive and he was going to call

17  911.  So we went out there in his truck.  I did

18  not drive.  He dropped me off and he called 911.

19      PRESIDING COMMISSIONER SAWYER:  Now, did all

20  this fight take place while this guy was sitting

21  in his car?

22      INMATE GRAFFAGNINO:  No, Sir.

23      PRESIDING COMMISSIONER SAWYER:  How did he

24  get back into his car?

25      INMATE GRAFFAGNINO:  I'm not sure how, but

26  he was not in his car because he jumped out, and

27  that's when we were fighting.  He did not stay

14

1    in his car.

2        **PRESIDING COMMISSIONER SAWYER:**  How much had

3    you had to drink that night?

4        **INMATE GRAFFAGNINO:**  I had over the course

5    of a couple hours out there, I had a lot, but I

6    wasn't drunk.

7        **PRESIDING COMMISSIONER SAWYER:**  Was it a

8    kegger?

9        **INMATE GRAFFAGNINO:**  No. It was just a

10   mixture of beer and stuff.

11       **PRESIDING COMMISSIONER SAWYER:**  Beer and

12   what?

13       **INMATE GRAFFAGNINO:**  There was hard alcohol,

14   but I wasn't drinking any of the hard alcohol.

15       **PRESIDING COMMISSIONER SAWYER:**  Was there

16   any drugs?

17       **INMATE GRAFFAGNINO:**  No, Sir.

18       **PRESIDING COMMISSIONER SAWYER:**  No

19   marijuana?

20       **INMATE GRAFFAGNINO:**  No.

21       **PRESIDING COMMISSIONER SAWYER:**  How many

22   drinks do you think you had?

23       **INMATE GRAFFAGNINO:**  I don't remember.

24       **PRESIDING COMMISSIONER SAWYER:**  Okay.  You

25   were 21 at the time?

26       **INMATE GRAFFAGNINO:**  Yes, Sir.

27       **PRESIDING COMMISSIONER SAWYER:**  Did you have

15

1    a history of drinking?

2        INMATE GRAFFAGNINO:  No, Sir.

3        PRESIDING COMMISSIONER SAWYER:

4    (Indiscernible).

5        INMATE GRAFFAGNINO:  No.  I drank at parties

6    and stuff like that, but it wasn't where I was

7    constantly drinking.

8        PRESIDING COMMISSIONER SAWYER:  Okay.  Thank

9    you for talking about it.  You don't have any

10   juvenile record or adult record.

11       INMATE GRAFFAGNINO:  No, Sir.

12       PRESIDING COMMISSIONER SAWYER:  Is that

13   correct?

14       INMATE GRAFFAGNINO:  That's correct.

15       PRESIDING COMMISSIONER SAWYER:  And you were

16   born on 7/24 of 1969.

17       INMATE GRAFFAGNINO:  Yes, Sir.

18       PRESIDING COMMISSIONER SAWYER:  In New York.

19       INMATE GRAFFAGNINO:  Yes, Sir.

20       PRESIDING COMMISSIONER SAWYER:  Your father

21   died in 1992.

22       INMATE GRAFFAGNINO:  Yes, Sir.

23       PRESIDING COMMISSIONER SAWYER:  And your

24   mother and your sister -- Your mother I-L-O-N-A,

25   Ilona.

26       INMATE GRAFFAGNINO:  Ilona.

27       PRESIDING COMMISSIONER SAWYER:  Nelson,

16

1    N-E-L-S-O-N, and your sister Heather reside in

2    Salinas.

3        INMATE GRAFFAGNINO:  Marina, a little off of

4    Salinas.

5        PRESIDING COMMISSIONER SAWYER:  They live in

6    Marina?

7        INMATE GRAFFAGNINO:  Yeah.

8        PRESIDING COMMISSIONER SAWYER:  A county

9    over.

10        INMATE GRAFFAGNINO:  Yes, Sir.

11        PRESIDING COMMISSIONER SAWYER:  Did they

12    live in Salinas at one time?

13        INMATE GRAFFAGNINO:  Yes, Sir.

14        PRESIDING COMMISSIONER SAWYER:  Your brother

15    Anthony lives in San Jose.

16        INMATE GRAFFAGNINO:  Yes, Sir.

17        PRESIDING COMMISSIONER SAWYER:  And your

18    brother Joe currently lives in Salinas.

19        INMATE GRAFFAGNINO:  Joe Graffagnino moved

20    up to Washington.

21        PRESIDING COMMISSIONER SAWYER:  To

22    Washington.

23        INMATE GRAFFAGNINO:  Yes, Sir.

24        PRESIDING COMMISSIONER SAWYER:  How much

25    time did he do?

26        INMATE GRAFFAGNINO:  He did six and a half.

27        PRESIDING COMMISSIONER SAWYER:  Six and a

17

1   half years?

2   **INMATE GRAFFAGNINO:** Yes, Sir.

3   **PRESIDING COMMISSIONER SAWYER:** What was his

4   -- What did he come in on, second degree --

5   murder second?

6   **INMATE GRAFFAGNINO:** No, he came in on a

7   manslaughter 11 with one-year enhancement for

8   the knife.

9   **PRESIDING COMMISSIONER SAWYER:** Did he go to

10   trial?

11   **INMATE GRAFFAGNINO:** No, Sir.

12   **PRESIDING COMMISSIONER SAWYER:** Did you go

13   to trial?

14   **INMATE GRAFFAGNINO:** No, Sir.

15   **PRESIDING COMMISSIONER SAWYER:** It says here

16   you did not abuse alcohol during the years of

17   '88 through May of '90. Claims he smoked

18   marijuana at least once a week.

19   **INMATE GRAFFAGNINO:** Experimenting, you

20   know, here and there, but it wasn't really --

21   **PRESIDING COMMISSIONER SAWYER:** Tried

22   cocaine twice. Experimented with

23   Methamphetamine three or four times.

24   **INMATE GRAFFAGNINO:** Yes, Sir.

25   **PRESIDING COMMISSIONER SAWYER:** Is that

26   correct?

27   **INMATE GRAFFAGNINO:** Yes, Sir.

18

1  **PRESIDING COMMISSIONER SAWYER:** And as you

2  said, you claim that you were only drinking

3  alcohol that night. No military history, and no

4  sexual deviations or mental disorders prior to

5  or during the time period the crime was

6  committed. Your future plans indicate that you

7  would reside with Clay and Susan Edgin.

8  **INMATE GRAFFAGNINO:** No, Sir. My parole

9  plans changed. Clay and Susan Edgin sold their

10  house. They're moving out of Monterey County.

11  So I'll go and stay with my mom.

12  **PRESIDING COMMISSIONER SAWYER:** Your mom and

13  your sister in Marina?

14  **INMATE GRAFFAGNINO:** Yes, Sir.

15  **PRESIDING COMMISSIONER SAWYER:** Do they

16  still live at Lake Drive, Number 40?

17  **INMATE GRAFFAGNINO:** Yes, Sir.

18  **PRESIDING COMMISSIONER SAWYER:** And what

19  kind of a house or apartment?

20  **INMATE GRAFFAGNINO:** It's a two-bedroom

21  apartment. It's just something, you know. I'll

22  stay there until I get my job, get my own place.

23  **PRESIDING COMMISSIONER SAWYER:** How old is

24  your sister Heather?

25  **INMATE GRAFFAGNINO:** My sister, 22 now.

26  She'll be getting ready to move out herself.

27  **PRESIDING COMMISSIONER SAWYER:** Your baby

1   sister?

2       INMATE GRAFFAGNINO:  Yes, Sir.

3       PRESIDING COMMISSIONER SAWYER:  Do you talk

4   with your mom and your sister?

5       INMATE GRAFFAGNINO:  Yes, Sir.

6       PRESIDING COMMISSIONER SAWYER:  Do they

7   visit?

8       INMATE GRAFFAGNINO:  My mom is fully

9   handicapped.  She's got rheumatoid arthritis and

10  diabetes.  She's bedridden.  She visited up

11  until she was put in the hospital.  And from

12  there she couldn't come up.

13      PRESIDING COMMISSIONER SAWYER:  Okay.

14      INMATE GRAFFAGNINO:  But I call her every

15  other week.

16      PRESIDING COMMISSIONER SAWYER:  And I have

17  some letters in your packet.  One undated letter

18  from Thomas Crites, C-R-I-T-E-S.

19      INMATE GRAFFAGNINO:  Yes, Sir, that's my

20  aunt's husband.

21      PRESIDING COMMISSIONER SAWYER:  Your aunt's

22  husband.

23      INMATE GRAFFAGNINO:  Yes, Sir, Audrey

24  Nelson.

25      PRESIDING COMMISSIONER SAWYER:  And he's

26  known you for 20 years.

27      INMATE GRAFFAGNINO:  Yeah.

20

1    **PRESIDING COMMISSIONER SAWYER:** "I'm willing

2    to lend him whatever support I can.  I work in

3    produce, (indiscernible) jobs, get him a job at

4    least."  And he says you certainly welcome in

5    his home.  I have a letter from your aunt.

6    **INMATE GRAFFAGNINO:**  Audrey Nelson.

7    **PRESIDING COMMISSIONER SAWYER:**  Audrey

8    Nelson.

9    **INMATE GRAFFAGNINO:**  Yes, Sir.

10   **PRESIDING COMMISSIONER SAWYER:**  When did you

11   receive these letters?

12   **INMATE GRAFFAGNINO:**  I got these letters,

13   what was it, September.

14   **PRESIDING COMMISSIONER SAWYER:**  Of this

15   year?

16   **INMATE GRAFFAGNINO:**  Yes, Sir.

17   **PRESIDING COMMISSIONER SAWYER:**  Do you have

18   the envelope?

19   **INMATE GRAFFAGNINO:**  No, I don't.  I didn't

20   think of bringing it.  I know they sent letters

21   to the counselor, to the BPT, and one to me.

22   They sent three letters out.

23   **ATTORNEY TARDIFF:**  If you don't get a --

24   make sure you tell them to date their letters.

25   **INMATE GRAFFAGNINO:**  All right.

26   **PRESIDING COMMISSIONER SAWYER:**  It talks

27   about they'll give you encouragement, be

21

1    available day and night for moral support.

2    "I've heard the pride in his educational skills

3    acquired while serving his time.   Unfortunately

4    I live in a small apartment and cannot afford

5    housing, but my home is always open."   And I

6    have a letter from your mother.

7         **INMATE GRAFFAGNINO:**  Yes, Sir.

8         **PRESIDING COMMISSIONER SAWYER:**   Ilona.

9         **INMATE GRAFFAGNINO:**   Ilona.

10        **PRESIDING COMMISSIONER SAWYER:**   Okay.   And

11   the same Lake Drive, Number 40 in Marina,

12   California.   It talks about how you matured in

13   your education.   She's severely disabled.   "I'll

14   be there for him morally and financially support

15   as possible.   As a disabled person I've learned

16   the importance of social programs to assist

17   people, encourage him to seek programs offered

18   when (indiscernible)."   She doesn't say you can

19   come live with her?

20        **ATTORNEY TARDIFF:**   The step-father's letter

21   doesn't.   I saw that letter, and I don't know --

22        **INMATE GRAFFAGNINO:**   No, she --

23        **ATTORNEY TARDIFF:**   Do you have a copy of it?

24        **INMATE GRAFFAGNINO:**   My step-dad?

25        **ATTORNEY TARDIFF:**   Yeah.

26        **INMATE GRAFFAGNINO:**   Yeah.   It's right here.

27   Yeah.   My mom does not list on the letter, but

22

1   she said that, you know --

2        ATTORNEY TARDIFF:  Can you give that to me?

3        INMATE GRAFFAGNINO:  -- at the one time they

4   still plan on living out in Middlefield, but

5   they just sold their house.

6        PRESIDING COMMISSIONER SAWYER:  Okay.

7        INMATE GRAFFAGNINO:  And that's where my mom

8   -- That letter came after the one from my mom.

9   That's from my step-dad right there.

10       PRESIDING COMMISSIONER SAWYER:  Okay.  I

11  have this letter in the file.

12       ATTORNEY TARDIFF:  And that letter I believe

13  states that he can live there.

14       PRESIDING COMMISSIONER SAWYER:  This is from

15  Bellingham, Washington.

16       INMATE GRAFFAGNINO:  Yeah.

17       ATTORNEY TARDIFF:  Okay.

18       INMATE GRAFFAGNINO:  He's still married with

19  my mom.  They're still --

20       ATTORNEY TARDIFF:  "My wife has a room ready

21  for him in Marina, California."  It says that at

22  the bottom.

23       PRESIDING COMMISSIONER SAWYER:  I see that.

24  Okay.  "In either case, his mother and I will

25  help him out financially with housing.  We'll

26  help him in any way (indiscernible) uneventful

27  rehabilitation.  (Indiscernible) for aunts,

23

1    uncles, brothers, sisters, mother and myself."
2    And this is from Mark Moss, M-O-S-S, Bellingham,
3    Washington.  It's interesting, he's moved back
4    to his reservation, huh?
5        INMATE GRAFFAGNINO:  Yes, Sir.  He's out
6    there teaching and working at the college up
7    there on the reservation.
8        PRESIDING COMMISSIONER SAWYER:  That's
9    interesting.  Now, I don't have any letters from
10   your brothers and sisters.
11       INMATE GRAFFAGNINO:  No, Sir.
12       PRESIDING COMMISSIONER SAWYER:  Okay.  One
13   sister lives in Marina.
14       INMATE GRAFFAGNINO:  That's right.
15       PRESIDING COMMISSIONER SAWYER:  How about
16   your brothers and sisters, besides Joe?
17       INMATE GRAFFAGNINO:  I've got one other
18   brother.  And I never asked him to write a
19   letter or anything like that.  He's always done
20   his own thing.  Last I heard he was an assistant
21   manager at an Olive Garden.  And I could get
22   letters from him and get help from him.  I just
23   never asked him for letters.
24       PRESIDING COMMISSIONER SAWYER:  Okay.
25   That's all I have.  Commissioner Mitchell.
26       DEPUTY COMMISSIONER MITCHELL:  Thank you.  I
27   want to correct myself on the confidential.  We

24

1    probably should discuss it whether or not

2    there's anything within it that we need to

3    consider or not.  So let's leave that as a

4    possibility.  I'm going to let you know if we're

5    going to consider any of it.

6        INMATE GRAFFAGNINO:  Yes, Sir.

7        DEPUTY COMMISSIONER MITCHELL:

8    (Indiscernible)?

9        INMATE GRAFFAGNINO:  Yes, Sir.

10       DEPUTY COMMISSIONER MITCHELL:  All right.

11   Thank you.  In my portion of the hearing, sir, I

12   reviewed your Central File, Post-Conviction

13   progress reports, the life prisoner evaluation

14   report prepared for the July 2005 calendar by

15   Correctional Counselor T., last name is spelled

16   capital M-C capital T-A-R-T-L-A-N.  Is that

17   McTartlan?

18       INMATE GRAFFAGNINO:  Yes, Sir.

19       DEPUTY COMMISSIONER MITCHELL:  Is that your

20   counselor now?

21       INMATE GRAFFAGNINO:  Yes, Sir.

22       DEPUTY COMMISSIONER MITCHELL:  Also, the

23   psychological evaluation prepared by Dr. Melvin

24   Macomber.  He's a psychologist, Ph.D.  The

25   dictation date, and I believe interview date, is

26   November 25th, 2005.  This appears to be your

27   third Subsequent Parole Consideration Hearing.

25

1    Your last hearing occurred on July 19th, 2004.

2    The Board took action and denied parole for one

3    year.  Recommendations, remain

4    disciplinary-free, and to participate in

5    self-help groups.  Is that correct, sir?

6        **INMATE GRAFFAGNINO:**  Yes, Sir.

7        **DEPUTY COMMISSIONER MITCHELL:**  I'm going to

8    refer to the disciplinary issue at this point

9    since I have it in front of me.  You've complied

10    with the Board's request.  Historically you've

11    received a total of six CDC 115 rule violation

12    reports, the last one dated July 1st, 1994.  You

13    refused a cell move at that time.  You received

14    a total of four counseling chronos, known as CDC

15    128(a)s, the last one dated March 4th, 1997 for

16    failure to follow instructions.  In looking at

17    your rule violation reports themselves, you have

18    one.  It's a 1992 for possession of another

19    inmate's property.  That was an administrative.

20    You have also one in 1992, in April, for force

21    and violence.  That was some kind of a fight

22    between you and another prisoner, on a battery,

23    is that correct?

24        **INMATE GRAFFAGNINO:**  That was force and

25    violence.  They wrote it up as a mutual combat,

26    which was reduced to horseplay.

27        **DEPUTY COMMISSIONER MITCHELL:**  Okay.  Let me

1    take a look at that, April '92.  I do not say

2    where they changed it to what you said.  They

3    may in fact have.

4        INMATE GRAFFAGNINO:  The bottom part where

5    your hand is at.

6        DEPUTY COMMISSIONER MITCHELL:  Let's take a

7    look down here.  Reduced to a division F

8    offense.  Okay.  And I agree with you.  They've

9    got the comments here as horseplay.  And they

10   left on here as a division D.  They probably

11   should have changed that D to an F.

12       INMATE GRAFFAGNINO:  Once the blue thing is

13   printed on top the only way that they change it

14   is on the bottom body part.

15       DEPUTY COMMISSIONER MITCHELL:  Okay.

16       INMATE GRAFFAGNINO:  And that's where it

17   says reduced to a division F.

18       DEPUTY COMMISSIONER MITCHELL:  Was the

19   senior hearing officer involved in that, chief

20   disciplinary officer?

21       INMATE GRAFFAGNINO:  That reduced it, yes,

22   Sir.

23       DEPUTY COMMISSIONER MITCHELL:  The associate

24   warden?

25       INMATE GRAFFAGNINO:  They all concurred with

26   it.

27       DEPUTY COMMISSIONER MITCHELL:  Okay.  You

27

1    have another 115 in 1992, October, stimulants

2    and sedatives, and that was alcohol, is that

3    correct, pruno?

4        **INMATE GRAFFAGNINO:**  Yes, Sir.

5        **DEPUTY COMMISSIONER MITCHELL:**  Okay.

6        **INMATE GRAFFAGNINO:**  And that was -- If you

7    read the body of it, my cellee had possession of

8    alcohol in the house.  But figuring this is in a

9    closed cell you are responsible for your

10   cellee's actions in prison.

11       **DEPUTY COMMISSIONER MITCHELL:**  Which is

12   true.  You always have the choice.  It may not

13   be your best choice, but you can always tell the

14   correctional officer that your buddy has some

15   pruno in the cell.

16       **INMATE GRAFFAGNINO:**  And then I become a

17   victim on the yard.

18       **DEPUTY COMMISSIONER MITCHELL:**  So that's

19   your choice, right?  But you picked up the beef

20   because it was in the house?

21       **INMATE GRAFFAGNINO:**  Yes, Sir.

22       **DEPUTY COMMISSIONER MITCHELL:**  All right.

23   And February 23rd, 1994 there was a threatening

24   staff.  Do you remember that one?

25       **INMATE GRAFFAGNINO:**  It was a verbal

26   argument.  I had the officer, he was calling me

27   by an improper name.  I told him it would be,

28

1    you know -- we got issues with it, and he took

2    it as a threat.

3        **DEPUTY COMMISSIONER MITCHELL:**  Let me see,

4    what it says here is I gave you two actually

5    direct orders to leave the office, then gave you

6    a third direct order to leave the office, but

7    again you refused at that time.  Let's see, he

8    stated Ramirez, Ramirez is the correctional

9    officer how wrote this, he quotes this and says

10   I'm going to hurt you if you don't watch it.  Do

11   you remember making that statement?

12       **INMATE GRAFFAGNINO:**  No, Sir, I don't

13   remember making that statement.

14       **DEPUTY COMMISSIONER MITCHELL:**  That's what's

15   alleged.  Do you recall that?

16       **INMATE GRAFFAGNINO:**  I haven't looked at the

17   rule violation report in a long time.

18       **DEPUTY COMMISSIONER MITCHELL:**  You might

19   look at them when you do your Olsen Review just

20   to be fresh on what the comments were, so if

21   someone asks you you'll remember.  That's what

22   he alleged.  So you were found guilty of that.

23   It was division F offense.  It was considered

24   fairly minor.  June 25th, 1994, conduct, obeying

25   orders -- rules I should say.  And July 1st,

26   1994, refusing a cell move.  Why would you

27   refuse a cell move?

29

1      **INMATE GRAFFAGNINO:**  I was in ad-seg for an

2   investigation into a fight.  And they were

3   moving me from one cell in with somebody I knew

4   I would not get along with.

5      **DEPUTY COMMISSIONER MITCHELL:**  Why?

6      **INMATE GRAFFAGNINO:**  Why, the dude was real

7   disrespectful.  His house was a constant mess.

8   And he's somebody that he just looks for fights.

9   So instead of moving in with a guy that I knew

10  I'd have problems with, it was easier to say no.

11     **DEPUTY COMMISSIONER MITCHELL:**  Did you end

12  up with a different cell?

13     **INMATE GRAFFAGNINO:**  Yes, Sir.

14     **DEPUTY COMMISSIONER MITCHELL:**  All right.

15     **INMATE GRAFFAGNINO:**  I moved to a different

16  cell with somebody else that had no problems.

17     **DEPUTY COMMISSIONER MITCHELL:**  The other

18  recommendation by the Board was to participate

19  in self-help, and apparently that was a concern

20  at last year's Panel, does that sound right to

21  you?

22     **INMATE GRAFFAGNINO:**  Yes, Sir.

23     **DEPUTY COMMISSIONER MITCHELL:**  And your

24  self-help, what I did I listed down all the

25  chronos I could find, including the ones that

26  your attorney gave me this morning as far as

27  self-help.  And it looks like the most recent is

1    dated October 5th, 2005 for Alcoholics Anonymous.

2    You have a March 2005 Alcoholics Anonymous

3    chrono.  You have a February 22nd, 2005 AA

4    chrono.  You have chronos in 2004.  There's one

5    that covers from July to December 2004.  You

6    have older ones, and let's see, from, let's see,

7    May 23rd, 2000.  This is not Alcoholics

8    Anonymous, but it's the Pleasant Valley State

9    Prison's lifer's group.

10         INMATE GRAFFAGNINO:  Yes, Sir.

11         DEPUTY COMMISSIONER MITCHELL:  Then in June

12    of 1999, April 1999, December 1998, October

13    1998, April 1998, and January 1998, you had a

14    combination.  Mostly those are Narcotics

15    Anonymous rather than the Alcoholics Anonymous,

16    but it shows the January 1998 as Alcoholics

17    Anonymous.  Does that sound right to you?

18         INMATE GRAFFAGNINO:  Yes, Sir.  I had NA

19    meetings.  They cancelled the Alcoholics

20    Anonymous because they lost the sponsor.

21         DEPUTY COMMISSIONER MITCHELL:  Okay.

22         INMATE GRAFFAGNINO:  And Narcotics Anonymous

23    was still ongoing, running, and it's pretty much

24    the same program.  So I figured I'll get that

25    program there.

26         DEPUTY COMMISSIONER MITCHELL:  Now, let's

27    talk about this last year since the Board was

31

1    concerned, how often do you attend Alcoholics

2    Anonymous meetings?

3        **INMATE GRAFFAGNINO:**  They've got it twice a

4    month.

5        **DEPUTY COMMISSIONER MITCHELL:**  Okay.  Is

6    that all that's offered to you here?

7        **INMATE GRAFFAGNINO:**  Yes.

8        **DEPUTY COMMISSIONER MITCHELL:**  And they

9    usually produce then a chrono for each class?

10       **INMATE GRAFFAGNINO:**  No, it's for each

11   quarter.

12       **DEPUTY COMMISSIONER MITCHELL:**  Each quarter.

13   All right.  At least based on your opinion,

14   could you have attended it more frequently than

15   you have?

16       **INMATE GRAFFAGNINO:**  Would I attend it more

17   frequently?

18       **DEPUTY COMMISSIONER MITCHELL:**  Could you

19   have?

20       **INMATE GRAFFAGNINO:**  Could I have?

21       **DEPUTY COMMISSIONER MITCHELL:**  Was it

22   available to you more frequently than it was?

23       **INMATE GRAFFAGNINO:**  No, Sir, it's not.

24       **DEPUTY COMMISSIONER MITCHELL:**

25   (Indiscernible) available?

26       **INMATE GRAFFAGNINO:**  Yes, Sir.

27       **DEPUTY COMMISSIONER MITCHELL:**  Okay.  Are

32

1   you at north?

2       INMATE GRAFFAGNINO:   I'm at north facility.

3       DEPUTY COMMISSIONER MITCHELL:   All right.

4   Also I noticed here there was something here

5   called outrageous math.   There's a notation or I

6   believe it's actually a chrono, February 16th,

7   2005.   What is that?

8       INMATE GRAFFAGNINO:   It's an extra

9   curricular activity program where as, you know,

10  basic math on up, you know, it's check your math

11  skills and stuff like that.

12      DEPUTY COMMISSIONER MITCHELL:   It wasn't

13  self-help?   It actually was a math type class?

14      INMATE GRAFFAGNINO:   Yeah, it was a math

15  type --

16      DEPUTY COMMISSIONER MITCHELL:   How many

17  hours?

18      INMATE GRAFFAGNINO:   It was a home study

19  type thing.   They sent the thing home and you do

20  it and send it in.

21      DEPUTY COMMISSIONER MITCHELL:   All right.

22  Going back to December of 2001, I found a

23  laudatory chrono by Correctional Officer J.

24  Eubanks.   And that chrono is the one I believe

25  that was submitted this morning.   It's December

26  1st, 2005.

27      INMATE GRAFFAGNINO:   Yes, Sir.

33

1  　　　**DEPUTY COMMISSIONER MITCHELL:**  And the

2  correctional officer assigned to the north

3  facility of this institution says he observed

4  you in the performance of your duties as the

5  unit IV clerk in the excess of three months.

6  And you performed your duties assigned

7  exceptionally well.  He consistently

8  demonstrated a willingness to utilize his

9  clerical skills to assist staff in the

10  completion of reports without complaint when

11  asked to assist by staff or assisted by staff

12  outside the scope, his current assignment.  I

13  have noted that under periods of extreme work

14  loads for the unit you demonstrate an excellent

15  work ethic by diligently assisting staff and

16  keeping up with the work load, and you've been

17  an exceptional asset to the unit operation.

18  Also, I found here that in 1993, April 1st --

19  '93, pardon me, 2003, you completed a 14-week

20  impact self-help group, is that correct?

21  　　　**INMATE GRAFFAGNINO:**  Yes, Sir.

22  　　　**DEPUTY COMMISSIONER MITCHELL:**  And that's

23  self-help to help you understand the

24  difficulties that the victims of crime see.  I

25  think they usually say it increases your

26  awareness of empathy for survivors of crime, is

27  that correct?

1    **INMATE GRAFFAGNINO:**  The impact of my crime

2    and other crimes has on the community and

3    everybody involved.

4    **DEPUTY COMMISSIONER MITCHELL:**  Okay.  Since

5    I'm talking about chronos and certificates, let

6    me just go down the laundry list of

7    certificates, and I'll group it by May, the one

8    I just mentioned.  Then going to 2001 we're

9    talking about welding.  This is all 2000, May,

10   July, May, April, May again here, April, April,

11   April, and May again.  It's all welding, all

12   forms of welding.  And these are all

13   certificates, and you completed these.  We're

14   talking about (indiscernible) arc welding, tools

15   and equipment, gas metal, arc welding, process,

16   orientation and safety, shielded metal arc

17   welding, gas tungsten, arc process, and a

18   settling process, is that correct?

19   **INMATE GRAFFAGNINO:**  Yes, Sir.

20   **DEPUTY COMMISSIONER MITCHELL:**  Kind of like

21   you should know what you're doing in welding?

22   **INMATE GRAFFAGNINO:**  Yes, Sir.  I'm a

23   certified welder.

24   **DEPUTY COMMISSIONER MITCHELL:**  All right.

25   Did you take the state certification test?

26   **INMATE GRAFFAGNINO:**  Yes, Sir.

27   **DEPUTY COMMISSIONER MITCHELL:**  All right.

35

1   IN 1998 to 1997 until the building maintenance

2   group, we're talking about one, two, three,

3   four, five, six, seven, eight, nine, ten, 11,

4   12, 13, 13 different certificates, some

5   duplicated in 1997 as well.

6        INMATE GRAFFAGNINO:  Yes, Sir.

7        DEPUTY COMMISSIONER MITCHELL:  And this is

8   for plumbing, carpentry, roofing, painting, wall

9   covering, glazing, floor coverings, mathematics

10  as it relates to building maintenance, more

11  floor coverings again, heating ventilation, air

12  conditioning, fountains, concrete, masonry,

13  electrical and shop and safety, is that correct?

14       INMATE GRAFFAGNINO:  Yes, Sir.

15       DEPUTY COMMISSIONER MITCHELL:  Going back to

16  1996, vocational landscape gardening, a

17  certificate.  I see there's three let's say

18  types of vocational trades.  When you look at

19  the building maintenance it's numerous types of

20  trades mixed in within those.

21       INMATE GRAFFAGNINO:  Yes, Sir.

22       DEPUTY COMMISSIONER MITCHELL:  Now, can you

23  tell me what your expertise is, like let's say

24  in welding there's the one certificate.  All

25  these are just in (indiscernible).  They're

26  dated June 9th.  You didn't complete all the

27  courses on one day.

1      **INMATE GRAFFAGNINO:**  No, Sir.  It was

2  over --

3      **DEPUTY COMMISSIONER MITCHELL:**  How long was

4  it?

5      **INMATE GRAFFAGNINO:**  It's a one-year course

6  if you get the full year in to be able to go

7  through oxi settling, arc, meg, the tig, the

8  healy arc, what is called the plasma cutter, and

9  then you go for the state certification.

10      **DEPUTY COMMISSIONER MITCHELL:**  In that

11  group?

12      **INMATE GRAFFAGNINO:**  Yes.

13      **DEPUTY COMMISSIONER MITCHELL:**  And that's a

14  one-year program basically?

15      **INMATE GRAFFAGNINO:**  Yeah.

16      **DEPUTY COMMISSIONER MITCHELL:**  Let's talk

17  about the building maintenance one.  It's the

18  plumbing, carpentry, roofing.  And they all have

19  the same date essentially.

20      **INMATE GRAFFAGNINO:**  Yes, Sir.

21      **DEPUTY COMMISSIONER MITCHELL:**  In 1998, and

22  then the same dates you might see in 1997 for

23  other ones.

24      **INMATE GRAFFAGNINO:**  Which is --

25      **DEPUTY COMMISSIONER MITCHELL:**

26  (Indiscernible)?

27      **INMATE GRAFFAGNINO:**  What the supervisor

37

1    does is usually he'll build up all the files,

2    and then we does the end of year chronos, or end

3    of, you know -- when he's getting ready to give

4    you a completion in the course, he does all

5    that, sends it over to the clerk.  He types up

6    all the chronos.  And then he places them into

7    the educational file.

8         **DEPUTY COMMISSIONER MITCHELL:**  What I'm

9    curious about, let's just take welding.

10        **INMATE GRAFFAGNINO:**  Right.

11        **DEPUTY COMMISSIONER MITCHELL:**  Welding in

12   the community takes more than a year to become

13   let's say a journeyman welder, or a plumber.

14        **INMATE GRAFFAGNINO:**  Right.

15        **DEPUTY COMMISSIONER MITCHELL:**  How much of

16   the year would you actually be trained in

17   plumbing?

18        **INMATE GRAFFAGNINO:**  Well, this was halfway

19   a refresher course because I also had this in

20   high school.

21        **DEPUTY COMMISSIONER MITCHELL:**  Okay.  What

22   about the carpentry?

23        **INMATE GRAFFAGNINO:**  The carpentry is

24   building maintenance.  It's pretty much a

25   beginner's to get you into an apprenticeship

26   program.

27        **DEPUTY COMMISSIONER MITCHELL:**  So you'd be

38

1    prepared for the community?

2        INMATE GRAFFAGNINO:  Yes, Sir.

3        DEPUTY COMMISSIONER MITCHELL:  So as opposed

4    to the welding, which you are certified in --

5        INMATE GRAFFAGNINO:  Right.

6        DEPUTY COMMISSIONER MITCHELL:  -- these

7    others, like floor covering, glazing, painting,

8    and roofing, that's to get you prepared to enter

9    a program for more advanced training?

10       INMATE GRAFFAGNINO:  Yes, Sir.

11       DEPUTY COMMISSIONER MITCHELL:  Or like a

12   journeyman type program?

13       INMATE GRAFFAGNINO:  Yes, for

14   apprenticeship.

15       DEPUTY COMMISSIONER MITCHELL:

16   (Indiscernible) I should say.  All right.  That

17   makes more sense.  How about the landscape

18   gardening, is that a complete program or also in

19   preparation for --

20       INMATE GRAFFAGNINO:  That's a complete

21   program, 19 months out there.  We work from soil

22   to roses, you know, plants, to tree care.  It's

23   full course.

24       DEPUTY COMMISSIONER MITCHELL:  All right.

25   Very good.  Is there anything else in vocational

26   training that I missed?

27       INMATE GRAFFAGNINO:  No, Sir.

39

1    **DEPUTY COMMISSIONER MITCHELL:**  Okay.  As far

2  as enemies and such, I noticed that you have

3  both confidential and non-confidential enemies.

4  The gang affiliation says Swordsmen member.  And

5  what is that?

6    **INMATE GRAFFAGNINO:**  That is not a gang.  It

7  was --

8    **DEPUTY COMMISSIONER MITCHELL:**  Tell me what

9  that is.

10    **INMATE GRAFFAGNINO:**  It was a Renaissance

11  club that we went to the Renaissance Fair, you

12  know, participation in the tournaments and stuff

13  like that.  It was never a gang.

14    **DEPUTY COMMISSIONER MITCHELL:**  Why do you

15  think they listed as a gang in the probation

16  report or police report?

17    **INMATE GRAFFAGNINO:**  Because the three of us

18  that were involved in this thing were all

19  members.

20    **DEPUTY COMMISSIONER MITCHELL:**  It's just on

21  here.  I didn't look up the specific reference.

22  I could.  But it came from the probation officer

23  report page eight, and I can look that up to see

24  what it says.  The counselor is going to look

25  for that.  Thank you, counselor.

26    **ATTORNEY TARDIFF:**  Yes.

27    **DEPUTY COMMISSIONER MITCHELL:**  In the POR.

40

1    **ATTORNEY TARDIFF:**  I did see something about

2    it being a Renaissance.

3    **DEPUTY COMMISSIONER MITCHELL:**  We might as

4    well clear that up.

5    **ATTORNEY TARDIFF:**  It's a Renaissance club

6    and it's not a gang or a White Supremist group

7    it goes on to state on page eight.

8    **DEPUTY COMMISSIONER MITCHELL:**  And that's in

9    the POR?

10   **ATTORNEY TARDIFF:**  Yes.

11   **DEPUTY COMMISSIONER MITCHELL:**  The

12   institution staff may have missed --

13   **ATTORNEY TARDIFF:**  They list --

14   **DEPUTY COMMISSIONER MITCHELL:**  -- as they

15   stated it.

16   **ATTORNEY TARDIFF:**  -- it as a club.

17   **DEPUTY COMMISSIONER MITCHELL:**  Okay.  And

18   just to clarify, I did find a gang status chrono

19   in your file by Lieutenant Bell at Folsom State

20   Prison, June 5th, 1991.  The lieutenant says, "I

21   reviewed the Central File in regards to his

22   current gang status.  The file does not contain

23   sufficient information to validate you as a

24   member, associate or drop out of any prison

25   gang, let's see, or street gang, neither one."

26   **INMATE GRAFFAGNINO:**  Right.

27   **DEPUTY COMMISSIONER MITCHELL:**  It looks like

41

1    there's no support for the gang (indiscernible).

2    You're currently assigned as a captain's clerk.

3         INMATE GRAFFAGNINO:  Yes, Sir.

4         DEPUTY COMMISSIONER MITCHELL:  Okay.  I see

5    that you receive exceptional ratings.  There's

6    several laudatory chronos from staff and the

7    captain.  And you've been in that assignment

8    since June of 2004.

9         INMATE GRAFFAGNINO:  Yes, Sir.

10         DEPUTY COMMISSIONER MITCHELL:  Can you type?

11         INMATE GRAFFAGNINO:  Yes, Sir.

12         DEPUTY COMMISSIONER MITCHELL:  Where did you

13    get your typing skills at?

14         INMATE GRAFFAGNINO:  In prison, Sir.

15         DEPUTY COMMISSIONER MITCHELL:  Okay.  Did

16    you take it formally or just on your own?

17         INMATE GRAFFAGNINO:  On my own.

18         DEPUTY COMMISSIONER MITCHELL:  From the

19    mental health point of view there's no

20    indication of a severe mental disorder.  There's

21    no treatment, no psychotropic medication.  The

22    psychologist report notes under the current

23    diagnostic impressions, which is under the

24    DSMIV, Axis I, no contributory clinical

25    disorder.  Axis II, no contributory

26    (indiscernible) disorder.  Axis III, no

27    contributory physical disorder.  Axis IV, life

42

1  term incarceration.  Axis V is a current Global

2  Assessment Functioning, that's a GAF score of

3  90, which is very high.  That means you

4  apparently are doing quite well within the

5  community in here.  You acquired your GED, which

6  was already mentioned, October 13th, 1993.

7      INMATE GRAFFAGNINO:  Yes, Sir.

8      DEPUTY COMMISSIONER MITCHELL:  We've already

9  covered your (indiscernible) groups.  We've

10 already covered your disciplinary issues.  We're

11 going to review the counselor's report here.

12 The counselor stated in their evaluation that

13 they no longer are supposed to give an

14 assessment of dangerousness.  They simply, in

15 their assessment, said that your parole plans

16 appear to be reasonable.  You plan to acquire

17 updated letters prior the parole consideration

18 hearing.  In the summary section the counselor

19 states that:

20         "Prior to release the prisoner

21         could benefit from remaining

22         disciplinary-free, soliciting

23         updated letters of support from

24         family members, friends and

25         potential employers in the

26         community and maintain his above

27         average to exceptional work

43

1        performance."

2    In the psychological evaluation the

3    psychologist, in addition to (indiscernible)

4    that I mentioned under assessment of

5    dangerousness, says you've been

6    disciplinary-free for the last 11 years.

7    There's no history of participation in riots,

8    possession of weapons, or assaults on others.

9    You did have a fistfight though, right?  That

10    was horseplay.

11    **INMATE GRAFFAGNINO:**  That was, yeah,

12    horseplay.  It was not --

13    **DEPUTY COMMISSIONER MITCHELL:**  You have

14    several chronos in the Central File indicating

15    that he was doing an outstanding job as a

16    captain's clerk.

17        "He's described as stable,

18        hardworking individual who is a

19        positive influence.  His potential

20        for violence is definitely below

21        average in comparison to other

22        inmates.  In considering his

23        potential for dangerous behavior if

24        released to the community at this

25        time, the last evaluator indicated

26        that his potential for dangerous

27        behavior was minimal to none.  I

44

1          agree with that assessment.  His

2          potential for violent behavior is

3          essentially nil, and is certainly

4          no greater than the average citizen

5          in the community.  There are no

6          significant risk factors in this

7          case."

8     And he concludes by this paragraph:

9          "There are no mental or emotional

10         problems in this case that would

11         interfere with granting a parole

12         date.  There are several factors

13         that would indicate a positive

14         adjustment in the community.  He

15         has very strong family support in

16         the Salinas area.  He has several

17         job offers that are current and

18         viable.  He has acquired three

19         trades in the institution.  He has

20         very high work ethics.  His

21         thinking is prosocial.  There's no

22         indication that antisocial thinking

23         or values -- He has no criminal

24         arrest record.  The prognosis for

25         successful adjustment in the

26         community is excellent."

27    Again, that's by Dr. Macomber.  Counselor, is

45

1    there anything I failed to address, that you

2    wanted to speak to, in this section of the

3    hearing?

4        **ATTORNEY TARDIFF:**  No.

5        **DEPUTY COMMISSIONER MITCHELL:**  Thank you

6    very much.  Chairman we just have about five

7    minutes or less on the tape.

8        **PRESIDING COMMISSIONER SAWYER:**  Do you want

9    to go ahead and flip it?

10       **DEPUTY COMMISSIONER MITCHELL:**  If that's

11   okay I'll turn it off and turn it over.  Thank

12   you.

13    (Thereupon, the tape was changed to side two)

14       **DEPUTY COMMISSIONER MITCHELL:**  We're back on

15   record.  This is side two.

16       **PRESIDING COMMISSIONER SAWYER:**  Thank you.

17   The counselor's report in its comments,

18   recommendations says that you have several job

19   offers that are current and viable.  What are

20   those?

21       **INMATE GRAFFAGNINO:**  I had job offers from

22   Cornett Foods, which is out in Tulare, South

23   Salinas.  I had Mountain Wood Firewood Company,

24   and A Tool Shed.  Well, A Tool Shed changed

25   ownerships.  The guy that offered me the job

26   there was my brother.  He left that place and

27   went up to Washington to work at a different

46

1    took rental place.  The firewood company was

2    seasonal, figuring he didn't have the manpower

3    to run the place up there in Salinas full time,

4    he pulled his thing down to Yuma, Arizona.  The

5    Cornett Foods is still operating and still right

6    here in Tulare, Salinas area.  And that's where

7    I was employed when I was arrested.  And they

8    said that if there's an opening when I get out

9    they will still hire me.  I did not get any

10   letters from them this time.  I did not ask them

11   for letters because they already sent -- three

12   different times they sent letters.  And I felt,

13   you know, asking them consistently for letters

14   is, you know -- was too much to ask for them.

15   So I figured, you know, when I get out I will go

16   and see Mr. Edmund, which is the guy that has

17   the job for me.

18       **PRESIDING COMMISSIONER SAWYER:**  Okay.  So

19   you may have several job offers, and they're

20   current and viable, but we don't have any --

21       **INMATE GRAFFAGNINO:**  No letters.

22       **PRESIDING COMMISSIONER SAWYER:**  --

23   indication, any documentation on that.

24       **INMATE GRAFFAGNINO:**  Right.

25       **PRESIDING COMMISSIONER SAWYER:**  All right.

26   Thank you.  Do you have any questions?

27       **DEPUTY DISTRICT ATTORNEY STORMS:**  I'll just

1    state the District Attorney's Office of Monterey

2    County that we've written a few letters over the

3    years, and I've seen that not able to attend

4    because the inmate had complied completely with

5    those letters.  And so we're very impressed with

6    that, and that he's remained disciplinary-free

7    for this time.  I was just wondering, you just

8    hit what I was wondering about, the job offers.

9    The other thing is does the inmate practice any

10   religion?

11       **INMATE GRAFFAGNINO:**  No, Sir.  I am baptized

12   Roman Catholic, but I've not attended church in

13   many, many years.

14       **DEPUTY DISTRICT ATTORNEY STORMS:**  And if he

15   was released, the inmate was released, at this

16   time on parole where does he think he would

17   actually end up living and working?

18       **INMATE GRAFFAGNINO:**  I'd be living out at

19   Lake Drive in Marina, California with my mom.

20   And most likely I would have the job at Cornett

21   Foods if a position is open.

22       **DEPUTY DISTRICT ATTORNEY STORMS:**  That's all

23   I have.

24       **PRESIDING COMMISSIONER SAWYER:**  Okay.  Thank

25   you.  Counsel, do you have any questions?

26       **ATTORNEY TARDIFF:**  I don't.

27       **PRESIDING COMMISSIONER SAWYER:**  Okay.  Would

48

1    you like to close?

2        **DEPUTY DISTRICT ATTORNEY STORMS:**   Just

3    basically reiterate the comments that I just

4    said.   I won't go through them again.   And it

5    seems like this is one of the inmates who's done

6    quite good and commendable job throughout his

7    time here at the Correctional Training Facility.

8    And I don't believe The People would have any

9    opposition to his paroling at this time.

10       **PRESIDING COMMISSIONER SAWYER:**   Okay.   Thank

11   you.   Would you like to close, Ms. Tardiff?

12       **ATTORNEY TARDIFF:**   Thank you.   In terms of

13   Mr. Graffagnino's pre-incarceration history, it

14   is supportive of release, particularly based on

15   the fact that he has absolutely no criminal

16   history either arrests or convictions.   He

17   appeared to have steady stable employment prior

18   to the commitment offense.   Since he has been

19   incarcerated he obtained two vocations.   He has

20   educationally upgraded with the GED.   His work

21   reports are above average to exceptional

22   throughout his incarceration with numerous

23   laudatory chronos from his supervisors.   His

24   psych evals, the last three, are supportive of

25   release starting in '94.   His violent potential

26   states was significantly diminished, and it's

27   likely to continue in the community.   The '99

49

1    psych eval states that his prognosis is good,

2    and that his violent potential is minimum to

3    none in the community.  Much of that was

4    reiterated in the most current '05 psych.  A lot

5    of that has been read into the record.  Just

6    briefly, there's no mental health disorders.

7    There's no indication that he has a substance

8    abuse history.  While he was drinking at the

9    time of the commitment offense, I went through

10   the documents from the time of the crime, or at

11   the time he pled out, I didn't see any

12   indication that he had a substance abuse issue

13   at that time either.  I think this is something

14   that's kind of been perpetuated and is not in

15   fact true.  But in either event, he has

16   participated in AA/NA at the request of the

17   Board.  He did do a testing procedure, which is

18   noted on page three of the most current psych

19   eval.  And it would show that he's an extremely,

20   extremely low risk score.  What it meant was

21   that if 100 inmates were inmate released on

22   parole his score would place him at above the 99

23   percentile for making a good adjustment.  So all

24   three psych evals, going back 11 years, are

25   supportive of release.  His parole plans, he

26   does have marketable skills, and he does have a

27   place to stay.  So he fulfils the requirements

50

1    for parole plans.  His last disciplinary was 11
2    years ago.  It was -- So enough time has in fact
3    passed that I believe that it should no longer
4    be used against him.  And you'll notice that all
5    those, his 115s, occurred in a two-year period.
6    I would submit that that was somewhat of an
7    adjustment period at that time.  The crime
8    itself, it was a highly situational crime as
9    noted in the most current psych eval.  It's not
10   likely to reoccur.  His set of facts were
11   extremely unique.  At the time in the probation
12   officer's report it stated that he was
13   remorseful.  He even stated that he told -- When
14   he arrived at someone's home he told them that
15   he killed a guy and was very upset.  So he's
16   always had a sense of wrongdoing in terms of
17   this commitment offense.  He pled out early on,
18   which is also another mitigating factor.  There
19   is no opposition to parole from the District
20   Attorney's Office.  I would submit that he is in
21   fact suitable for parole.  Thank you.
22       **PRESIDING COMMISSIONER SAWYER:**  Thank you.
23   This is your opportunity to tell us why you feel
24   you are suitable for parole.
25       **INMATE GRAFFAGNINO:**  Over the past 15 years
26   I have matured.  I know the circumstances of my
27   crime does not justify what I did to the guy,

51

1   the circumstances of what he was doing.  I know

2   I'm responsible for taking a man's life.  I live

3   with this every day of my life now.  This is

4   something that will never occur again.  I don't

5   drink.  I don't do drugs anymore.  I don't drink

6   anymore, do drugs anymore.  I don't plan on

7   doing anything like that again.  Attending

8   programs on the streets, AA, I already looked

9   into some of those programs, serious programs,

10  real close to where my mom lives that are

11  available to me.  I've got a big family in

12  Salinas that they all have no problem assisting

13  me again to work, a place to live, any of

14  that -- programs like that.  All I've got to say

15  is, you know, I appreciate the opportunity to

16  let me speak my case.  I know I'm not going to

17  recommit.  I know I will do when I get back out

18  on the community.  I will adjust to the

19  community, the (indiscernible), not be a burden

20  on the state.  This has been a long 15 years of,

21  you know, having to live with the knowledge that

22  I killed a guy, or assisted in killing a guy.

23  And it's something that I never will forget, and

24  will always live with it, you know.  I thank

25  you.

26      **PRESIDING COMMISSIONER SAWYER:**  Okay.

27  Great.  Thank you.  It's 9:54, and we will --

52

1          **ATTORNEY TARDIFF:**   Recess.

2          **PRESIDING COMMISSIONER SAWYER:**   -- recess.

3     Thank you.   For deliberations.

4                        **R  E  C  E  S  S**

5                           --o0o--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

53

1          **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                    **D E C I S I O N**

3          **PRESIDING COMMISSIONER SAWYER:**   The Panel

4     has reviewed all the information received from

5     the public and relied on the following

6     circumstances in concluding that the prisoner is

7     suitable for parole.  He would not pose an

8     unreasonable risk of danger to society or a

9     threat to public safety if released from prison.

10    The prisoner has no juvenile record of

11    assaulting.  He has had, up until the commitment

12    offense, has had a stable social history

13    exhibited by a reasonably stable relationship

14    with others.  He was working at the time in his

15    community.  His family is in the same community.

16    While in prison he's enhanced his ability to

17    function within the law upon release through

18    participation and education programs.  He's

19    completed his GED in 1993.  Self-help, he's been

20    regularly attending AA as he could, albeit twice

21    a month, but in the particular yard that he's in

22    he has trouble getting anymore AA than that, NA

23    and AA since 1998.  He's done two lifer's groups

24    in the year 2000.  In '03 he did the impact, the

25    14-week impact group.  Most recently has been

26    doing self-study in the area of outrageous math,

27    **S. GRAFFAGNINO     E-89844     DEC PAGE 1     12/9/05**

54

1    whatever that is.  It would be outrageous.  His

2    vocational programs have been outstanding.  He

3    receives above average to exceptional work

4    reports.  He's completed nearly all the building

5    maintenance, is that correct, sir?

6         INMATE GRAFFAGNINO:  That's right.

7         PRESIDING COMMISSIONER SAWYER:  Which is

8    about 14 different disciplines.  How many

9    different disciplines in building maintenance?

10        INMATE GRAFFAGNINO:  I lost count.  I

11   have -- You've got the main chronos of the big

12   ones.  I got like 22 of the smaller ones, which

13   is even more steps of it.  It's close to 40

14   stages.

15        PRESIDING COMMISSIONER SAWYER:  Forty.

16        DEPUTY COMMISSIONER MITCHELL:  I've got

17   about 11 separate disciplines.

18        INMATE GRAFFAGNINO:  And then you've the

19   other ones, which are smaller.

20        PRESIDING COMMISSIONER SAWYER:  Well, and

21   quite impressive.  I'm not going to read them

22   all, but they're quite impressive, all the

23   different disciplines within that building

24   maintenance program that he's been involved in.

25   And as well as landscape maintenance.  And

26   probably the most impressive, which gives you a

27   S. GRAFFAGNINO    E-89844    DEC PAGE 2    12/9/05

55

1    marketable skill, which far outweighs your lack

2    of letters for your job offers, is your welding.

3    You're a certified welder.

4         INMATE GRAFFAGNINO:  Yes, Sir.

5         PRESIDING COMMISSIONER SAWYER:  And in this

6    community, throughout this entire community,

7    this agriculture community that we're in, that's

8    certainly a marketable skill.

9         INMATE GRAFFAGNINO:  Yes, Sir.

10        PRESIDING COMMISSIONER SAWYER:  Because it's

11   not just welding.  It's different disciplines

12   within the welding area, and you're certified in

13   that, which certainly makes you very marketable

14   year round marketing, because there is a lot of

15   seasonal work around here.

16        INMATE GRAFFAGNINO:  Yes, Sir.

17        PRESIDING COMMISSIONER SAWYER:  And I'm sure

18   Cornett has seasonal work, as you came -- when

19   you were working there you were a boxer.  Were

20   you a boxer?

21        INMATE GRAFFAGNINO:  What's called forklift

22   driver.

23        PRESIDING COMMISSIONER SAWYER:  And a

24   forklift driver.  When the work wasn't here then

25   you didn't work, right?

26        INMATE GRAFFAGNINO:  I went onto the

27   S. GRAFFAGNINO    E-89844    DEC PAGE 3    12/9/05

56

1   maintenance area when seasonal, five months,

2   that they went down to Yuma.

3       **PRESIDING COMMISSIONER SAWYER:**  But I think

4   you've got some -- You've really taken advantage

5   of the vocational programs in the institution.

6   And your institutional job assignment currently

7   is working as a captain's clerk, and you've

8   received some -- you've received some laudatory

9   chronos for your work and your assisting staff,

10  and recently as this year from Officer Eubanks,

11  which I understand doesn't give out a lot of

12  chronos.

13      **INMATE GRAFFAGNINO:**  Yes, Sir.

14      **PRESIDING COMMISSIONER SAWYER:**  You lack any

15  criminal history of violent crime.  You have no

16  criminal history, not only your juvenile, but

17  your adult criminal history, albeit this crime

18  occurred when you were 21 years old.  You were

19  only technically an adult for three years, but

20  you didn't have any criminal history.  Because

21  of your maturation, growth and greater

22  understanding we feel that that has reduced the

23  probability of recidivism.  You have realistic

24  parole plans.  Again, to reiterate that you have

25  a very marketable -- have marketable skills,

26  more than one, and your family support.  You

27  **S. GRAFFAGNINO    E-89844    DEC PAGE 4    12/9/05**

1  have an invalid mother who probably could use

2  your help.  You have a sister who's becoming of

3  age, and they have -- they live in Marina, which

4  is in Monterey County and, again, close to

5  places that you could be working --

6      INMATE GRAFFAGNINO:  Yes, Sir.

7      PRESIDING COMMISSIONER SAWYER:  -- with your

8  marketable skills.  You have maintained close

9  family ties while in prison.  I read some

10  letters from your family.  They're all very

11  supportive, as well as the letter from your

12  mother and step-father who indicate they would

13  help you any way they can, including housing and

14  transportation.  You maintained positive

15  institutional behavior for the last 11 years.

16      INMATE GRAFFAGNINO:  Yes, Sir.

17      PRESIDING COMMISSIONER SAWYER:  And that

18  indicates significant self-control, because it's

19  not -- that there was a period of adjustment

20  that you went through in 1992 and '94, or as

21  your attorney says a period of adjustment, where

22  you get yourself into some problems and some

23  trouble.  But the last one being 7/1 of '94,

24  last 115.  And you've had (indiscernible) of

25  four 128s.  Your 115s, there was six of those

26  total, and none in this institution.

27  S. GRAFFAGNINO    E-89844    DEC PAGE 5    12/9/05

58

1        INMATE GRAFFAGNINO:  Yes, Sir.

2        PRESIDING COMMISSIONER SAWYER:  Okay.  You

3    have indicated to us -- You readily talked about

4    the offense.  You talked about the offense.  We

5    appreciate that.  Instead of me reading your

6    version, you gave your version, which is

7    consistent with the -- which was consistent with

8    the crime, and you kept the same story

9    throughout.  The crime itself was horrendous.

10   You took a life of a 22-year-old man, Mr. Jose

11   Gonzalez.  No matter what he was doing there was

12   other remedies.  There was other things -- other

13   ways to handle that.  There's no question about

14   that.

15       INMATE GRAFFAGNINO:  Yes, Sir.

16       PRESIDING COMMISSIONER SAWYER:  And I think

17   you probably see that now.  You had mitigated

18   the problem.  You had take the girl away from

19   where, or she got away from him.

20       INMATE GRAFFAGNINO:  Yes, Sir.

21       PRESIDING COMMISSIONER SAWYER:  So the

22   problem was over.  You didn't need to take the

23   law into your own hands, you and your brother,

24   and your crime partner.  But you did show signs

25   of remorse.  You indicate you understand the

26   magnitude of this offense.  And probably very

27   S. GRAFFAGNINO    E-89844    DEC PAGE 6    12/9/05

59

1   importantly it appears that you have real good

2   insight into this by accepting responsibility

3   for this criminal behavior and your desire to

4   change towards good citizenship.

5       **INMATE GRAFFAGNINO:**  Yes, Sir.

6       **PRESIDING COMMISSIONER SAWYER:**  Psychiatric

7   factors, we have a psychologist report dated

8   11/25 of '05.  It's very -- It can't get any

9   fresher than that, authored by Dr. M. Macomber,

10  M-A-C-O-M-B-E-R, Ph.D., at this institution.

11  And in considering your potential for dangerous

12  behavior in the institution, it shows that

13  you've been free from disciplinaries for the

14  last 11 years.  The force and violence in 1992,

15  force and violence 115 you received has been

16  reduced to horseplay.  You've made an excellent

17  institutional adjustment.  No history of

18  participation in riots, possession of weapons or

19  assaults on others.  You had several chronos in

20  your Central File indicating you do an

21  outstanding job as a captain's clerk.  You're

22  described as a stable, hardworking individual

23  who has a positive influence.  Your potential

24  for violence is definitely below average in

25  comparison to other inmates.  And in considering

26  your potential for violence if released to the

27  **S. GRAFFAGNINO     E-89844     DEC PAGE 7     12/9/05**

1   community, the last evaluator indicated that

2   your potential was minimal to none.

3   Dr. Macomber would agree with that assessment.

4   His potential for a violent behavior is

5   essentially nil, and it's certainly no greater

6   than the average citizen in the community.

7   There's no significant risk factors in this case

8   according to Dr. Macomber.  Also, we did note --

9   Commissioner Mitchell did note that we were

10  going to look into the confidential file, which

11  we did.

12      **INMATE GRAFFAGNINO:**  Yes, Sir.

13      **PRESIDING COMMISSIONER SAWYER:**  We reviewed

14  the confidential file.  We did not use any

15  information from the confidential file.  That's

16  for the record.  The base term of confinement,

17  the base life offense, which the prisoner has

18  been convicted is murder in the second degree,

19  PC 187.  The offense occurred on 10/8 of 1990.

20  The term is derived from the matrix located in

21  the California Code of Regulations Title XV at

22  C3, C is severe trauma, death resulted from

23  severe trauma inflicted with deadly intensity,

24  stabbing in this case.  And the three is no

25  prior relationship.  The victim had no personal

26  relationship with the prisoner or motivation

27  **S. GRAFFAGNINO    E-89844    DEC PAGE 8    12/9/05**

61

1    (indiscernible) resulting in the death

2    (indiscernible) of another crime.  That would be

3    assault with great bodily injury, and the death

4    resulted from that, the crime taking place.  The

5    Panel assessed 240 months.  We used the middle

6    term, and that is 20 years.  And that broken

7    down is 240 months.  Post-Conviction credits,

8    you receive credit for every year that you are

9    discipline free.  You receive four months of

10   good time.

11       **INMATE GRAFFAGNINO:**  Yes, Sir.

12       **PRESIDING COMMISSIONER SAWYER:**  Okay.  So

13   you have 48 months calculates out to 12 years.

14   Forty-eight months of good time, subtracted from

15   240 is 192 months.  That is your date.  Okay.

16   And you can figure that -- We figured it out as

17   to --

18       **DEPUTY COMMISSIONER MITCHELL:**  Actually 192.

19   I put down the wrong there, so that's two.  So

20   it comes out to about 16 years and two months of

21   total time to serve.  And I calculate you have

22   14 years, five months and 16 days in custody as

23   of today.

24       **PRESIDING COMMISSIONER SAWYER:**  You've still

25   got some time to serve.

26       **DEPUTY COMMISSIONER MITCHELL:**  About a year

27   **S. GRAFFAGNINO    E-89844    DEC PAGE 9    12/9/05**

62

1   and a half.

2       PRESIDING COMMISSIONER SAWYER:   Okay.   Upon

3   your release you'll receive -- there are special

4   conditions that will be placed upon you.   You do

5   not use alcoholic beverages.   And while we can't

6   -- And we're going to load you up here.   Okay.

7   Submit to alcohol testing, submit to

8   anti-narcotic testing, submit to THC testing.

9   That's marijuana.

10      INMATE GRAFFAGNINO:   Yes, Sir.

11      PRESIDING COMMISSIONER SAWYER:   Participate

12  in a substance abuse program.   Okay.   So you

13  need to start tuning up where you're going to be

14  going to NA or AA on the outside.   Start working

15  on getting a sponsor and start making a move in

16  that direction.   And you'll also be required to

17  attend a parole outpatient clinic, and they'll

18  do an analysis to see whether you need any

19  further treatment or any other special

20  conditions that parole may place on you on the

21  outside.   Okay.   Here's your copy.   You also

22  realize that this has to go before a Decision

23  Review Unit?

24      INMATE GRAFFAGNINO:   Yes, Sir.

25      PRESIDING COMMISSIONER SAWYER:   And can be

26  reviewed by the entire Board.   And it also goes

27  S. GRAFFAGNINO    E-89844    DEC PAGE 10    12/9/05

63

1    to the Governor.

2        INMATE GRAFFAGNINO:  Yes, Sir.

3        PRESIDING COMMISSIONER SAWYER:  For his --

4    He can reverse this decision if he doesn't feel

5    that it was correct in this.  So there's still

6    some time.  And our advice to you would be to

7    keep this under your hat.

8        INMATE GRAFFAGNINO:  Yes, Sir.

9        PRESIDING COMMISSIONER SAWYER:  So nobody

10    gets jealous and nobody gets you in trouble,

11    because we also indicate here that you have --

12    that your behavior while still in prison will be

13    no more 115s or 128s.  Earn the positive

14    chronos.  Continue your self-help, particularly

15    AA/NA.

16        INMATE GRAFFAGNINO:  Yes, Sir.

17        PRESIDING COMMISSIONER SAWYER:  Any other

18    classes you can -- any other self-help you can

19    get would be to your benefit, and remain

20    discipline free.  Okay.

21        INMATE GRAFFAGNINO:  Yes, Sir.

22        DEPUTY COMMISSIONER MITCHELL:  Just a

23    question for you, the victim's family, do they

24    live in the area that you're going to parole to?

25        INMATE GRAFFAGNINO:  No, Sir.  They're on

26    (indiscernible) Country of Mexico.

27    S. GRAFFAGNINO    E-89844    DEC PAGE 11    12/9/05

64

1    **ATTORNEY TARDIFF:** Yeah. It's noted in --

2    **DEPUTY COMMISSIONER MITCHELL:**

3    (Indiscernible) around all that?

4    **INMATE GRAFFAGNINO:** No.

5    **ATTORNEY TARDIFF:** No. And the probation

6    reports say that the family came up from

7    Mexico --

8    **DEPUTY COMMISSIONER MITCHELL:** All right.

9    **ATTORNEY TARDIFF:** -- after the death of the

10    victim.

11    **DEPUTY DISTRICT ATTORNEY STORMS:** They've

12    never made an impact statement to our office.

13    They've never registered, and they've never

14    shown any interest whatsoever in this case.

15    **DEPUTY COMMISSIONER MITCHELL:** My assumption

16    you won't run into them. But if you were to run

17    into somehow a member of the family, just think

18    about what you're going to do to respond.

19    **INMATE GRAFFAGNINO:** Yes, Sir.

20    **DEPUTY COMMISSIONER MITCHELL:** Talk to your

21    parole agent. That's the first thing you've got

22    to do.

23    **INMATE GRAFFAGNINO:** Yes, Sir.

24    **DEPUTY COMMISSIONER MITCHELL:** Stay away

25    from them. Thank you. Good luck to you.

26    **PRESIDING COMMISSIONER SAWYER:** Good luck to

27    **S. GRAFFAGNINO    E-89844    DEC PAGE 12    12/9/05**

65

1    you, sir.

2         **INMATE GRAFFAGNINO:**   I thank you guys.

3         **PRESIDING COMMISSIONER SAWYER:**   That

4    concludes this hearing.   It's 10:30.

5                        **--o0o--**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   **PAROLE GRANTED**

24   **THIS DECISION WILL BE FINAL ON:** <u>Apr. 8, 2006</u>

25   **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26   **DATE, THE DECISION IS MODIFIED.**

27   **S. GRAFFAGNINO    E-89844    DEC PAGE 13    12/9/05**

66

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, CONNIE MASTIN, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 65, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of SALVATORE GRAFFAGNINO, CDC No. E-89844 on DECEMBER 9, 2005, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated DECEMBER 28, 2005, at Sacramento County, California.

*Connie Mastin*

Connie Mastin
Transcriber
**PETERS SHORTHAND REPORTING**