# EXHIBIT 7

IN THE COURT OF APPEALS OF THE STATE OF CALIFORNIA
SIXTH APPELLATE COURT

| | | |
|---|---|---|
| In re Salvatore Graffagnino | ) | Case No. |
| Petitioner, | ) | |
| | ) | (Monterey County Sup. Court |
| On Habeas Corpus | ) | No. HC 5446) |

---

## PETITION FOR WRIT OF HABEAS CORPUS

---

Petitioner, In Pro Per

Salvatore Graffagnino
E-89844
P. O. Box 705, WA-306L
Soledad, CA 93960-0705

**TABLE OF CONTENTS**

Table of Authorities.........................................ii

Petition for Writ Of Habeas Corpus..........................1

Verification................................................8

Memorandum and Points of Authorities........................9

Table of Attachments.......................................23

Proof of Service...................................Last Page

i

TABLE OF AUTHORITIES

CASES

In re Danneberg (2005) 34 Cal.App.4th 1061
In re Fain (1983) 139 Cal.App.3d 295
In re McClendon (2003) 113 Cal.App.4th 315
In re Morrall (2002) 102 Cal.App.4th 280
In re Ramirez (2001) 94 Cal.App.4th 549
In re Rosenkrantz (2002) 29 Cal.4th 616
In re Smith (2003) 109 Cal.App.4th 489
In re Smith (2003) 114 Cal.App.4th 366
In re Scott (2004) 119 Cal.App.4th 871
In re Scott (2005) 133 Cal.App.4th 573
In re Van Houten (2004) 116 Cal.App.4th 339

People v. Davis (1969) 270 Cal.App.2d 841
People v. Johnson (1999) 80 Cal.App.4th 1429
People v. Mendoza (2000) 24 Cal.App.4th 130
People v. Overton (1961) 190 Cal.App.2d 369

Barnes v. United States, 412 U.S. 837 (1973)
Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003)
Irons v. Warden of Cal. State Prison-Solano, (N.D. Cal. 2004)
    358 F.Supp.2d 936
Leary v. United States, 395 U.S. 6
McQuillion v. Duncan, 306 F.3d 895 (9th Cir 2002)
McQuillion v. Duncan, 342 F.3d 1012 (9th Cir. 2003)
Superintendent v. Hill, 472 U.S. 445 (1985)

STATUTES

Penal Code
    § 187
    § 189
    § 3041
    § 3041, subd. (a)

CONSTITUTIONS

United States Constitution
    Amendments
        Fifth
        Sixth
        Fourteenth

California Constitution
    Article V, sec. 8 (b)

**MISCELLANEOUS**

California Code of Regulations
    Title 15
        § 2400
        § 2402, subd. (a)
        § 2402, subd. (b)
        § 2402, subd. (c)(1)(A)-(E)
        § 2402, subd. (d)


CALJIC
    No. 8.11.

1  Salvatore Graffagnino, E-89844
   P. O. Box 705, WA-306L
2  Soledad, CA 93960-0705

3  Petitioner, In Pro Per

4

5

6

7

8

9

10        IN THE COURT OF APPEALS OF THE STATE OF CALIFORNIA

11                   SIXTH APPELLATE DISTRICT

12

13

14  _____ )
                                     )
15  In re                            )
                                     )        Case No.
16        Salvatore Graffagnino      )
                                     )        (Monterey County Sup. Court
17           On Habeas Corpus        )        No. HC 5446)
    _____ )

18

19

20             PETITION FOR WRIT OF HABEAS CORPUS

21      Petitioner, Salvatore Graffagnino, in pro per, petitions

22  for a Writ of Habeas Corpus, and by this verified petition

23  states as follow:

24                            I

25                       INTRODUCTION

26      1.   Thirty-seven-year-old life prisoner Salvatore

27  Graffagnino seeks a writ of habeas corpus on the grounds that:

28  1) petitioner was denied the due process mandated under state

                            1

1 || and federal law because the Governor's reversal was not

2 || supported by some evidence that petitioner's offense was

3 || particularly egregious; 2) the Governor failed to demonstrate

4 || petitioner's current level of dangerousness or that he is

5 || currently a threat to public safety; and 3) the Governor relied

6 || on unchanging factors to reverse petitioner's parole release

7 || date.   On these grounds, petitioner seeks a writ ordering his

8 || immediate release.

9 ||                              II

10 ||      2.   This petition is addressed to this court's jurisdiction

11 || in the second instance and based on the material herein and the

12 || full record that was before the Superior Court of Monterey

13 || County, Case No. HC 5446.   (Attachment One, Petition for Writ of

14 || Habeas Corpus and Attachment Two, Order Denying Petition for

15 || Writ of Habeas Corpus.)

16 ||                              III

17 ||      3.   Petitioner would incorporate the grounds, claims, facts

18 || and legal arguments in the attached petition and memorandum of

19 || points and authorities by reference herein.

20 ||                              IV

21 ||                            **PARTIES**

22 ||      4.   Petitioner Salvatore Graffagnino is a prisoner of the

23 || State of California, incarcerated by the Department of

24 || Corrections and Rehabilitation at the Correctional Training

25 || Facility in Monterey County.

26 ||      5.   Respondent Ben Curry is the Warden of the Correctional

27 || Training Facility in Soledad, California.

28 ||

1      6.   Respondent Arnold Schwarzenegger is the Governor of the

2  State of California and is invested with the authority to review

3  and reverse indeterminate sentence parole release decisions of

4  the Board of Parole Hearing pursuant to Penal Code section

5  3041.2.

6                            **V**

7                  **STATEMENT OF THE CASE**

8      7.  On March 14, 1991, petitioner was sentenced to a term

9  of 15 years-to-life in prison, following a plea bargain of

10  second degree murder.  (Attachment Three, Abstract of

11  Judgement.)

12      8.  Petitioner became eligible for parole in 2000 and was

13  first considered for parole in 1999.  As of 2005, his case had

14  been reviewed by the Board of Prison Terms [now Board of Parole

15  Hearings] (hereinafter Board) four times.

16      9.  On December 9, 2005, the Board conducted petitioner's

17  fourth parole suitability hearing and found petitioner suitable

18  for parole.  The Board established petitioner's term at 20

19  years. (Attachment One, Exhibit 2, Subsequent Parole

20  Consideration Hearing Transcript [hereinafter HT], p. 61, L

21  4:6.)

22      10.  The case was then sent to Governor Schwarzenegger for

23  review pursuant to Penal Code section 3041.2.  On May 3, 2006,

24  the Governor reversed the grant of parole, finding that

25  petitioner's offense was particularly egregious and that the

26  gravity of the crime outweighed the positive case factors.

27  (Attachment One, Exhibit 1, Governor's Indeterminate Sentence

28

1  Parole Release Review [hereinafter Review], p. 2.)  The Governor

2  cited the following facts:

3      "[T]he second-degree murder for which Mr. Graffagnino was
    convicted was especially grave because the victim, who was

4      in his car at the time of the attack and outnumbered three
    to one, was especially vulnerable and the manner in which

5      he was killed was exceedingly brutal.  Each of Mr.
    Gonzalez's three attackers was armed, Mr. Graffagnino and

6      his brother with knives and Mr. Altemeyer with a bicycle
    fork.  According to the probation report, the autopsy

7      concluded that 'most of the wounds appeared to be defensive
    wounds caused by hacking or slashing with an elongated

8      sharp object.'  The same reference noted the wounds as
    being 'a 7 inch long cut across the neck ... a stab wound

9      on the left side of the chest below the armpit and deep
    cuts to the left arm, cuts on both hands, cuts to the mid-

10      thigh and lower left leg, and wounds in the area of the
    penis.'  Furthermore, Mr. Graffagnino's own description of

11      the offense, based on statements contained in the probation
    report by friends who saw him shortly after the crime –

12      that his brother 'stuck the knife in the guy's neck and
    then ripped it out sideways and ... had buried his knife up

13      to the handle when he had stabbed the victim, having
    difficulty removing it because Altemeyer was busy hitting

14      the victim in the head with the bicycle forks and kicking
    him' – demonstrates not only the extreme brutality of this

15      murder but also the extreme callousness with which it was
    carried out." (Id., p. 2.)

16

17      The Governor states that this factor alone was sufficient

18  for him to conclude presently that petitioner's release from

19  prison would pose an unreasonable public-safety risk.

20      The Governor concluded:

21      "Now age 36, after approximately 15 years in prison, Mr.
    Graffagnino has made some encouraging gains.  But given the

22      current record before me and after carefully considering
    the very same factors the Board must consider, I find the

23      gravity of the murder committed by Mr. Graffagnino
    presently outweighs the positive factors tending to support

24      his parole suitability." (Id. pp. 2 and 3.)

25  VI

26  **STATEMENT OF FACTS**

27  Petitioner's Commitment Offense

28

4

1        11.   A version of the circumstances of the commitment

2   offense taken from the July 2005 Board report was read into the

3   record at petitioner's 2005 suitability hearing.   On the evening

4   of October 7, 1990, petitioner, his brother Joe, Chuck

5   Altemeyer, and two girls were in a strawberry field when a girl

6   came running towards them yelling for help.   The girl stated

7   that a guy had just tried to rape her.   As the girl approached

8   petitioner's group, the alleged rapist drove towards them.

9   Petitioner then drove his vehicle forwards and blocked the

10  victim's vehicle from fleeing.   The victim exited his vehicle as

11  petitioner, his brother Joe and friend Chuck approached.   A

12  physical altercation ensued during which the victim was stabbed

13  by both petitioner and his brother, while Altemeyer was hitting

14  and kicking the victim.   The group then left the victim lying on

15  the ground and left the area.   Petitioner later returned to the

16  scene with another friend, Donny Blaylock.   My. Blaylock went to

17  the vehicle, where the victim was sitting in the driver's seat,

18  and removed the victim's wallet.   Mr. Blaylock returned to where

19  the petitioner was waiting and stated that the victim was alive.

20  Mr. Blaylock later telephoned 911.   The victim was transported

21  to the hospital where he died three days later.   (Attachment

22  One, Exhibit 2, HT, p. 6: L 10:27, to p. 10, L 1:25)

23       12.   Forensic evidence indicated that Mr. Gonzalez died as

24  a result of anoxic, brain damage due to loss of blood caused by

25  the stab wounds.

26  **Petitioner's Pre-Prison History and Subsequent In-Prison**

27  **Behavior**

28

5

1     13.   The Governor found that petitioner had no other

2   documented criminal history.  As the hearing further showed,

3   petitioner has had, up until the committed offense, a stable

4   social history exhibited by a reasonably stable relationship

5   with others.  (Attachment One, Exhibit 2, HT, p. 53, L 11:15.)

6     14.  The Governor found that petitioner had worked to

7   enhance his ability to function within the law upon his release.

8   The Governor also noted that petitioner had earned his GED,

9   participated in self-help and therapy, including Alcoholics

10  Anonymous, Narcotics Anonymous, Lifer's Group, the Impact

11  Program and had received favorable reports from correctional and

12  mental-health professionals. (Attachment One, Exhibit 1, pp. 1

13  and 2.)

14                            VII

15                        CONTENTIONS

16  I.    THE GOVERNOR'S REVERSAL VIOLATED DUE PROCESS BECAUSE IT WAS
          NOT SUPPORTED BY SOME EVIDENCE THAT PETITIONER'S OFFENSE
17        WAS PARTICULARLY EGREGIOUS

18  II.   THE GOVERNOR REVERSED THE GRANT OF PAROLE WITHOUT
          DEMONSTRATING PETITIONER'S CURRENT LEVEL OF DANGEROUSNESS
19        OR THAT HE IS CURRENTLY A THREAT TO PUBLIC SAFETY

20  III.  THE GOVERNOR RELIED ON UNCHANGING FACTORS TO REVERSE
          PETITIONER'S PAROLE RELEASE DATE
21

22  IV.   THE APPROPRIATE REMEDY FOR THESE VIOLATIONS IS AN ORDER FOR
          PETITIONER'S RELEASE, WITHOUT REMAND TO THE GOVERNOR
23

24                            VIII

25                      PRAYER FOR RELIEF

26     WHEREFORE petitioner Salvatore Graffagnino prays that this

27  court:

28

                              6

1        1.   Declare the rights of the parties and issue an order

2    granting the petition for writ of habeas corpus;

3        2.  Order his immediate release on parole; and

4        3.  Issue any other relief the Court deems proper.

5    DATE:   November 30, 2006                    Respectfully submitted,

6

7                                                Salvatore Graffagnino
                                                 Petitioner, In Pro Per

8    ///

9    ///

10   ///

11   ///

12   ///

13   ///

14   ///

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

7

### VERIFICATION

I, Salvatore Graffagnino, state:

I am the petitioner in this action. I have read the foregoing petition for writ of habeas corpus and the facts stated therein are true of my own knowledge, except as to matters that are therein stated on my own information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at Soledad, California on November 30, 2006.

Salvatore Graffagnino
Petitioner

8

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

I

3

### THE GOVERNOR'S REVERSAL VIOLATES DUE PROCESS BECAUSE IT WAS NOT SUPPORTED BY SOME EVIDENCE THAT PETITIONER'S OFFENSE WAS PARTICULARLY EGREGIOUS

4

5

**A.    The Governor's discretion is subject to due process limits.**

6

7    Although the Governor is invested with authority to review

8  and reverse a parole suitability decision, that authority is

9  subject to mandates of due process, as well as statutory and

10  regulatory boundaries.  The California Supreme Court has

11  recognized that the California Constitution's due process

12  requirements place limits on the Governor's discretionary

13  authority.  (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 660; Cal.

14  Const., Art. V, § 8, subd. (b).)  The federal constitutional

15  guarantee of due process also protects a life prisoner's liberty

16  interest in parole.  (*Biggs v. Terhune,* 334 F.3d 910, 914-915

17  (9th Cir. 2003); *McQuillion v. Duncan,* 306 F.3d 895, 903-904

18  (9th Cir. 2002); U.S. Const., Fifth and Fourteenth Amends.)  To

19  satisfy due process, the Governor may not abuse his discretion

20  by acting arbitrarily and capriciously and his conclusions must

21  be supported by "some evidence."  (*Rosenkrantz,* at pp. 664-665;

22  *McQuillion,* at p. 904.)  Discretion is also abused and due

23  process denied when a parole conclusion has no rational

24  relationship to the facts on which it is purportedly based.

25  (See *Rosenkrantz* at pp. 657-658; *People v. Mendoza* (2000) 24

26  Cal.4th 130, 180, citing *Barnes v. United States,* 412 U.S. 837,

27  841-843 (1973); see also *Leary v. United States,* 395 U.S. 6,

28  36.)

9

1    In addition to constitutional due process limitations,

2  state law sets specific limits on the Governor's discretion to

3  deny or reverse a grant of parole. "[T]he legislature has

4  clearly expressed its intent that when murderers – who are the

5  great majority of inmates serving indeterminate life sentences –

6  approach their minimum eligible parole date, the Board 'shall

7  normally set a parole release date.'" (*In re Rosenkrantz,*

8  *supra,* 29 Cal.4th at pp. 569-570; Pen. Code § 3041, subd. (a).)

9  Thus, parole applicants have "an expectation that they will be

10  granted parole unless the Board finds, in the exercise of its

11  discretion, that they are unsuitable for parole in the light of

12  the circumstances specified by statute and by regulations."

13  (*Rosenkrantz* at p. 654.)   The same considerations limit the

14  Governor's review of a life parole decision.  (*Id.* at pp. 659-

15  660.)  A prisoner is thus entitled to have his parole

16  application "duly considered" based upon an individualized

17  consideration of all relevant factors.  (*Rosenkrantz* at p. 655.)

18  Ultimately, an inmate may be found unsuitable for and denied

19  parole only if the inmate "will pose an unreasonable risk of

20  danger to society if released from prison."  (California Code of

21  Regulations [hereinafter CCR], tit. 15, § 2402, subd. (a).)

22  Accordingly, the Governor's decision in this case must be set

23  aside because the Governor failed to point to any evidence

24  demonstrating that petitioner *currently* presents an unreasonable

25  risk of danger to society – the ultimate issue in determining

26  petitioner's suitability for parole.  (Cal. Code Regs., tit. 15,

27  § 2402, subd. (a).)

28

10

1   **B. There is not "some evidence" that petitioner's.
    crime was "particularly egregious."**

2

3       The Governor's decision violates the legal requirement that

4   parole must be granted except in the most egregious cases.   Our

5   parole laws require a distinction between most second degree

6   murders – for which parole must normally be granted – and those

7   crimes that are especially egregious, to ensure that parole is

8   denied for only the most heinous offenses.   (Pen. Code § 3041;

9   *In re Ramirez* (2001) 94 Cal.App.4th 549; *In re Rosenkrantz,*

10  *supra,* 29 Cal.4th at p. 683; see also *In re Morrall* (2002) 102

11  Cal.App.4th 280, 301 ["it would be contrary to the statutory

12  scheme to deny parole simply because the commitment offense was

13  murder"].)   Thus, a prisoner's offense is sufficient to justify

14  a parole denial only if the prisoner committed the offense in an

15  "especially heinous, atrocious or cruel manner."   (*Rosenkrantz*

16  at p. 678; *In re Smith* (2003) 109 Cal.App.4th 489, 506; CCR, §

17  2402, subd. (c)(1).)

18      The Governor's decision to deny petitioner parole was based

19  on the nature of the committed offense.   The Governor reiterated

20  some facts of the case and concluded that the offense was

21  especially grave because Mr. Gonzalez was stabbed multiple times

22  while still in his car. (Attachment One, Review, p. 2.)

23  However, the facts of the case do not support this

24  characterization of the offense.   The Governor's reversal is

25  contradicted by a statement from a witness contained in the

26  Probation Officer's Report [hereinafter POR], "When the victim

27  drove his vehicle towards them, Sal [petitioner] pushed him off

28  into the field and Sal and Chuck jumped out of the car.   Chuck

11

1  punched him and Sal was stabbing him.  Joe came up behind and
2  stabbed him." (Attachment One, Exhibit 3, POR, p. 5, L 13:14.)
3      There is no evidence to support any finding that
4  petitioner's offense was particularly egregious as defined by
5  the Boards regulations. (CCR, § 2402 (c)(1)(A)-(E).)  The record
6  establishes that petitioner stabbed Mr. Gonzalez in the course
7  of a physical altercation.  (Attachment One, Exhibit 2, HT, pp.
8  11, 12, and 13, L 1:27.)  There is no basis to doubt
9  petitioner's version of events as it is supported by the POR.
10  Nor does this case include any of the specific regulatory
11  factors that would support a finding that an offense was
12  especially heinous, atrocious, or cruel: multiple victims were
13  not attacked; this was not a pre-meditated murder; the victim
14  was not abused or mutilated; there is no evidence of a callous
15  disregard for the victim's suffering; and the motive – reacting
16  to an attempted rape – is no more trivial than any other motive
17  for an unlawful killing found to be a murder.  (See CCR, § 2402,
18  subd. (c)(1)(A)-(E).)  The record therefore cannot support a
19  finding that there is "some evidence" that this crime was
20  committed in a *particularly egregious* manner such that
21  petitioner requires a more lengthy period of confinement than
22  prescribed for most second degree murders.
23      Petitioner's crime may not be considered in isolation, but
24  must be considered in relation to other second degree murders.
25  For example, in a recent case, a Court of Appeal examined the
26  factual record and found that the evidence did not support a
27  finding that the crime was committed in a more aggravated or
28  violent manner, or for a materially less significant motive,

12

1  than that ordinarily shown in the commission of second degree

2  murder.  (*In re Scott* (2004) 119 Cal.App.4th 871, 887-896.)

3  Conversely, those cases upholding denials of parole based on the

4  commitment offense have contained evidence of extraordinary

5  factors such as gratuitous cruelty, infliction of prolonged pain

6  or torture. (*In re Van Houten* (2004), 116 Cal.App.4th 339, 351)

7  or premeditation and deliberation (*Rosenkrantz* at p. 678;

8  *Morrall* at 285; *In re McClendon* (2003) 113 Cal.App.4th 315, 319-

9  320 (2003).)  The Governor would have been hard-pressed to

10 demonstrate how this crime was committed in an *especially* cruel

11 manner with reference to the crime discussed in *Rosenkrantz,*

12 *Morrall,* or any other second-degree murders – and it is

13 undisputed that he did not even try.  Since the Governor denied

14 petitioner's parole on the basis of the crime the decision

15 violated due process, as there could be no basis for a finding

16 that this crime was *particularly* egregious.

17                                  II

18          **THE GOVERNOR REVERSED THE GRANT OF PAROLE WITHOUT**
            **DEMONSTRATING PETITIONER'S CURRENT LEVEL OF DANGEROUSNESS**
19            **OR THAT HE IS CURRENTLY A THREAT TO PUBLIC SAFETY**

20      For the Governor to revoke a grant of parole, he must

21 provide relevant, reliable evidence that the potential parolee

22 poses a current unreasonable threat to public safety.  This

23 evidence must be drawn from an individualized analysis of

24 fifteen factors identified by the Legislature.  (CCR, § 2402 (c)

25 and (d); *Rosenkrantz* at pp. 653-654.)  These factors include:

26 whether the commitment offense was "especially heinous,

27 atrocious or cruel," motive (trivial vs. resulting from

28 significant stress), previous record of inflicting or attempting

                                    13

1   to inflict serious injury, social history (stable v. unstable),

2   sadistic sexual offenses, psychological factors, institutional

3   behavior (further infractions vs. exemplary record), lack of

4   juvenile record, signs of remorse, battered women's syndrome,

5   lack of significant criminal history, age, and understanding and

6   plans for the future.  (CCR, § 2402 (c) and (d).)   In addition,

7   the Governor must consider "all relevant, reliable information

8   available." (CCR, § 2402 (b).)   "Such information shall include

9   circumstances of the prisoner's social history; past and present

10  mental state; past criminal history; ... the base and other

11  commitment offenses ...; past and present attitude towards the

12  crime; and conditions of treatment or control ...; and any other

13  information that bears on the prisoner's suitability for

14  release." (CCR, § 2402 (b).)

15       From this extensive list of factors, including other

16  "relevant, reliable information," that must be considered to

17  determine if a prisoner is a current threat to public safety, it

18  is clear that the Legislature did not intend for any single

19  factor to consistently trump all others.  Yet this is exactly

20  what is happening.  Decision after decision from the Executive

21  focuses almost exclusively on the commitment offense, a sub-

22  factor of one factor among fifteen.  The Governor consistently

23  attempts to insulate his denials and revocations by stating by

24  rote that, although post-conviction behavior was duly considered

25  and the inmate otherwise is suitable for parole, the offense was

26  so "especially heinous, atrocious or cruel" that the prisoner is

27  ineligible for parole.  The reduction of the parole assessment

28  process to consideration of one factor and one factor alone –

14

1  apparently as a general rule and in all circumstances - was

2  never intended by the Legislature and cannot be permitted.

3      In relying solely on the commitment offense to deem a

4  prisoner unsuitable for parole, the Governor relies on what he

5  believes is an unfettered license from the language in

6  *Rosenkrantz* and *Dannenberg* that "the nature of the prisoner's

7  offense, alone, *can* constitute a sufficient basis for denying

8  parole." (*Rosenkrantz* at p. 682; *Dannenberg* at p. 1094

9  (emphasis added.)  Such a view ignores the conditional language

10 that the offense *can* constitute such a basis, as well as the

11 clear directive in these cases that sole reliance on the

12 commitment offense will in fact violate prisoner's due process

13 under Penal Code, § 3041, subd. (a), in situations "where no

14 circumstances of the offense *reasonable* could be considered more

15 aggravated or violent than the minimum necessary to sustain a

16 conviction for that offense." (*Rosenkrantz* at 683; *Dannenberg*

17 at pp. 1094-1095 (emphasis added).)

18     Second degree murder is not a crime automatically deemed

19 unsuitable for parole. (See, e.g., *In re Smith, supra,* 114

20 Cal.App.4th at p. 366.)  Thus, given the above directive in

21 *Rosenkrantz* and *Dannenberg*, there must be a base set of factors

22 upon which a second degree murderer would have to be paroled or

23 the Governor would risk violating due process.  To determine

24 what would qualify as more than the minimum necessary for a

25 conviction, then, the Executive and reviewing courts must first

26 consider what is required, *at the minimum*, for a conviction of

27 second degree murder.  This Court has explained that "[s]econd

28 degree murder requires express or implied malice - i.e., the

1    perpetrator must kill another person with the specific intent to
2    do so; or he or she must cause another person's death by
3    intentionally performing an act, knowing it is dangerous to life
4    and with conscious disregard for life." (§§ 187-189; and CALJIC
5    No. 8.11.) (Id.) From this, the limits on "minimum necessary to
6    sustain a conviction" of second degree murder can be defined.
7    These must be: (1) a killing of another person; (2) with
8    expressed or implied malice; (3) but without premeditation (as
9    characterized, in the case of first degree murder, by torture,
10   lying in wait, using poison or a bomb, or in the commission of a
11   felony).

12        Now that the crime is defined, the question must be what
13   evidence indicates that any particular second degree murder was
14   somehow "beyond the minimum necessary to sustain a conviction."
15   In other words: what evidence indicates the commitment offense
16   was "especially heinous" or "exceptionally grave" given that
17   there typically must be a finding of *some* level of heinousness,
18   callousness and gravity in order for a inmate to have been
19   convicted of second degree murder in the first place? (CCR §
20   2402 (c)(1); *Smith,* 114 Cal.App.4th at 366-367 (noting that "*all*
21   second degree murders by definition involves some callousness -
22   i.e., lack of emotion or sympathy, emotion insensitivity,
23   indifference to the feeling and suffering of others" and that
24   the facts of the instant crime were callous, but not
25   exceptionally callous) (citing Webster's Third New International
26   Dict. (3rd ed. 1993) p. 319, col. 1.)

27        Courts must be particularly careful about assessing whether
28   evidence used to purportedly establish that a crime went "beyond

1   the minimum elements" is reasonable and relevant to a
2   determination of the question of *current threat to public*
3   *safety,* because many facts can be used by the Executive in
4   contradictory and arbitrary fashion.  The Governor's use of
5   hearsay evidence, taken from the POR, and ascribing these
6   "facts" as petitioner's own description of the offense clearly
7   illustrates this danger.  The Governor then goes on to cite the
8   actions of petitioner's co-defendants as evidence of
9   petitioner's "extreme brutality" and "extreme callousness."
10  Neither the statutory framework nor case law, however, suggests
11  that the actions of co-defendants somehow makes a crime
12  especially callous or cruel.
13      The use of acts committed by others as an enhancement in
14  the instant case does not reasonably demonstrate that
15  petitioner's crime was "beyond the minimal elements" of a
16  second-degree murder conviction, and is in no way some evidence
17  establishing that he is a current unreasonable threat to public
18  safety.  As such, the Governor's enhancement rationale in the
19  instant case illustrates the care that must be exercised in
20  evaluating facts proffered as "beyond the minimum elements" of
21  the commitment offense to justify a denial of parole.
22      The Governor has failed to demonstrate any reliable or
23  relevant evidence to show that petitioner's crime was "beyond
24  the minimal necessary to sustain a conviction" and that he
25  currently would "pose an unreasonable threat to public safety"
26  if given a parole date.  Absent this evidence, the Governor's
27  decision is arbitrary and capricious and has resulted in a due
28  process violation of petitioner's rights.

1

## III

2   THE GOVERNOR RELIED ON UNCHANGING FACTORS TO<br>REVERSE PETITIONER'S PAROLE RELEASE DATE

3

4      The Ninth Circuit Court of Appeals has held that a

5 prisoner's commitment offense alone may not justify the denial

6 of parole indefinitely.  In *Biggs v. Terhune, supra,* 334 F.3d at

7 916, the Court acknowledged that a prisoner's crime and other

8 pre-commitment factors may initially support a parole denial,

9 but warned: "Over time, however, should [the prisoner] continue

10 to demonstrate exemplary behavior and evidence of

11 rehabilitation, denying him a parole date simply because of the

12 nature of [the] offense and prior conduct would raise serious

13 questions involving his liberty interest in parole."  Indeed,

14 "[a] continued reliance in the future on an unchanging factor,

15 the circumstance of the offense and conduct prior to

16 imprisonment, runs contrary to the rehabilitative goals espoused

17 by the prison system and could result in a due process

18 violation."  *(Id.* at 917; cf. *Rosenkrantz* at 689, con. opn.

19 Moreno [suggesting that the offense may not support parole

20 denial of one convicted of second degree murder when the

21 prisoner has served the time prescribed for first degree

22 murder].)

23      The factual record contains no evidence that paroling

24 petitioner will "pose an unreasonable risk of danger to

25 society."  He has behaved well in prison, worked hard, attended

26 numerous rehabilitation programs and been deemed by the Board

27 psychologists and correctional counselors to be of no particular

28

18

1  threat to anyone.   (See Attachment Four, Psychological

2  Evaluations and Attachment Five, Board Reports.)

3      The real danger of allowing the parole determination to

4  hinge upon the frozen factor of the commitment offense is that

5  it converts an indeterminate life sentence into the infinitely

6  harsher sentence of life in prison without chance of parole.

7  This results in a fundamental change to the sentencing

8  guidelines established by the Legislature.   As explained by the

9  Eastern District:

10      "Continuous reliance on unchanging circumstances
        transforms an offense for which California law provides

11      eligibility for parole into a de facto life imprisonment
        without the possibility of parole.   The court asks

12      rhetorically – what is it about the circumstances of
        petitioner's crime or motivation which are going to

13      change?   The answer is nothing.   The circumstances of the
        crime will always be what they were, and petitioner's

14      motive for committing them will always be trivial.
        Petitioner has no hope of ever obtaining parole except

15      perhaps that a panel in the future will arbitrarily hold
        that the circumstances were not that serious or the motive

16      was more than trivial.   Given that no one seriously
        contends lack of seriousness or lack of triviality at the

17      present time, the potential for parole in this case is
        remote to the point on non-existence.   Petitioner's

18      liberty interest should not be determined by such an
        arbitrary, remote possibility."

19

20  (*Irons v. Warden of Cal. State Prison-Solano*, 358 F.Supp. 2d

21  936, 947 (N.D. Cal. 2004).)

22      As the *Irons* court noted, reliance on the commitment

23  offense leaves a change in the Board of Parole Hearings, or the

24  election of a new Governor, as a prisoner's only hope of parole,

25  as every evaluation will turn on a factor that necessarily can

26  never change. (*Id.*) A decision based on a few facts that will

27  *always* form the basis for denying parole, amounting to a

28  permanent and virtually automatic denial of parole, in

19

1  contravention of due process, is clearly arbitrary and

2  capricious.  "The presence of a large measure of discretion in a

3  parole system ... does not alter the fundamental due process

4  limitation against capricious decision-making.  A legislative

5  grant of discretion does not amount to a license for arbitrary

6  behavior.  When the Parole Board [or Governor] bases its

7  decision on factors that bears no rational relationship to

8  rehabilitation or deterrence, it transgresses the legitimate

9  bounds of its discretion."  (*In re Fain* (1983) 139 Cal.App.3d

10  295, 307 [quoting *Block v. Potter*, 631 F.2d 233, 236-237 (3rd

11  Cir. 1980)].)

12                                VI

13  **THE APPROPRIATE REMEDY FOR THESE VIOLATIONS IS AN ORDER**
    **FOR PETITIONER'S RELEASE, WITHOUT REMAND TO THE GOVERNOR**

14

15      The California Supreme Court has recognized that "the

16  existence of [life prisoners' due process] rights could not

17  exist in any practical sense without a remedy against their

18  abrogation."  (*In re Rosenkrantz, supra*, 29 Cal.App.4th at p.

19  655.)  Accordingly, this Court should order a meaningful remedy

20  for the Governor's violation of petitioner's rights, grant the

21  prisoner's petition for writ of habeas corpus and order the

22  Governor to vacate the decision denying parole.

23      The decision in *Smith* [(2003) 109 Cal.App.4th 489] further

24  supports an order for release under the circumstances presented

25  here.  In *Smith*, the Court found that where the record contains

26  "no evidence" to support the Governor's reversal of parole, the

27  Court must order the prisoner's release.  (*Id.* at p. 507; see

28  also *In re Smith, supra, 114* Cal.App.4th at p. 374

                                20

1  [distinguishing remedy where some, but not all, of the

2  governor's findings supported by "some evidence"].)  "Although

3  the Board can give the prisoner a new hearing and consider

4  additional evidence, the Governor's constitutional authority is

5  limited to a review of the materials provided by the Board. ...

6  Since we have reviewed the materials that were before the Board

7  and found no evidence to support a decision other than the one

8  reached by the Board, a remand to the Governor in this case

9  would amount to an idle act."  (In re Smith, supra, 109

10  Cal.App.4th at p. 507 (italics in original); see also McQuillion

11  v. Duncan, 342 F.3d 1012, 1015 (9th Cir. 2003) [refusing to

12  remand case to the parole authority to review a record that

13  court already determined was devoid of evidence].)

14      As reiterated above, none of the grounds cited by the

15  Governor for denying petitioner parole are supported by the

16  evidence.  Accordingly, a remand to the Governor to again review

17  the same record would amount to an idle act.  Thus, this Court

18  should vacate the Governor's decision and order petitioner's

19  release in accord with the term previously calculated by the

20  Board of Parole Hearings.

21                         **CONCLUSION**

22      Clearly, the facts at hand do not meet the requirements set

23  forth by the regulations and the courts to justify the

24  Governor's revocation of petitioner's grant of parole.

25      Petitioner is being held indefinitely for a crime that

26  clearly does not go beyond the minimum necessary for conviction.

27  His almost perfect post-conviction history demonstrates that he

28  is not a current unreasonable threat to public safety.

1  Petitioner is being confined behind prison walls indefinitely
2  despite his glowing psychological evaluation, and his good in-
3  prison conduct.  In light of these circumstances, petitioner's
4  continued detention is equal to or surpasses the point feared by
5  the *Biggs* court, where the commitment offense, in light of
6  significant and compelling evidence of perfect post-commitment
7  behavior, no longer has any relation to a present finding of
8  dangerousness.  Continued reliance upon it violates petitioner's
9  right to due process.
10   When the Court applies the "some evidence" standard
11 petitioner is confident that it will find that the Governor's
12 decision was not based on some relevant, reliable evidence that
13 reasonably suggests that petitioner poses a current,
14 unreasonable threat to public safety.  For these reasons,
15 petitioner respectfully requests that this Court vacate the
16 Governor's reversal of the Board's granting of parole.

17

18 DATE: November 30, 2006                  Respectfully submitted,

19

20                                          Salvatore Graffagnino
21                                          Petitioner, In Pro Per

22 ///
23 ///
24 ///
25 ///
26 ///
27 ///
28 ///

22

## DECLARATION OF SERVICES

I, Salvatore Graffagnino, declare:

I am a resident of the Correctional Training Facility in Soledad, California; I am over the age of eighteen (18) years; I am a party to the attached action; My address is P. O. Box 705, WA-306L, CTF-North Facility, Soledad, CA 93960-0705; I served the attached document entitled:

**PETITION FOR WRIT OF HABEAS CORPUS**

On the persons/parties specified below by placing a true copy of said document into a sealed envelope with a Trust Account Withdraw form for appropriate postage affixed thereto and surrendering said envelopes to the staff of the Correctional Training Facility entrusted with logging and mailing of inmate legal mail, addressed as followed:

**Court of Appeals**
**Sixth Appellate District**
**333 West Santa Clara Street**
**San Jose, CA 95113-1717**

**State of California**
**Office of the Attorney General**
**Department of Justice**
**455 Golden Gate Ave., Suite 11000**
**San Francisco, CA 94102-7004**

There is First Class mail delivery service by the United States Post Office between the place of mailing and the addresses indicated above. I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct, and I executed this service this 30th Day of November, 2006, at the Correctional Training Facility in Soledad, California.

Salvatore Graffagnino