1   SALVATORE GRAFFAGNINO
    E-89844.  C.T.F. Central-FW-358U
2   P.O. Box 689
    Soledad, CA 93960-0689

3

4   In Pro Per                                       **FILED**

5                                              MAR **2 1** 2008

6                                              

7

8              IN THE UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  SALVATORE GRAFFAGNINO      )    CASE NO: C07-3728 (JSW)(PR)
                               )
12            Petitioner       )    TRAVERSE IN RESPONSE TO
                               )    ATTORNEY GENERALS'S ANSWER
13       VS.                   )
                               )
14  BEN CURRY, Warden          )
                               )
15            Respondent       )

16

17

18                   STATEMENT OF THE CASE

19       Petitioner, Salvatore Graffagnino, plead guilty to second

20  degree murder on February 11, 1991, and was sentenced to a term

21  of fifteen-years-to-life in prison, following a plea bargain of

22  second degree murder on March 14, 1991. (See attached Exhibit

23  "A" Report of Indeterminate Sentence)

24       Petitioner became eligible for parole in 2000 and was first

25  considered for parole in 1999.  As of 2005, his case had been

26  reviewed by the Board of Prison Terms [now Board of paroles

27  Hearing][hereafter Board]

28  //

                               1

1   On December 9, 2005, the Board conducted petitioner's fourth
2   subsequent board hearing and found petitioner suitable for
3   parole.  The Board established petitioner's term at 20 years.
4   (See attached EXHIBIT "B" Board Transcript at page 61, line 4-6)

5       The case was sent to Governor Schwarzenegger for review
6   pursuant to penal code section §3041.2... On May 3, 2006, the
7   Governor reversed the grant of parole, finding that petitioner's
8   offense was particularly egregious and that the gravity of the
9   crime outweighs the positive case factors.  (See attached
10  Exhibit "C" Governor's Indeterminate Sentence Parole Release
11  Review at page 2).  The Governor states that the factors alone
12  was sufficient for him to conclude presently that petitioner's
13  release from prison would pose an unreasonable public safety
14  risk.

15                          CONCLUSION

16      Petitioner contends Governor's mischaracterization of the
17  facts and speculation are not "some evidence" that petitioner's
18  crime was particularly egregious.  The Governor's action were,
19  therefore, arbitrary and capricious and resulted in a due
20  process violation.

21

22      THE ATTORNEY GENERAL ASSERTS THE FOLLOWING

23      ALLEGATIONS FROM 1 THROUGH 21 ON PAGE 6

24  1. Petitioner admits for purpose of this action only the
25  allegation contained in paragraph –page-6- Petitioner denies he
26  is lawfully in custody, and admits paragraphs-page-2-line 3
27  through 5. (Exhibit. "A") Report Indeterminate Sentence.)

28

                             2

1    2. Petitioner denies the argument as to the statement "we'll
2    kill him."   There is no evidence to support the allegations;
3    (See attached Exhibit "D". "Probation Report," at p. 7-8.)
4    3. Petitioner admits at p. 2, lines 11-15.  Petitioner denies
5    Governor's allegations as to being convicted of a crime that was
6    especially grave and carried out with extremely callousness and
7    exceedingly brutal manner.  Petitioner further asserts there is
8    no evidence petitioner wound pose an unreasonable public safety
9    risk if released from prison; see Respondents writ at p. 2,
10   lines 16-21.

11   4. Petitioner admits appeal process through the courts; see
12   Responders writ at p. 2, lines 22-24

13   5. Petitioner noted there is no Respondents response number 3;
14   see Respondents writ at p. 5-6.

15   6. Petitioner admits appeal process through the courts.
16   Petitioner noted that the attorney for the Officer of the
17   Attorney General referred to a different appellant at page 3,
18   lines 3 of Respondents writ.

19   7. Petitioner admits process through the court; see p. 3, lines
20   7-10.   Petitioner denies that he did not exhaust his claim to
21   the extent that they are more broadly interpreted to encompass
22   any systematic issue beyond the 2006 reversal; see Respondents
23   writ, at p. 3, lines 10-12

24   8. Petitioner does have a federally protected liberty interest
25   in parole, and denies the argument set forth by the respondents;
26   see Respondents writ, at p. 3, lines 13-22.

27   //

28   //

3

1  9. Petitioner asserts that he did make a case for relief under
2  AEDPA, and denies respondent argument under that criteria; see
3  Respondents writ, at p. 3, lines 23-26.

4  10. Petitioner denies the argument set forth by the respondent
5  that he has an opportunity to present his case to the Board; see
6  Respondents writ, at p. 3, line 27 through p.4 line 2.

7  11. Petitioner denies the argument set forth by the respondent
8  on page 4, lines 3-11.

9  12. Petitioner denies the argument set forth by the respondent
10  on page 4, lines 12-19.

11  13. Petitioner denies the argument set forth by the respondent
12  on page 4, line 20 through page 5, line 3.

13  14. Petitioner denies all arguments set forth by the respondent
14  on page 5, lines 4-9.  Petitioner co-defendant received a lesser
15  sentence of manslaughter, and received a sentence of 11 years
16  and a one-year enhancement.

17  15. Petitioner admits that the evidentiary rules prohibiting
18  hearsay evidence apply to factual determination made by the
19  Governor in the parole reversal.  Petitioner admits that the
20  Governor's factual determination must be based only on evidence
21  presented at trial; see Respondents writ, at p. 5, lines 17-21.

22  16. Petitioner admits that he exceeded his minimum term and
23  denies the argument set forth by the respondent on p.5, lines
24  22-23.

25  17. Petitioner agrees with the argument set forth on page 5,
26  lines 22-23.

27  18. Petitioner asserts that an evidentiary hearing is necessary
28  in this matter; see p.5, lines 24-25.

4

1    19. Petitioner states he is entitled to the date ordered by the
2    Board; see p. 5, line 26.

3    20. Petitioner asserts that he established grounds for habeas
4    corpus relief; see Respondents writ, at p. 5, 27-28.

5    21. Petitioner is denying every allegations set forth in the
6    respondent answers and asserts that petitioner's constitutional
7    rights have been violated; see Respondents writ, at page 6,
8    lines 1-3.

9

10                RESPONDENTS ARGUMENT AT PAGE 6

11        Petitioner asserts Respondent's argument set forth on -
12   page-6- at section (A) -page-6-9; section (B)-page 9-10 and
13   section (C) page -11.  Petitioner denies each and every
14   allegation set forth in section (A), (B) and (C).

15        In reviewing the board's decision, the Governor must
16   consider the same factors as the Board. (Cal. Const., Art. V. §8,
17   subd. (b); In re Rosenkrantz, 29 Cal. 4th 616, 667.).

18        The test is not whether some evidence supports reasons the
19   Governor cites for denying parole, but whether some evidence
20   indicates a parolee's release unreasonable endanger public
21   safety (Cal. Code Regs., tit 15 §2401, subd. (a) [parole denial
22   if prisoner "will pose an unreasonable risk of danger to society
23   if released from prison"]; See e.g, In re Scott, (2005) 133 Cal.
24   App. 573, 595 ["The commitment offense can negate suitability
25   [for parole] Only if circumstances of the crime... rationally
26   indicates that the offender will present an unreasonable public
27   safety risk if released from prison"].)

28

1    A cursory review of the record in this case demonstrates
2    that the state court's decision was unreasonable under the
3    applicable "some evidence" rule and was otherwise arbitrary."

4    The record simply does not contain any evidence that
5    petitioner's act of second degree murder was, in contrast to the
6    large majority of such offense, **particularly egregious**. Nor does
7    it contain any evidence that petitioner is currently a threat to
8    society.  Given that both findings are required by California
9    law, there is zero evidence in the record to support the
10   Governor's decision.

11   An independent review of the record reveals that the
12   Governor's determination is "otherwise arbitrary" in at least
13   two respects, and that the state court's decision ratifying it
14   constitutes an unreasonable application of that part of the **Hill**
15   rule.

16   The Governor's reliance on instantiated, uncorroborated and
17   unreliable hearsay evidence is against all concept of fairness
18   and justice.  The determination of the facts must be based on
19   the evidence presented at trial.  Discretion is abused and due
20   process denied when a parole conclusion has no rational
21   relationship to the facts on which it is purportedly based.

22   The state court's decision supporting the Governor was
23   therefore unreasonable and otherwise arbitrary.

24   //
25   //
26   //
27   //
28   //

6

I

**PETITIONER HAS A LIBERTY INTEREST IN PAROLE RELEASE PROTECTED BY STATE AND FEDERAL LAW, AND THE STANDARD OF REVIEW OF PAROLE BOARD OR GOVERNOR'S DECISION TO DENY A PETITIONER OF HIS LIBERTY INTEREST IN PAROLE RELEASE IS THE "SOME EVIDENCE" STANDARD.**

The Fourteenth Amendment of the United States Constitution provides that no state may "deprive any person of life, liberty, or property, without due process of law." (U.S. Const., amend. XIV, § 1). In *Greenholtz* v. *Inmates of the Nebraska Penal and Correctional Complex,* 442 U.S. 1 (1979), the Supreme Court found that the inmates has a liberty interest in discretionary parole that was protected by the Due Process Clause. The Right was created by the "expectancy of release provided in [the Nebraska parole statute.]" That statute provide that the parole board "shall order" release of eligible inmates unless that release would have created negative impacts. (*Id*. At 11-12). The Supreme Court returned to the issue in *Board of Pardons v. Allen,* 482 U.S.369 (1987). There it held that a similar liberty interest was created even though the parole board had greater discretion. (*Id*. at 381). For parole decisions, this mode of analysis survived the Supreme Court's later rejection of it for prison disciplinary decisions in *Sadin v. Conner*, 515 U.S. 472 (1995). *Biggs v. Terhune,* 334 F.3d 910, 914 (9th Cir. 2003) "Sandis" does not affect the creation of liberty interest in parole under *Greenholtz* and *Allen*.

Admittedly, there is "no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." (*Greenholtz,* 442 U.S. at 7). A

1     state's statutory parole scheme, if it uses mandatory language,

2     may create a presumption that the parole release will be granted

3     when or unless certain designated findings are made, and thereby

4     give rise to a constitutionally protected liberty interest. (*See*

5     *Allen,* 442 U.S. at 376-378 [Montana parole statute providing the

6     that board "shall" release prisoner, subject to certain

7     restrictions, creates due process liberty interest in release on

8     parole]: *Greenholtz,* 442 U.S. at 11-12 [Nebraska parole statute

9     provides that board "shall" release prisoner, subject to certain

10    restrictions, creates due process liberty interest in parole]).

11    that cannot be denied without procedural due process

12    protections. (*See Allen,* 482 U.S. at 373-381]; *Greenholtz,* 442

13    U.S. at 11-16).

14

15       California's parole scheme uses mandatory language and is

16    similar to the scheme in *Allen* and *Greenholtz* which the Supreme

17    Court held gave rise to a protected interest in release on

18    parole. In California, the panel or board "shall" set a release

19    date unless it determines that the gravity of the current

20    convicted offense or offenses, or the timing and gravity of

21    current or past convicted offense or offenses, is such that

22    consideration of the public safety requires a more lengthy

23    period of incarceration for this individual, and that a parole

24    date, therefore, cannot be fixed at this meeting. "Penal Code §

25    3041(b). Under the clearly established framework of *Allen* and

26    *Greenholtz.* California's Parole Scheme gives rise to a

27    cognizable liberty interest in release on parole." (*Sass v.*

28    *Cal. Bd. Of Prison Terms.* 461 F.3d 1123, 1127 (9th Cir. 2002)]).

 1  [quoting *McQuillion v. Dincan,* 306 F.3d 895, 902 (9th Cir.
 2  2002)]) Moreover, this "liberty interest is created not upon the
 3  granting of parole date, but upon the incarceration of the
 4  inmate." (*Id.* [quoting *Biggs v. Terhune,* 334 F.3d 910. 915 (9th
 5  Cir. 2003). Footnote omitted]).

 6      The scheme requires that parole release be granted unless
 7  the statutory defined determination (that the record before the
 8  board indicates that the prisoner's release to supervised parole
 9  would unreasonably endanger public safety) is made.  *(Id.;*
10  *Biggs,* 334 F.3d at 915-916 [finding initial refusal to set
11  parole date for prisoner with fifteen-years-to-life sentence
12  implicated prisoner's liberty interests]).   In sum, the
13  structure of California's parole scheme-with its mandatory
14  language and substantive predicates-gives rise to a federally
15  protective liberty interest in parole such that petitioner has a
16  federal right to due process in parole proceedings.

17              Petitioner asserts these rights were
18              violated by Governor Arnold Schwarzenegger
19              on May 3, 2006 because: 1.) the conclusions
20              of the reversal were not supported by
21              evidence in the record that petitioner's
22              release, after 17 years, 5 months, of
23              incarceration would unreasonable endanger
24              public safety; 2.) repeated reliance on
25              unchanging factors such as the commitment
26              offense, and a non-violent institution
27              disciplinary infraction history, no longer
28              retain a predictive value sufficient enough

1 | to support the conclusion that petitioner's
2 | release onto parole would unreasonable
3 | endanger public safety; and 3.) the
4 | Governor's subjected, unsupported and
5 | conclusory determination were "otherwise
6 | arbitrary." (*Superintendent v. Hill,* 472
7 | U.S. 445, 457, (1985).

8 |

9 | Under federal law, the United States Supreme Court has
10 | clearly established that a parole board's decision is not
11 | supported by "some evidence" in the record, or is "otherwise
12 | arbitrary." (*Irons v. Carey,* 479 F.3d 658, 662 (9th Cir 2007)
13 | [applying "some evidence" standard used for disciplinary
14 | hearings as outlined in *Superintendent v. Hill,* 472 U.S. 445-455
15 | (1985); See also *Irons v. Carey,* 505 F.3d at 851, 2007 WL
16 | 2027359. At *3 (9th Cir. 2007) (quoting *Hill,* 472 U.S. ; *Sass.*
17 | 461 F.3d at 1128-1129); *McQuillion,* 306 F.3d at 904 [same]).
18 | The evidence underlying the Board's decision must also have
19 | "some indicia of reliability." (*MqQuillion,* 306 F.3d at 915).
20 | The same evidence standard identified in *Hill* is clearly
21 | established federal law in the parole context for purpose of 28
22 | U.S.C. § 2254 (d)(federal habeas corpus). *See Sass,* 461 F.3d at
23 | 1128-1129).

24 | Ascertaining whether that some evidence standard is met
25 | "does not require examination of the entire record, indendent
26 | assessment of the credibility of witness, or weighting of the
27 | evidence.

28 |

1    Instead, the relevant question is whether there is any

2  evidence in the record that could support the *conclusion* reached

3  by the disciplinary board." (*Hill,* 472 U.S. at 455, emphasis

4  added, *Sass,* 461 F.3d at 1128). The some evidence standard in

5  minimal, and assures that the record is not so devoid of

6  evidence that that the findings of the disciplinary board were

7  without support or otherwise arbitrary." (*Sass,*  461 F.3d at

8  1129 (quoting *Hill*, U.S. at 457).

9    Recent Ninth Circuit Court of Appeals cases reflect that a

10  critical issue in parole denials cases is the Board's use of

11  evidence from the commitment offense and prior offenses.  In

12  *Biggs*, the court explain that the some evidence standard may be

13  considered in light of the Board's decision over time.  (*Biggs,*

14  334 F.3d at 916-917).  The Court reasoned that "[T]he Parole

15  Board's decision is one of 'equity' and requires a careful

16  balancing and assessment of the factor considered... A continued

17  reliance in the future on an unchanging factor, the

18  circumstances of the offense and conduct prior to imprisonment,

19  rune contrary to the rehabilitative goals espoused by the prison

20  system and could result in a due process violation."  *(Id.)*

21  Although the *Biggs* court upheld the initial denial of a parole

22  release date based solely on the nature of the crime and the

23  prisoner's conduct before incarceration the court cautioned that

24  "[o]ver time, however, should *Biggs* continued to demonstrate

25  exemplary behavior and evidence of rehabilitation denying him a

26  parole date simply because of the nature of his offense would

27  raise serious questions involving his liberty interest." *(Id.* at

28  916).

1    The *Sass* court criticized the decision in *Biggs:* "Under
2    AEDPA it is not our function to speculate about how future
3    parole hearing could proceed." *Sass*, 461 F.3d at 1129). *Sass*
4    determined that it is not a due process violation per se if the
5    Board determines parole suitability based solely on the
6    unchanging factors of the commitment offense and prior offenses.
7    (*See Id.* [prisoner's commitment offense in combination with
8    priors amounted to **some evidence** to support the Board's denial
9    of parole-seven prior drunk drivings and final alcohol-related
10   second degree murder]).  However, *Sass* does not depute the
11   argument in *Biggs* that over time, a commitment offense may be
12   less probative of a prisoner's current threat to public safety.

13       In *Irons* the Ninth Circuit Court of Appeals emphasize the
14   continuing vitality of *Biggs*, but concluded that relief for
15   *Irons* was precluded by *Sass*. *(See Irons,* 470 F.3d at 664; See
16   also *Irons v. Carey,* 505 F.3d 846, at 851, 2007 WL 2027359, at
17   *3 (9th Cir, 2007) (quoting *Hill,* U.S. at 457; *Sass,* 461 F.3d at
18   1128-1129)).  The Ninth Circuit explain that all of the cases in
19   which it previously held that denying parole based solely on the
20   commitment offense comported with due process were one in which
21   the prisoner had not yet served the minimum years required by
22   the sentence.  (*Id*. at 665).  Also, noting that the parole board
23   in *Sass* and *Irons* appeared to give little or no weight to
24   evidence of the prisoner's rehabilitation, the Ninth Circuit
25   stress its hope that "the Board will come to recognize that in
26   some cases, indefinite detention based solely on an inmate's
27   commitment offense, regardless of the extent of his
28   rehabilitation, will at some point violate due process, given

12

1  the liberty interest in parole that flows from relevant

2  California Statutes." (*Id.* [Citing *Biggs*, 334 F.3d at 917]).

3      In further support of federal review of parole Board of

4  Governor's denials of a prisoner's parole is the recent holding

5  by the United States Courts of Appeals in *Hayward v.*

6  *Marshall,* ___ F.3d___, 2008 U.S. App. LEXIS 40, No 06-55392 (9th

7  Cir, January 3, 2008).  One important point is that the Circuit

8  Court has firmly held that "the (United States) Supreme Court

9  ha[s] clearly established that a parole Board or Governor's

10  decision is not supported by 'some evidence' the record 'or is

11  otherwise arbitrary'" (citing *Irons* v. *Carey,* 505 F.3d at 851,

12  2007 WL 2027359, at *3 (9th Cir. 2007). [quoting *Superintendent*

13  v. *Hill*, 472 U.S. 445, 457; *Sass* v. *Cal. Bd. Of Prison Terms,*

14  461 F.3d 1123, 1128-1129 (9th Cir. 2006)), and has now adopted

15  California's *Scott, Lee, Elkins, Dannenberg(II),* standard of

16  applying the "some evidence" test;

17      "Even though these suitability and unsuitability factors
        [15 §§2402(c) & 2402(d) are helpful in analyzing whether a
18      prisoner should be granted parole, California courts have
        made clear that the "findings that are necessary to deem a
19      prisoner unsuitable for parole,' *Irons* v. *Carey,* 505 F.3d
        [846] at 851, 2007 WL 2927359, at *3, are not that a
20      particular factor or factors indicating unsuitability
        exist, but that a prisoner's release will unreasonably
21      endanger public safety.  *In re Dannenberg(II),* 156 Cal.
        App. 1387, 2007 WL 3408290, at *9 (Ca. Ct. App. 2007)
22      modified 2007 Cal. App. LEXIS 1985, 2007 WL 4227229 (Cal.
        Ct. App. December 3, 2007); *In re Lee,* 143 Cal. App. 4th
23      1400, 1408, 49 Cal. Rptr 3d 931 (Cal Ct App. 2006); *In re*
        *Scott*, 133 Cal. App. 573, 595, 34 Cal. Rptr. 3d 905 (Cal.
24      App. 2005); see Cal. Penal Code § 3041(b) (providing that
        the Board shall set a release date unless... consideration
25      of the public safety requires a more lengthy period of
        incarceration for this individual").  For our purpose,
26      then. "[T]he test is not whether some evidence of the
        existence of a particular factor does not necessarily
27      equate to some evidence the parolee's release unreasonably
        endanger public safety,' *Lee,* 143 Call App. 4th at 1408
28      (citing and footnote); see also *In re Elkins*, a44 Cal. App.
        475, 499, 50 Cal Rptr. 3d 503 (Cal. Ct. App. 2006) (holding

that the Governors, in reviewing a suitability determination, must remain focused... on facts indicating that release currently poses 'an unreasonable risk of danger to society' '(citing Cal. Code Regs. Tit. 15 §1402(a))); *Scott*, 133 Cal. App at 591 (The factor statutorily required to be considered, and overarching consideration, is 'public safety.' (citing Cal. Penal Code 3041(b)))).'' *(Hayward* at pp. *17-*18).

### ARGUMENT

1.  **PETITIONER WAS DENIED DUE PROCESS WHEN GOVERNOR REVERSE GRANT OF PAROLE WITHOUT SUPPORTING EVIDENCE PETITIONER'S OFFENSE WAS PARTICULARLY EGREGIOUS.**

The Governor may deny parole if a defendant committed his crime "in an especially heinous, atrocious or cruel manner." Cal. Code Regs., tit 15 §2402. (c) (1), italics added.) not with standing the Governor's description of petitioner's crime, it was not "atrocious" and was not committed "in an especially heinous, atrocious or cruel manner." The measure of atrociousness is not general notions of common decency or social norms, for by that yardstick all murders are atrocious. (See *In re Scott*, (2004) 199 Cal. App. 4th 871, 891 ("[A]ll second degree murders by definition involve some callousness i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feeling of others'")) . ) (*In re Ramirez*, (2001) 94 Cal. App. 4th 549, 570, disapproved on other point by *In re Dannenberg* (2005) 34 Cal. 4th 1061, 1082-1083, 1100.) by that measure petitioner's crime was more commonplace than egregious.

Beside not being especially atrocious, heinous or callous, Petitioner's crime over 17 years, 5 months ago has lost much of its usefulness foreseeing the likelihood of future offense than if he had committed it five or ten years ago. (*In re Scott, Supra,* 133 Cal. App. 4th 573 (past crime's value for predicting

14

1   future crime diminishes over time).)  Moreover, petitioner's
2   motivation for the stabbing – his rage against a rapist – augurs
3   against any future offenses.

4        Instead of being atrocious, petitioner's conduct involved
5   no more than necessary to commit his crime.  (*Rosenkrantz,*
6   *supra,* 29 Cal 4th at p. 683 (cannot deny parole based on nature
7   of offense if defendant's acts were the bare minimum needed to
8   commit the offense).)

9   2.  **PETITIONER DENIED DUE PROCESS WHEN GOVERNOR REVERSE GRANT
       OF PAROLE WITHOUT SUPPORTING EVIDENCE PETITIONER CURRENTLY
10     POSES AN UNREASONABLE RISK OR THREAT TO PUBLIC SAFETY.**

11

12       For the Governor to revoke a grant of parole, he must
13  provide relevant, reliable evidence that the potential parolee
14  poses a current unreasonable threat to public safety.  The test
15  is not whether some evidence supports the reasons the Governor
16  cites for denying parole, but whether some evidence indicates a
17  parolee's release unreasonably endangers public safety.  (Cal.
18  Code Regs., tit 15 §2402, subd. (a) (parole denied if prisoner
19  "will pose an unreasonable risk of danger to society if released
20  from prison"); see e.g. *In re Scott* (2005) 133 Cal. App. 4th
21  573, 579 ("The commitment offense can negate suitability (for
22  parole) only if circumstances of the crime... rationally
23  indicates that the offender will present an unreasonable public
24  safety risk if released from prison"); but see *In re Lowe* (2005)
25  130 Cal. App. 4th 1405 (suggested "some evidence" applies to the
26  factors, not dangerousness).)  Some evidence of the existence of
27  a particular factor does not necessarily endangers public
28  safety.

15

1       The Governor's reasons must be viewed within the context of
2   the other factors he must consider to see if some evidence shows
3   petitioner continues to pose an unreasonable risk to public
4   safety.  (*In re Scott, supra,* 133 Cal. App. 4th at pp. 594-595.)
5   Applying that test, there is no evidence that petitioner is
6   likely to commit another crime or that his release would
7   unreasonably endanger that public.

8       Regardless of whether the Governor was entitled to rely
9   upon the commitment offense to find that petitioner posed an
10  unreasonable risk of danger and was unsuitable for parole
11  violates due process because it results in an arbitrary decision
12  and because the facts surrounding the offense do not now
13  constitute "some evidence" possessing "some indicia of
14  reliability" that petitioner pose a danger to the community.
15  (See *Superintendent* v. *Hill*, 472 U.S., 455 (1985); *Biggs v.*
16  *Terhune*, 334 F.3d Supp.2d 947; *Masoner* v. *State*, 2004 WL
17  1080177, at *1-2 (C.D. Cal. 2004) ("Although the gravity of the
18  commitment offense and other pre-conviction factors alone may be
19  sufficient to justify the denial of a parole date at a
20  prisoner's initial hearing, subsequent BPH (and Governor's)
21  decision to deny a parole date must be supported by some post-
22  conviction evidence that the release of an inmate is against the
23  interest of public safety").)

24      The Governor's failure to demonstrate that petitioner
25  currently poses an unreasonable risk or threat to public safety
26  resulted in a due process violation.

27  //

28  //

                                16

3.   **PETITIONER DENIED DUE PROCESS WHEN GOVERNOR RELY ON UNCHANGING FACTORS TO REVERSE PETITIONER'S GRANT OF PAROLE**

The Governor reliance upon the nature of petitioner's crime to deny him parole violates due process.  First, continued reliance upon the unchanging facts of petitioner's crime makes a sham of California's parole system and amounts to an arbitrary denial of petitioner's liberty interest.  Continued reliance upon the unchanging characterization of petitioner's offense amounts to converting petitioner's sentence of fifteen years to life, to a term of life without the possibility of parole. Second, the circumstances of petitioner's crime do not amount to some evidence supporting the conclusion that petitioner poses an unreasonable risk of danger if release. In the parole context, the requirement of due process are met if some evidence supports the decision.  (*Biggs v. Terhune*, 334, F.3d at 915) "Some evidence", however, does not mean literally "any" evidence.  If it did, the protection afforded by due process would be meaningless.

In finding petitioner unsuitable the Governor relied exclusively on unchanging factors: The commitment offense.  In assessing any due process violation is the fact that continuous reliance on unchanging circumstances transforms any offense for which California law provides eligibility for parole into a de facto life imprisonment without the possibility of parole.  What is it about the circumstances of petitioner's crime which are going to change?  The answer is nothing.  The circumstances of the crime will always be what they are.  Petitioner has no hope of ever obtaining parole except perhaps that a Governor in the

1  future will arbitrarily hold that the circumstances were not
2  that serious.

3       Given that no one seriously contends lack of seriousness at
4  the present time, the potential for parole in this case is
5  remote to the point of non-existence.  Petitioner's liberty
6  interest should not be determined by such an arbitrary, remote
7  possibility.

8       The Governor's reliance on an unchanging factor to reverse
9  petitioner's parole release date resulted in an due process
10 violation.

11                           **CONCLUSION**

12      Petitioner is being held indefinitely for a crime that
13 clearly does not go beyond the minimum necessary for conviction.
14 His almost perfect post-conviction history demonstrates that he
15 is not a current unreasonable threat to public safety.

16      Petitioner is being confined behind prison walls
17 indefinitely despite his glowing psychological evaluation, and
18 his good-prison conduct.  In light of these circumstances,
19 petitioner's continued detention is equal to or surpasses the
20 point feared by the *Biggs* court, where the commitment offense,
21 in light of behavior, no longer has any relation to a present
22 post-commitment dangerousness.  Continued reliance upon it
23 violates petitioner's right to due process.

24                            **RELIEF**

25      When the Court applies the 'some evidence' standard
26 petitioner is confident that it will find that the Governor's
27 decision was not based on some evidence, reliable evidence that
28 reasonable suggest that petitioner poses a current, unreasonable

1    threat to public safety.  For these reason, petitioner

2    respectfully request that this Court **vacate** the Governor's

3    reversal of the Board's granting of parole and **Order**

4    petitioner's release in accord with the term previously

5    calculated by the Board of Parole Hearing on December 9, 2005.

6    //

7    //

8    Date: *March 19, 2008*                          Respectfully

9                                                    *M Duffagnino*

10   //

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

## DECLARATION OF SEVICES BY MAI

I, <u>Salvatore Graffagnino</u>, do hereby declare that I am
a citizen of the United States, and over 18 years of age.
My address is Correctional Training Facility, Soledad, CA
93960-0689.

On the date set forth below, I deposited in the mail
box Petitioner's Traverse in response to Attorney General's
answer.  The Following copies of Traverse was sent to the
following:


    1.)   Edmund G. Brown Jr.
          State of California Department of Justice
          Office of the Attorney General
          455 Golden Gate Avenue, Suite 11000
          San Francisco, CA 94102-7004


    2.)   United States District Court
          Northern District of California
          450 Golden Gate Avenue
          San Francisco, CA 94102


I, <u>Salvatore Graffagnino</u>, declare under penalty of
perjury under the law of the state of California that the
above is true and correct.



Executed: *March 19,* 2008.          Respectfully

                                     *Sal Graffagnino*
                                     Salvatore Graffagnino

# E X H I B I T   "A"
## "Report Indeterminate Sentence
## Or Other Sentence Choice"

I⁵⁰ # ³/₆₂ A

REPORT – IN\_\_\_\_'MINATE SENTENCE,
OR OTHER. \_TENCE CHOICE

291

E59844

FILED

MAR 15  11 2₄ ₄ᵤ '91

SUPERIOR COURT OF CALIFORNIA, COUNTY OF **MONTEREY**      BRANCH

COURT I.D.
|2|7|_|_|_|_|_|

MAR 15  11 2₄ ₄ᵤ '91

PEOPLE OF THE STATE OF CALIFORNIA versus
DEFENDANT: SALVATORE GRAFFAGNINO
AKA:

☒ PRESENT
☐ NOT PRESENT

CASE NUMBER (S)
CR 16037

- A
- B

REPORT OF:
☐ DEATH SENTENCE
☒ INDETERMINATE SENTENCE
☐ OTHER SENTENCE CHOICE

AMENDED
REPORT ☐

- C
- D
- E

| DATE OF HEARING (MO) (DAY) (YR) | DEPT. NO | JUDGE | CLERK |
|---|---|---|---|
| 3  14 91 | 3 | HON. RICHARD M. SILVER | PAT CHESLEIGH |

| REPORTER | COUNSEL FOR PEOPLE | COUNSEL FOR DEFENDANT | PROBATION NO. OR PROBATION OFFICER |
|---|---|---|---|
| SARA MAYER | Wm. McCardle | Richard West | Sonja Sheeler |

1. DEFENDANT WAS CONVICTED OF THE COMMISSION OF THE FOLLOWING FELONIES (OR ALTERNATE FELONY/MISDEMEANORS).

☐ ADDITIONAL COUNTS ARE LISTED ON ATTACHMENT _____ (NUMBER OF PAGES)

| COUNT | CODE | SECTION NUMBER | CRIME | YEAR CRIME COMMITTED | DATE OF CONVICTION MO DAY YEAR | CONVICTED BY (JURY/COURT/PLEA) |
|---|---|---|---|---|---|---|
| 1 | PC | 187** | Murder 2nd | 90 | 2  11  91 | X |
| | | | | | | |
| | | | | | | |

2. ENHANCEMENTS (charged and found true) TIED TO SPECIFIC COUNTS (mainly in the § 12022-series) including WEAPONS, INJURY, LARGE AMOUNTS OF CONTROLLED SUBSTANCES, BAIL STATUS, ETC.:
For each count list enhancements horizontally. DO NOT LIST enhancements charged but not found true or stricken under § 1385. DO NOT LIST TIME imposed.
For indeterminate terms, report enhancements and time imposed for them on the abstract.

| Count | Enhancement | Yrs or S | Enhancement | Yrs or S | Enhancement | Yrs or S | Enhancement | Yrs or S | Enhancement | Yrs or S |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

3. ENHANCEMENTS charged and found true FOR PRIOR CONVICTIONS OR PRIOR PRISON TERMS (mainly § 667-series) and OTHER.
List all enhancements based on prior convictions or prior prison terms charged and found true. If 2 or more under the same section, repeat it for each enhancement (e.g., if 2 non-violent prior prison terms under §667.5(b) list § 667.5(b) 2 times. DO NOT LIST enhancements not found true. Also enter here any enhancement not provided for in space 2. DO NOT LIST TIME imposed.
For indeterminate terms, report enhancements and time for them on the abstract.

| Enhancement | Yrs or S | Enhancement | Yrs or S | Enhancement | Yrs or S | Enhancement | Yrs or S | Enhancement | Yrs or S |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| Enhancement | | Enhancement | | Enhancement | | Enhancement | | Enhancement | |
| | | | | | | | | | |

4. ☐ Defendant was sentenced TO DEATH on counts _____ .

5. ☒ Defendant was sentenced to State Prison for an indeterminate term:

   A. ☒ For LIFE, or a term such as 15 or 25 years to life, WITH POSSIBILITY OF PAROLE on counts \_\_\_1\_\_\_ .

   B. ☐ For LIFE WITHOUT the possibility of parole on counts _____ .

   C. ☐ For other term prescribed by law on counts _____ . (Life Terms are on "A" and "B.")

6. ☐ Counts _____ are alternate felony/misdemeanors and were DEEMED MISDEMEANORS.
   A term in jail ☐ was ☐ was not ordered.

7. ☐ For counts _____ the defendant was placed on FELONY probation.

   A. (1) ☐ Sentence pronounced and execution of sentence was suspended; or

     (2) ☐ Imposition of sentence was suspended.

   B. Conditions of probation included     ☐ Jail Time     ☐ Fine

8. ☐ Other dispositions

   A. ☐ Defendant was committed to California Youth Authority.

   B. ☐ Proceedings suspended, and defendant was committed to California Rehabilitation Center.

   C. ☐ Proceedings suspended, and defendant was committed as a Mentally Disordered Sex Offender.

   D. ☐ Proceedings suspended, and defendant was committed as mentally incompetent.

NOTE 1: PURSUANT TO ARTICLE VI, SECTION 6 OF THE CALIFORNIA CONSTITUTION AND SECTION 68505 OF THE GOVERNMENT CODE, THE CHIEF JUSTICE REQUIRES THAT EACH SUPERIOR COURT SHALL COMPLETE THIS FORM FOR EACH INDETERMINATE SENTENCE TO STATE PRISON OR SENTENCE CHOICE OTHER THAN STATE PRISON.

NOTE 2: FOR DEATH SENTENCE OR INDETERMINATE SENTENCE, ABSTRACT OF JUDGMENT MUST ALSO BE PREPARED. IT IS NOT SENT TO THE ADMINISTRATIVE OFFICE OF THE COURTS (AOC).

NOTE 3: IF DEFENDANT IS SENTENCED ON BOTH DETERMINATE AND INDETERMINATE COUNTS, FORM DSL 290 OR 290.1 MUST BE PREPARED AND SENT TO AOC AS WELL AS THIS FORM (AND AN ABSTRACT FOR INDETERMINATE COUNTS THAT IS NOT SENT TO AOC).

| DEPUTY'S SIGNATURE | DATE |
|---|---|
| | Mar. 14, 1991 |

**REPORT – INDETERMINATE SENTENCE**
FORM CR 291

Const. A

Form Adopted by the
Judicial Council of California
Effective April 1, 1990

DISTRIBUTION:    PINK COPY – COURT FILE      YELLOW COPY – EXTRA      WHITE COPY – ADMINISTRATIVE OFFICE OF ...

**E X H I B I T   "B"**
**"Board Of Parole Hearing Transcript"**

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )     CDC Number E-89844
Hearing of:                   )
                              )
SALVATORE GRAFFAGNINO         )
_____)


CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

DECEMBER 9, 2005

9:00 A.M.


PANEL PRESENT:

TOM SAWYER, Presiding Commissioner
BRUCE MITCHELL, Deputy Commissioner

OTHERS PRESENT:

SALVATORE GRAFFAGNINO, Inmate
MARY ANN TARDIFF, Attorney for Inmate
RICHARD STORMS, Deputy District Attorney
CORRECTIONAL OFFICER UNIDENTIFIED


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____   No    See Review of Hearing
_____   Yes   Transcript Memorandum


**Connie Mastin**              **Peters Shorthand Reporting**

ii

# INDEX

                                                           Page

Proceedings ..................................   1

Case Factors .................................   6

Pre-Commitment Factors........................  15

Post-Commitment Factors.......................  24

Parole Plans .................................  18

Closing Statements ...........................  48

Recess .......................................  52

Decision .....................................  53

Adjournment ..................................  65

Transcriber Certification.....................  66

--oOo--

1

PROCEEDINGS

1        **PROCEEDINGS**

2        **PRESIDING COMMISSIONER SAWYER:**  Okay.  Thank

3  you.  This is a Subsequent Parole Consideration

4  Hearing for Salvatore Graffagnino.  Did I

5  pronounce that right?

6        **INMATE GRAFFAGNINO:**  Salvatore.

7        **PRESIDING COMMISSIONER SAWYER:**  Salvatore.

8        **INMATE GRAFFAGNINO:**  Yeah.

9        **PRESIDING COMMISSIONER SAWYER:**  Sorry.  I'm

10  so worried about the last name that I blew over

11  the first name.  G-R-A-F-I --

12  G-R-A-F-A-G-N-I-N-O.

13        **INMATE GRAFFAGNINO:**  No, Sir.

14        **PRESIDING COMMISSIONER SAWYER:**  That's not

15  correct?

16        **INMATE GRAFFAGNINO:**  No, Sir.

17  G-R-A-F-F-A-G-N-I-N-O.  Double F.

18        **PRESIDING COMMISSIONER SAWYER:**  Two Fs in

19  there.  Okay.  I'm going to put that F in there.

20        **DEPUTY COMMISSIONER MITCHELL:**  Did you say

21  two Is also?

22        **INMATE GRAFFAGNINO:**  No, Sir.

23        **DEPUTY COMMISSIONER MITCHELL:**  Just the one

24  I between the --

25        **PRESIDING COMMISSIONER SAWYER:**  I left an

26  out, right?

27        **ATTORNEY TARDIFF:**  Uh-hmm.

2

1       **PRESIDING COMMISSIONER SAWYER:**  Okay.  The

2    correct spelling would be G-R-A-F-F-A-G-N-I-N-O.

3       **INMATE GRAFFAGNINO:**  Yes, Sir.

4       **PRESIDING COMMISSIONER SAWYER:**  And

5    Salvatore is S-A-L-V-A-T-O-R-E.

6       **INMATE GRAFFAGNINO:**  Yes, Sir.

7       **PRESIDING COMMISSIONER SAWYER:**  Okay.  Thank

8    you.  CDC number E as in Edward 89844.  Today's

9    date is 12/9 of '05.  The time is 9:00 a.m.

10   We're located at the Correctional Training

11   Facility in Soledad.  Date received is 3/19 of

12   1981.  That's not correct, is it?

13      **INMATE GRAFFAGNINO:**  No.

14      **PRESIDING COMMISSIONER SAWYER:**  '91?

15      **INMATE GRAFFAGNINO:**  3/18/90 -- yeah, '91,

16   yes.

17      **PRESIDING COMMISSIONER SAWYER:**  The crime

18   was committed in '90.

19      **INMATE GRAFFAGNINO:**  Yes, Sir.

20      **PRESIDING COMMISSIONER SAWYER:**  From

21   Monterey County.

22      **INMATE GRAFFAGNINO:**  Yes, Sir.

23      **PRESIDING COMMISSIONER SAWYER:**  For murder

24   in the second degree, case number CR6037, count

25   number one, 187 of the Penal Code.  The term is

26   15 years to life.  Minimum eligible parole date

27   was 10/23 of the year 2000.  This hearing is

3

1    being tape-recorded.  And for purpose of voice

2    identification each of us is required to state

3    our first and last name, spelling our last name.

4    When it comes to your turn, we want you to spell

5    your last name slowly, and give us your CDC

6    number as well.  Okay.  I'll start.  Tom Sawyer,

7    S-A-W-Y-E-R, Commissioner.

8        **DEPUTY COMMISSIONER MITCHELL:**  Bruce

9    Mitchell, M-I-T-C-H-E-L-L, Deputy Commissioner.

10       **DEPUTY DISTRICT ATTORNEY STORMS:**  Richard

11   Storms, last name S-T-O-R-M-S, and I work for

12   the District Attorney's Office.

13       **ATTORNEY TARDIFF:**  What county?

14       **DEPUTY DISTRICT ATTORNEY STORMS:**  Monterey

15   County.

16       **ATTORNEY TARDIFF:**  Mary Ann Tardiff,

17   T-A-R-D-I-F-F, attorney for Mr. Graffagnino.

18       **INMATE GRAFFAGNINO:**  Salvatore Graffagnino,

19   G-R-A-F-F-A-G-N-I-N-O, E-89844.

20       **PRESIDING COMMISSIONER SAWYER:**  Okay.  Thank

21   you.  We have a correctional peace officer in

22   the room for security purposes.  The record

23   reflects you signed a BPT Form 1073, which is

24   the reasonable accommodation notice and request

25   in accordance with the provisions of the ADA,

26   Americans with Disabilities Act, 3/10 of '05.

27   You indicate on here you do not have any

4

1  disabilities.

2      **INMATE GRAFFAGNINO:**  That's correct.

3      **PRESIDING COMMISSIONER SAWYER:**  Okay.  Would

4  you pass that over and make sure it's current

5  and correct.

6      **INMATE GRAFFAGNINO:**  Yes, Sir.

7      **PRESIDING COMMISSIONER SAWYER:**  Thank you.

8  Also today you had a brief interview with your

9  attorney, and she talked about the accommodation

10  disabilities.

11      **INMATE GRAFFAGNINO:**  Yes, Sir.

12      **PRESIDING COMMISSIONER SAWYER:**  And she

13  talked about the outline of the hearing

14  procedure.

15      **INMATE GRAFFAGNINO:**  Yes, Sir.

16      **PRESIDING COMMISSIONER SAWYER:**  She talked

17  about your rights.

18      **INMATE GRAFFAGNINO:**  Yes, Sir.

19      **PRESIDING COMMISSIONER SAWYER:**  And she

20  talked about confidential material that might be

21  used in this case.

22      **INMATE GRAFFAGNINO:**  Yes, Sir.

23      **PRESIDING COMMISSIONER SAWYER:**  You and she

24  signed 12/9/05, Mary Ann Tardiff and the

25  inmate's signature on this document.  And,

26  counsel, are you waiving those items?

27      **ATTORNEY TARDIFF:**  I am.

5

1      **PRESIDING COMMISSIONER SAWYER:**   Thank you.

2    Commissioner Mitchell, is there any confidential

3    material?

4      **DEPUTY COMMISSIONER MITCHELL:**   Yes, there

5    is.   It's not going to be used.

6      **PRESIDING COMMISSIONER SAWYER:**   Thank you.

7    Okay.   We'll pass the hearing checklist marked

8    Exhibit One.   Pass it to Ms. Tardiff.   Check

9    those against -- We do have a new psych report I

10   believe.

11     **ATTORNEY TARDIFF:**   Yes.   I'll mark that.

12     **PRESIDING COMMISSIONER SAWYER:**   Thank you.

13     **ATTORNEY TARDIFF:**   I have these documents.

14   Thank you.

15     **DEPUTY DISTRICT ATTORNEY STORMS:**   I also

16   have these documents.

17     **PRESIDING COMMISSIONER SAWYER:**   Thank you.

18     **ATTORNEY TARDIFF:**   I've submitted all

19   documents.

20     **PRESIDING COMMISSIONER SAWYER:**   Will there

21   be any preliminary objections?

22     **ATTORNEY TARDIFF:**   No.   I would like the

23   Panel to note though that there is a writ

24   pending at this time, and that my client does

25   not waive any rights he may have under that

26   pending writ pertaining to the last Panel's

27   decision in '04.

6

1        **PRESIDING COMMISSIONER SAWYER:**  Okay.  Will

2    he be speaking with --

3        **ATTORNEY TARDIFF:**  Yes.

4        **PRESIDING COMMISSIONER SAWYER:**  Okay.  Would

5    you raise your right hand, sir.  Do you solemnly

6    swear or affirm the testimony you're about to

7    give in this hearing will be the truth, the

8    whole truth, and nothing but the truth?

9        **INMATE GRAFFAGNINO:**  Yes, Sir.

10       **PRESIDING COMMISSIONER SAWYER:**  Okay.  I'm

11   going to be reading from the July 2005 calendar

12   Board report, summary of crime, page one.

13              "On the evening of 10/8 of 1990

14              Jose Gonzalez was found by Monterey

15              County Sheriff's Deputies after

16              receiving a call about a possible

17              murder in the area of Rogge,

18              R-O-G-G-E, Road in Natividad,

19              N-A-T-I-V-I-D-A-D.  Jose Gonzalez

20              was found sitting in the driver's

21              seat and slumped sideways over the

22              center console of his car.  There

23              was a large amount of blood on his

24              shirt and large laceration on his

25              side of his neck.  The autopsy

26              later revealed this laceration

27              largely severed the neck muscular

7

1    attachments at the base of -- at
2    the base of the tongue.  There were
3    also multiple stab wounds.  One
4    stab wound was located on the left
5    side of the chest, and one below
6    the armpit.  There were deep cuts
7    on the left arm, cuts on both
8    hands, cuts to the mid thigh, lower
9    left leg, and wounds in the area of
10   the penis.  Gonzalez never regained
11   consciousness and died 10/10 of
12   1990 as a result of anoxic,
13   A-N-O-X-I-C, brain damage due to
14   loss of blood caused by the stab
15   wounds.  The evening of 10/7/1990
16   the inmate and his brother Joe,
17   Chuck Altemeyer, A-L-T-E-M-E-Y-E-R,
18   and two 15-year-old and 16-year-old
19   girls, names unknown, were partying
20   near the strawberry fields on Rogge
21   Road when a girl came running
22   towards them yelling for help.  The
23   girl stated that a guy had just
24   tried to rape her.  This made the
25   inmate angry.  According to
26   witnesses, the inmate stated this
27   guy is going to pay.  Soon after

8

1          the girl approached them, the man,

2          Jose Gonzalez -- the girl said that

3          he had raped her and drove towards

4          him.   Salvatore drove his --

5          Salvatore drove his vehicle towards

6          pushing Jose Gonzalez into the

7          field.   The Graffagnino brothers,

8          Joe and Salvatore, exited the

9          vehicle and began stabbing Jose

10         Gonzalez.   Mr. Altemeyer was also

11         hitting and kicking Jose Gonzalez

12         while Joe and Salvatore was

13         stabbing him.   Once they completed

14         their assault they drove to

15         Natividad Plaza where they let the

16         16-year-old girl go -- where the

17         let the 16-year-old girl with them

18         out of the vehicle.   According to

19         the 15-year-old girl, who was with

20         them, she helped Salvatore wipe the

21         blood of his sweatshirt at the

22         Quick Mart.   It was also observed

23         Joe and Salvatore wrap their knives

24         in a bloody sweatshirt and placed

25         it in the trunk of the car.   She

26         stated she went -- then went with

27         Joe to the house where he had put

9

1        the knives in a metal box behind a

2        wall.   Later on that evening

3        Salvatore, Joe, approached a friend

4        named Donny Blaylock,

5        B-L-A-Y-L-O-C-K, and stated to him

6        that they had just killed somebody.

7        They stated that the guy tried to

8        rape a girl who was with them, and

9        for that they killed him.  Blaylock

10       stated that Joe was one of them who

11       slashed the victim's next, and

12       Salvatore stabbed him under the

13       arm.  Blaylock stated that he did

14       not believe them and decided to

15       drive to the scene with Salvatore

16       to show him the murder victim.

17       Danny Blaylock later called 911.

18       The defendants were taken into

19       custody on 10/23/1990 while driving

20       a blue 1980 Mercury Cougar.  Search

21       of the vehicle and the residence

22       produced several knives, two of

23       which matched the descriptions

24       given by witnesses as the knives

25       used in the murder.  Chuck

26       Altemeyer was later taken into

27       custody at his residence.  None of

10

1           the suspects admitted any knowledge

2           of the killing.  There was no

3           evidence provided which indicated

4           the victim was known by any of the

5           suspects prior to the crime.  The

6           crime was committed in concert with

7           brother Joe and Chuck, friend --

8           and friend Chuck Altemeyer.  The

9           weapons that used -- The weapons

10          that killed Jose Gonzalez were

11          described as a Rambo type knife,

12          which belonged to Joe, and a buoy

13          knife, which belong to Salvatore,

14          and bicycle fork, which was used by

15          Chuck Altemeyer to strike murder

16          victim Jose Gonzalez.  The source

17          of these documents -- source

18          documents used to compile this

19          information were the probation

20          officer's report from the Superior

21          Court Monterey County dated 3/4/91,

22          pages two through 12, and one

23          document from the Superior Court of

24          the State of California Monterey

25          County dated 12/21/1990."

26  I have your version also in print here, but can

27  you tell me what happened that night.

11

1        **INMATE GRAFFAGNINO:**  We were out at

2     Alexander's Ranch, a place called Rogge and

3     Natividad.  There's like -- There were a lot of

4     people out there, close to 50 people or more.

5     It was somebody's party, birthday party.  And

6     when we were leaving I offered to given Joanne

7     Trigolo (phonetic) a ride home because who she

8     was riding with was real drunk, and he wasn't

9     somebody to trust behind the wheel with her in

10    there.  Because she lived a couple blocks away,

11    I offered to give her a ride.  When me, my

12    brother, and Joanne was leaving the area, Chuck

13    Altemeyer and his girlfriend were in the car

14    behind us.  They were leaving behind us.  When

15    we pulled up on top of the other area where we

16    were partying, this girl came running out to the

17    car with a guy chasing her.  Well, when he seen

18    us stop he turned around and took off running.

19    When she come running up to the car she was

20    already missing her shoes, some of her clothes

21    were ripped, and this guy she said was trying to

22    attack her.  So I jump back in the car using the

23    car's headlights, turn and try to see where he

24    went.  He come -- He jumped back in his car,

25    which was through the field.  He come charging

26    through the road in what's called -- approached

27    our car going real fast.  My brother was out of

12

1    the car walking down the road trying to see

2    where he went.  Well, when he went racing past

3    where my brother was he almost hit my brother

4    also with his car.  So that when I, using the

5    car -- He stopped in front of us and started

6    backing up.  Using my car, I used bumper to

7    bumper, pushed him back into the strawberry

8    fields where he couldn't get out.  And I got out

9    and commenced -- was fighting with him.  I don't

10   -- I ain't sure when my brother came up, or how

11   Altemeyer came up onto the scene.  He was in a

12   different car.  But fighting with the guy, I

13   ended up pulling out my knife.

14        **PRESIDING COMMISSIONER SAWYER:**  Is that a

15   folded knife?

16        **INMATE GRAFFAGNINO:**  No, Sir.

17        **PRESIDING COMMISSIONER SAWYER:**  It was a

18   sheath knife?

19        **INMATE GRAFFAGNINO:**  Yes, Sir.  And I had it

20   on my side.  But I pulled out the knife and I

21   stabbed him.  I don't remember how many times or

22   where, but I stabbed him.  I didn't find out,

23   you know -- When my brother came up, he was

24   pulling us apart and stuff.  I don't remember

25   Chuck Altemeyer hitting the guy until, you know,

26   later on when they said that's what happened.

27   But I started to walk away from the area, and

13

1   that's what -- I looked back and I seen them

2   looking for something.  Well, I started walking

3   back and they said they found it, and Altemeyer

4   stood up with his hat.  I guess he dropped his

5   hat during the tussle.  Well, we all got back in

6   the cars and left.  I didn't find out until we

7   got to a Quick Stop or the Quickie Mart,

8   whatever it, on Alvin and Natividad, that my

9   brother cut the guy's throat.  But we told the

10  girl to go.  That's when Danny Blaylock showed

11  up.  Danny or Donny Blaylock, one of the two.

12  They showed up.  And what do you call it, his

13  brother was showing up too.  We went out there,

14  you know, to find out if the dude was still

15  alive.  Donny went up to the car and he said the

16  guy was still alive and he was going to call

17  911.  So we went out there in his truck.  I did

18  not drive.  He dropped me off and he called 911.

19      **PRESIDING COMMISSIONER SAWYER:**  Now, did all

20  this fight take place while this guy was sitting

21  in his car?

22      **INMATE GRAFFAGNINO:**  No, Sir.

23      **PRESIDING COMMISSIONER SAWYER:**  How did he

24  get back into his car?

25      **INMATE GRAFFAGNINO:**  I'm not sure how, but

26  he was not in his car because he jumped out, and

27  that's when we were fighting.  He did not stay

14

1    in his car.

2        **PRESIDING COMMISSIONER SAWYER:**  How much had

3    you had to drink that night?

4        **INMATE GRAFFAGNINO:**  I had over the course

5    of a couple hours out there, I had a lot, but I

6    wasn't drunk.

7        **PRESIDING COMMISSIONER SAWYER:**  Was it a

8    kegger?

9        **INMATE GRAFFAGNINO:**  No. It was just a

10   mixture of beer and stuff.

11       **PRESIDING COMMISSIONER SAWYER:**  Beer and

12   what?

13       **INMATE GRAFFAGNINO:**  There was hard alcohol,

14   but I wasn't drinking any of the hard alcohol.

15       **PRESIDING COMMISSIONER SAWYER:**  Was there

16   any drugs?

17       **INMATE GRAFFAGNINO:**  No, Sir.

18       **PRESIDING COMMISSIONER SAWYER:**  No

19   marijuana?

20       **INMATE GRAFFAGNINO:**  No.

21       **PRESIDING COMMISSIONER SAWYER:**  How many

22   drinks do you think you had?

23       **INMATE GRAFFAGNINO:**  I don't remember.

24       **PRESIDING COMMISSIONER SAWYER:**  Okay. You

25   were 21 at the time?

26       **INMATE GRAFFAGNINO:**  Yes, Sir.

27       **PRESIDING COMMISSIONER SAWYER:**  Did you have

15

1    a history of drinking?

2         INMATE GRAFFAGNINO:  No, Sir.

3         PRESIDING COMMISSIONER SAWYER:

4    (Indiscernible).

5         INMATE GRAFFAGNINO:  No.  I drank at parties

6    and stuff like that, but it wasn't where I was

7    constantly drinking.

8         PRESIDING COMMISSIONER SAWYER:  Okay.  Thank

9    you for talking about it.  You don't have any

10   juvenile record or adult record.

11        INMATE GRAFFAGNINO:  No, Sir.

12        PRESIDING COMMISSIONER SAWYER:  Is that

13   correct?

14        INMATE GRAFFAGNINO:  That's correct.

15        PRESIDING COMMISSIONER SAWYER:  And you were

16   born on 7/24 of 1969.

17        INMATE GRAFFAGNINO:  Yes, Sir.

18        PRESIDING COMMISSIONER SAWYER:  In New York.

19        INMATE GRAFFAGNINO:  Yes, Sir.

20        PRESIDING COMMISSIONER SAWYER:  Your father

21   died in 1992.

22        INMATE GRAFFAGNINO:  Yes, Sir.

23        PRESIDING COMMISSIONER SAWYER:  And your

24   mother and your sister -- Your mother I-L-O-N-A,

25   Ilona.

26        INMATE GRAFFAGNINO:  Ilona.

27        PRESIDING COMMISSIONER SAWYER:  Nelson,

16

1   N-E-L-S-O-N, and your sister Heather reside in

2   Salinas.

3       **INMATE GRAFFAGNINO:**  Marina, a little off of

4   Salinas.

5       **PRESIDING COMMISSIONER SAWYER:**  They live in

6   Marina?

7       **INMATE GRAFFAGNINO:**  Yeah.

8       **PRESIDING COMMISSIONER SAWYER:**  A county

9   over.

10      **INMATE GRAFFAGNINO:**  Yes, Sir.

11      **PRESIDING COMMISSIONER SAWYER:**  Did they

12  live in Salinas at one time?

13      **INMATE GRAFFAGNINO:**  Yes, Sir.

14      **PRESIDING COMMISSIONER SAWYER:**  Your brother

15  Anthony lives in San Jose.

16      **INMATE GRAFFAGNINO:**  Yes, Sir.

17      **PRESIDING COMMISSIONER SAWYER:**  And your

18  brother Joe currently lives in Salinas.

19      **INMATE GRAFFAGNINO:**  Joe Graffagnino moved

20  up to Washington.

21      **PRESIDING COMMISSIONER SAWYER:**  To

22  Washington.

23      **INMATE GRAFFAGNINO:**  Yes, Sir.

24      **PRESIDING COMMISSIONER SAWYER:**  How much

25  time did he do?

26      **INMATE GRAFFAGNINO:**  He did six and a half.

27      **PRESIDING COMMISSIONER SAWYER:**  Six and a

17

1   half years?

2       INMATE GRAFFAGNINO:  Yes, Sir.

3       PRESIDING COMMISSIONER SAWYER:  What was his

4   -- What did he come in on, second degree --

5   murder second?

6       INMATE GRAFFAGNINO:  No, he came in on a

7   manslaughter 11 with one-year enhancement for

8   the knife.

9       PRESIDING COMMISSIONER SAWYER:  Did he go to

10  trial?

11      INMATE GRAFFAGNINO:  No, Sir.

12      PRESIDING COMMISSIONER SAWYER:  Did you go

13  to trial?

14      INMATE GRAFFAGNINO:  No, Sir.

15      PRESIDING COMMISSIONER SAWYER:  It says here

16  you did not abuse alcohol during the years of

17  '88 through May of '90.  Claims he smoked

18  marijuana at least once a week.

19      INMATE GRAFFAGNINO:  Experimenting, you

20  know, here and there, but it wasn't really --

21      PRESIDING COMMISSIONER SAWYER:  Tried

22  cocaine twice.  Experimented with

23  Methamphetamine three or four times.

24      INMATE GRAFFAGNINO:  Yes, Sir.

25      PRESIDING COMMISSIONER SAWYER:  Is that

26  correct?

27      INMATE GRAFFAGNINO:  Yes, Sir.

18

1    **PRESIDING COMMISSIONER SAWYER:**  And as you

2    said, you claim that you were only drinking

3    alcohol that night.  No military history, and no

4    sexual deviations or mental disorders prior to

5    or during the time period the crime was

6    committed.  Your future plans indicate that you

7    would reside with Clay and Susan Edgin.

8    **INMATE GRAFFAGNINO:**  No, Sir.  My parole

9    plans changed.  Clay and Susan Edgin sold their

10   house.  They're moving out of Monterey County.

11   So I'll go and stay with my mom.

12   **PRESIDING COMMISSIONER SAWYER:**  Your mom and

13   your sister in Marina?

14   **INMATE GRAFFAGNINO:**  Yes, Sir.

15   **PRESIDING COMMISSIONER SAWYER:**  Do they

16   still live at Lake Drive, Number 40?

17   **INMATE GRAFFAGNINO:**  Yes, Sir.

18   **PRESIDING COMMISSIONER SAWYER:**  And what

19   kind of a house or apartment?

20   **INMATE GRAFFAGNINO:**  It's a two-bedroom

21   apartment.  It's just something, you know.  I'll

22   stay there until I get my job, get my own place.

23   **PRESIDING COMMISSIONER SAWYER:**  How old is

24   your sister Heather?

25   **INMATE GRAFFAGNINO:**  My sister, 22 now.

26   She'll be getting ready to move out herself.

27   **PRESIDING COMMISSIONER SAWYER:**  Your baby

19

1   sister?

2       **INMATE GRAFFAGNINO:** Yes, Sir.

3       **PRESIDING COMMISSIONER SAWYER:** Do you talk

4   with your mom and your sister?

5       **INMATE GRAFFAGNINO:** Yes, Sir.

6       **PRESIDING COMMISSIONER SAWYER:** Do they

7   visit?

8       **INMATE GRAFFAGNINO:** My mom is fully

9   handicapped. She's got rheumatoid arthritis and

10  diabetes. She's bedridden. She visited up

11  until she was put in the hospital. And from

12  there she couldn't come up.

13      **PRESIDING COMMISSIONER SAWYER:** Okay.

14      **INMATE GRAFFAGNINO:** But I call her every

15  other week.

16      **PRESIDING COMMISSIONER SAWYER:** And I have

17  some letters in your packet. One undated letter

18  from Thomas Crites, C-R-I-T-E-S.

19      **INMATE GRAFFAGNINO:** Yes, Sir, that's my

20  aunt's husband.

21      **PRESIDING COMMISSIONER SAWYER:** Your aunt's

22  husband.

23      **INMATE GRAFFAGNINO:** Yes, Sir, Audrey

24  Nelson.

25      **PRESIDING COMMISSIONER SAWYER:** And he's

26  known you for 20 years.

27      **INMATE GRAFFAGNINO:** Yeah.

20

1    **PRESIDING COMMISSIONER SAWYER:** "I'm willing

2    to lend him whatever support I can.  I work in

3    produce, (indiscernible) jobs, get him a job at

4    least."  And he says you certainly welcome in

5    his home.  I have a letter from your aunt.

6       **INMATE GRAFFAGNINO:**  Audrey Nelson.

7       **PRESIDING COMMISSIONER SAWYER:**  Audrey

8    Nelson.

9       **INMATE GRAFFAGNINO:**  Yes, Sir.

10      **PRESIDING COMMISSIONER SAWYER:**  When did you

11   receive these letters?

12      **INMATE GRAFFAGNINO:**  I got these letters,

13   what was it, September.

14      **PRESIDING COMMISSIONER SAWYER:**  Of this

15   year?

16      **INMATE GRAFFAGNINO:**  Yes, Sir.

17      **PRESIDING COMMISSIONER SAWYER:**  Do you have

18   the envelope?

19      **INMATE GRAFFAGNINO:**  No, I don't.  I didn't

20   think of bringing it.  I know they sent letters

21   to the counselor, to the BPT, and one to me.

22   They sent three letters out.

23      **ATTORNEY TARDIFF:**  If you don't get a --

24   make sure you tell them to date their letters.

25      **INMATE GRAFFAGNINO:**  All right.

26      **PRESIDING COMMISSIONER SAWYER:**  It talks

27   about they'll give you encouragement, be

21

1    available day and night for moral support.

2    "I've heard the pride in his educational skills

3    acquired while serving his time.  Unfortunately

4    I live in a small apartment and cannot afford

5    housing, but my home is always open."   And I

6    have a letter from your mother.

7         **INMATE GRAFFAGNINO:**  Yes, Sir.

8         **PRESIDING COMMISSIONER SAWYER:**  Ilona.

9         **INMATE GRAFFAGNINO:**  Ilona.

10        **PRESIDING COMMISSIONER SAWYER:**  Okay.  And

11   the same Lake Drive, Number 40 in Marina,

12   California.  It talks about how you matured in

13   your education.  She's severely disabled.  "I'll

14   be there for him morally and financially support

15   as possible.  As a disabled person I've learned

16   the importance of social programs to assist

17   people, encourage him to seek programs offered

18   when (indiscernible)."  She doesn't say you can

19   come live with her?

20        **ATTORNEY TARDIFF:**  The step-father's letter

21   doesn't.  I saw that letter, and I don't know --

22        **INMATE GRAFFAGNINO:**  No, she --

23        **ATTORNEY TARDIFF:**  Do you have a copy of it?

24        **INMATE GRAFFAGNINO:**  My step-dad?

25        **ATTORNEY TARDIFF:**  Yeah.

26        **INMATE GRAFFAGNINO:**  Yeah.  It's right here.

27   Yeah.  My mom does not list on the letter, but

22

1    she said that, you know --

2         **ATTORNEY TARDIFF:** Can you give that to me?

3         **INMATE GRAFFAGNINO:** -- at the one time they

4    still plan on living out in Middlefield, but

5    they just sold their house.

6         **PRESIDING COMMISSIONER SAWYER:** Okay.

7         **INMATE GRAFFAGNINO:** And that's where my mom

8    -- That letter came after the one from my mom.

9    That's from my step-dad right there.

10        **PRESIDING COMMISSIONER SAWYER:** Okay. I

11   have this letter in the file.

12        **ATTORNEY TARDIFF:** And that letter I believe

13   states that he can live there.

14        **PRESIDING COMMISSIONER SAWYER:** This is from

15   Bellingham, Washington.

16        **INMATE GRAFFAGNINO:** Yeah.

17        **ATTORNEY TARDIFF:** Okay.

18        **INMATE GRAFFAGNINO:** He's still married with

19   my mom. They're still --

20        **ATTORNEY TARDIFF:** "My wife has a room ready

21   for him in Marina, California." It says that at

22   the bottom.

23        **PRESIDING COMMISSIONER SAWYER:** I see that.

24   Okay. "In either case, his mother and I will

25   help him out financially with housing. We'll

26   help him in any way (indiscernible) uneventful

27   rehabilitation. (Indiscernible) for aunts,

23

1   uncles, brothers, sisters, mother and myself."

2   And this is from Mark Moss, M-O-S-S, Bellingham,

3   Washington. It's interesting, he's moved back

4   to his reservation, huh?

5      **INMATE GRAFFAGNINO:** Yes, Sir. He's out

6   there teaching and working at the college up

7   there on the reservation.

8      **PRESIDING COMMISSIONER SAWYER:** That's

9   interesting. Now, I don't have any letters from

10   your brothers and sisters.

11      **INMATE GRAFFAGNINO:** No, Sir.

12      **PRESIDING COMMISSIONER SAWYER:** Okay. One

13   sister lives in Marina.

14      **INMATE GRAFFAGNINO:** That's right.

15      **PRESIDING COMMISSIONER SAWYER:** How about

16   your brothers and sisters, besides Joe?

17      **INMATE GRAFFAGNINO:** I've got one other

18   brother. And I never asked him to write a

19   letter or anything like that. He's always done

20   his own thing. Last I heard he was an assistant

21   manager at an Olive Garden. And I could get

22   letters from him and get help from him. I just

23   never asked him for letters.

24      **PRESIDING COMMISSIONER SAWYER:** Okay.

25   That's all I have. Commissioner Mitchell.

26      **DEPUTY COMMISSIONER MITCHELL:** Thank you. I

27   want to correct myself on the confidential. We

24

1    probably should discuss it whether or not

2    there's anything within it that we need to

3    consider or not.  So let's leave that as a

4    possibility.  I'm going to let you know if we're

5    going to consider any of it.

6         **INMATE GRAFFAGNINO:** Yes, Sir.

7         **DEPUTY COMMISSIONER MITCHELL:**

8    (Indiscernible)?

9         **INMATE GRAFFAGNINO:** Yes, Sir.

10        **DEPUTY COMMISSIONER MITCHELL:** All right.

11   Thank you.  In my portion of the hearing, sir, I

12   reviewed your Central File, Post-Conviction

13   progress reports, the life prisoner evaluation

14   report prepared for the July 2005 calendar by

15   Correctional Counselor T., last name is spelled

16   capital M-C capital T-A-R-T-L-A-N.  Is that

17   McTartlan?

18        **INMATE GRAFFAGNINO:** Yes, Sir.

19        **DEPUTY COMMISSIONER MITCHELL:** Is that your

20   counselor now?

21        **INMATE GRAFFAGNINO:** Yes, Sir.

22        **DEPUTY COMMISSIONER MITCHELL:** Also, the

23   psychological evaluation prepared by Dr. Melvin

24   Macomber.  He's a psychologist, Ph.D.  The

25   dictation date, and I believe interview date, is

26   November 25th, 2005.  This appears to be your

27   third Subsequent Parole Consideration Hearing.

25

1   Your last hearing occurred on July 19th, 2004.

2   The Board took action and denied parole for one

3   year.  Recommendations, remain

4   disciplinary-free, and to participate in

5   self-help groups.  Is that correct, sir?

6   **INMATE GRAFFAGNINO:**  Yes, Sir.

7   **DEPUTY COMMISSIONER MITCHELL:**  I'm going to

8   refer to the disciplinary issue at this point

9   since I have it in front of me.  You've complied

10  with the Board's request.  Historically you've

11  received a total of six CDC 115 rule violation

12  reports, the last one dated July 1st, 1994.  You

13  refused a cell move at that time.  You received

14  a total of four counseling chronos, known as CDC

15  128(a)s, the last one dated March 4th, 1997 for

16  failure to follow instructions.  In looking at

17  your rule violation reports themselves, you have

18  one.  It's a 1992 for possession of another

19  inmate's property.  That was an administrative.

20  You have also one in 1992, in April, for force

21  and violence.  That was some kind of a fight

22  between you and another prisoner, on a battery,

23  is that correct?

24  **INMATE GRAFFAGNINO:**  That was force and

25  violence.  They wrote it up as a mutual combat,

26  which was reduced to horseplay.

27  **DEPUTY COMMISSIONER MITCHELL:**  Okay.  Let me

26

1    take a look at that, April '92.  I do not say

2    where they changed it to what you said.  They

3    may in fact have.

4        **INMATE GRAFFAGNINO:**  The bottom part where

5    your hand is at.

6        **DEPUTY COMMISSIONER MITCHELL:**  Let's take a

7    look down here.  Reduced to a division F

8    offense.  Okay.  And I agree with you.  They've

9    got the comments here as horseplay.  And they

10   left on here as a division D.  They probably

11   should have changed that D to an F.

12       **INMATE GRAFFAGNINO:**  Once the blue thing is

13   printed on top the only way that they change it

14   is on the bottom body part.

15       **DEPUTY COMMISSIONER MITCHELL:**  Okay.

16       **INMATE GRAFFAGNINO:**  And that's where it

17   says reduced to a division F.

18       **DEPUTY COMMISSIONER MITCHELL:**  Was the

19   senior hearing officer involved in that, chief

20   disciplinary officer?

21       **INMATE GRAFFAGNINO:**  That reduced it, yes,

22   Sir.

23       **DEPUTY COMMISSIONER MITCHELL:**  The associate

24   warden?

25       **INMATE GRAFFAGNINO:**  They all concurred with

26   it.

27       **DEPUTY COMMISSIONER MITCHELL:**  Okay.  You

27

1   have another 115 in 1992, October, stimulants

2   and sedatives, and that was alcohol, is that

3   correct, pruno?

4       **INMATE GRAFFAGNINO:**  Yes, Sir.

5       **DEPUTY COMMISSIONER MITCHELL:**  Okay.

6       **INMATE GRAFFAGNINO:**  And that was -- If you

7   read the body of it, my cellee had possession of

8   alcohol in the house.  But figuring this is in a

9   closed cell you are responsible for your

10  cellee's actions in prison.

11      **DEPUTY COMMISSIONER MITCHELL:**  Which is

12  true.  You always have the choice.  It may not

13  be your best choice, but you can always tell the

14  correctional officer that your buddy has some

15  pruno in the cell.

16      **INMATE GRAFFAGNINO:**  And then I become a

17  victim on the yard.

18      **DEPUTY COMMISSIONER MITCHELL:**  So that's

19  your choice, right?  But you picked up the beef

20  because it was in the house?

21      **INMATE GRAFFAGNINO:**  Yes, Sir.

22      **DEPUTY COMMISSIONER MITCHELL:**  All right.

23  And February 23rd, 1994 there was a threatening

24  staff.  Do you remember that one?

25      **INMATE GRAFFAGNINO:**  It was a verbal

26  argument.  I had the officer, he was calling me

27  by an improper name.  I told him it would be,

1   you know -- we got issues with it, and he took
2   it as a threat.
3       **DEPUTY COMMISSIONER MITCHELL:**  Let me see,
4   what it says here is I gave you two actually
5   direct orders to leave the office, then gave you
6   a third direct order to leave the office, but
7   again you refused at that time.  Let's see, he
8   stated Ramirez, Ramirez is the correctional
9   officer how wrote this, he quotes this and says
10  I'm going to hurt you if you don't watch it.  Do
11  you remember making that statement?
12      **INMATE GRAFFAGNINO:**  No, Sir, I don't
13  remember making that statement.
14      **DEPUTY COMMISSIONER MITCHELL:**  That's what's
15  alleged.  Do you recall that?
16      **INMATE GRAFFAGNINO:**  I haven't looked at the
17  rule violation report in a long time.
18      **DEPUTY COMMISSIONER MITCHELL:**  You might
19  look at them when you do your Olsen Review just
20  to be fresh on what the comments were, so if
21  someone asks you you'll remember.  That's what
22  he alleged.  So you were found guilty of that.
23  It was division F offense.  It was considered
24  fairly minor.  June 25th, 1994, conduct, obeying
25  orders -- rules I should say.  And July 1st,
26  1994, refusing a cell move.  Why would you
27  refuse a cell move?

29

1      **INMATE GRAFFAGNINO:**  I was in ad-seg for an

2      investigation into a fight.  And they were

3      moving me from one cell in with somebody I knew

4      I would not get along with.

5      **DEPUTY COMMISSIONER MITCHELL:**  Why?

6      **INMATE GRAFFAGNINO:**  Why, the dude was real

7      disrespectful.  His house was a constant mess.

8      And he's somebody that he just looks for fights.

9      So instead of moving in with a guy that I knew

10     I'd have problems with, it was easier to say no.

11     **DEPUTY COMMISSIONER MITCHELL:**  Did you end

12     up with a different cell?

13     **INMATE GRAFFAGNINO:**  Yes, Sir.

14     **DEPUTY COMMISSIONER MITCHELL:**  All right.

15     **INMATE GRAFFAGNINO:**  I moved to a different

16     cell with somebody else that had no problems.

17     **DEPUTY COMMISSIONER MITCHELL:**  The other

18     recommendation by the Board was to participate

19     in self-help, and apparently that was a concern

20     at last year's Panel, does that sound right to

21     you?

22     **INMATE GRAFFAGNINO:**  Yes, Sir.

23     **DEPUTY COMMISSIONER MITCHELL:**  And your

24     self-help, what I did I listed down all the

25     chronos I could find, including the ones that

26     your attorney gave me this morning as far as

27     self-help.  And it looks like the most recent is

30

1    dated October 5th, 2005 for Alcoholics Anonymous.

2    You have a March 2005 Alcoholics Anonymous

3    chrono.  You have a February 22nd, 2005 AA

4    chrono.  You have chronos in 2004.  There's one

5    that covers from July to December 2004.  You

6    have older ones, and let's see, from, let's see,

7    May 23rd, 2000.  This is not Alcoholics

8    Anonymous, but it's the Pleasant Valley State

9    Prison's lifer's group.

10        **INMATE GRAFFAGNINO:**  Yes, Sir.

11        **DEPUTY COMMISSIONER MITCHELL:**  Then in June

12   of 1999, April 1999, December 1998, October

13   1998, April 1998, and January 1998, you had a

14   combination.  Mostly those are Narcotics

15   Anonymous rather than the Alcoholics Anonymous,

16   but it shows the January 1998 as Alcoholics

17   Anonymous.  Does that sound right to you?

18        **INMATE GRAFFAGNINO:**  Yes, Sir.  I had NA

19   meetings.  They cancelled the Alcoholics

20   Anonymous because they lost the sponsor.

21        **DEPUTY COMMISSIONER MITCHELL:**  Okay.

22        **INMATE GRAFFAGNINO:**  And Narcotics Anonymous

23   was still ongoing, running, and it's pretty much

24   the same program.  So I figured I'll get that

25   program there.

26        **DEPUTY COMMISSIONER MITCHELL:**  Now, let's

27   talk about this last year since the Board was

31

1   concerned, how often do you attend Alcoholics

2   Anonymous meetings?

3       **INMATE GRAFFAGNINO:**  They've got it twice a

4   month.

5       **DEPUTY COMMISSIONER MITCHELL:**  Okay.  Is

6   that all that's offered to you here?

7       **INMATE GRAFFAGNINO:**  Yes.

8       **DEPUTY COMMISSIONER MITCHELL:**  And they

9   usually produce then a chrono for each class?

10      **INMATE GRAFFAGNINO:**  No, it's for each

11   quarter.

12      **DEPUTY COMMISSIONER MITCHELL:**  Each quarter.

13   All right.  At least based on your opinion,

14   could you have attended it more frequently than

15   you have?

16      **INMATE GRAFFAGNINO:**  Would I attend it more

17   frequently?

18      **DEPUTY COMMISSIONER MITCHELL:**  Could you

19   have?

20      **INMATE GRAFFAGNINO:**  Could I have?

21      **DEPUTY COMMISSIONER MITCHELL:**  Was it

22   available to you more frequently than it was?

23      **INMATE GRAFFAGNINO:**  No, Sir, it's not.

24      **DEPUTY COMMISSIONER MITCHELL:**

25   (Indiscernible) available?

26      **INMATE GRAFFAGNINO:**  Yes, Sir.

27      **DEPUTY COMMISSIONER MITCHELL:**  Okay.  Are

32

1  you at north?

2  **INMATE GRAFFAGNINO:** I'm at north facility.

3  **DEPUTY COMMISSIONER MITCHELL:** All right.

4  Also I noticed here there was something here

5  called outrageous math. There's a notation or I

6  believe it's actually a chrono, February 16th,

7  2005. What is that?

8  **INMATE GRAFFAGNINO:** It's an extra

9  curricular activity program where as, you know,

10  basic math on up, you know, it's check your math

11  skills and stuff like that.

12  **DEPUTY COMMISSIONER MITCHELL:** It wasn't

13  self-help? It actually was a math type class?

14  **INMATE GRAFFAGNINO:** Yeah, it was a math

15  type --

16  **DEPUTY COMMISSIONER MITCHELL:** How many

17  hours?

18  **INMATE GRAFFAGNINO:** It was a home study

19  type thing. They sent the thing home and you do

20  it and send it in.

21  **DEPUTY COMMISSIONER MITCHELL:** All right.

22  Going back to December of 2001, I found a

23  laudatory chrono by Correctional Officer J.

24  Eubanks. And that chrono is the one I believe

25  that was submitted this morning. It's December

26  1st, 2005.

27  **INMATE GRAFFAGNINO:** Yes, Sir.

33

1    **DEPUTY COMMISSIONER MITCHELL:**   And the
2    correctional officer assigned to the north
3    facility of this institution says he observed
4    you in the performance of your duties as the
5    unit IV clerk in the excess of three months.
6    And you performed your duties assigned
7    exceptionally well.   He consistently
8    demonstrated a willingness to utilize his
9    clerical skills to assist staff in the
10   completion of reports without complaint when
11   asked to assist by staff or assisted by staff
12   outside the scope, his current assignment.   I
13   have noted that under periods of extreme work
14   loads for the unit you demonstrate an excellent
15   work ethic by diligently assisting staff and
16   keeping up with the work load, and you've been
17   an exceptional asset to the unit operation.
18   Also, I found here that in 1993, April 1st --
19   '93, pardon me, 2003, you completed a 14-week
20   impact self-help group, is that correct?
21        **INMATE GRAFFAGNINO:**   Yes, Sir.
22        **DEPUTY COMMISSIONER MITCHELL:**   And that's
23   self-help to help you understand the
24   difficulties that the victims of crime see.   I
25   think they usually say it increases your
26   awareness of empathy for survivors of crime, is
27   that correct?

34

1      **INMATE GRAFFAGNINO:**  The impact of my crime
2    and other crimes has on the community and
3    everybody involved.

4      **DEPUTY COMMISSIONER MITCHELL:**  Okay.  Since
5    I'm talking about chronos and certificates, let
6    me just go down the laundry list of
7    certificates, and I'll group it by May, the one
8    I just mentioned.  Then going to 2001 we're
9    talking about welding.  This is all 2000, May,
10   July, May, April, May again here, April, April,
11   April, and May again.  It's all welding, all
12   forms of welding.  And these are all
13   certificates, and you completed these.  We're
14   talking about (indiscernible) arc welding, tools
15   and equipment, gas metal, arc welding, process,
16   orientation and safety, shielded metal arc
17   welding, gas tungsten, arc process, and a
18   settling process, is that correct?

19     **INMATE GRAFFAGNINO:**  Yes, Sir.

20     **DEPUTY COMMISSIONER MITCHELL:**  Kind of like
21   you should know what you're doing in welding?

22     **INMATE GRAFFAGNINO:**  Yes, Sir.  I'm a
23   certified welder.

24     **DEPUTY COMMISSIONER MITCHELL:**  All right.
25   Did you take the state certification test?

26     **INMATE GRAFFAGNINO:**  Yes, Sir.

27     **DEPUTY COMMISSIONER MITCHELL:**  All right.

35

1    IN 1998 to 1997 until the building maintenance

2    group, we're talking about one, two, three,

3    four, five, six, seven, eight, nine, ten, 11,

4    12, 13, 13 different certificates, some

5    duplicated in 1997 as well.

6        **INMATE GRAFFAGNINO:**  Yes, Sir.

7        **DEPUTY COMMISSIONER MITCHELL:**  And this is

8    for plumbing, carpentry, roofing, painting, wall

9    covering, glazing, floor coverings, mathematics

10   as it relates to building maintenance, more

11   floor coverings again, heating ventilation, air

12   conditioning, fountains, concrete, masonry,

13   electrical and shop and safety, is that correct?

14       **INMATE GRAFFAGNINO:**  Yes, Sir.

15       **DEPUTY COMMISSIONER MITCHELL:**  Going back to

16   1996, vocational landscape gardening, a

17   certificate.  I see there's three let's say

18   types of vocational trades.  When you look at

19   the building maintenance it's numerous types of

20   trades mixed in within those.

21       **INMATE GRAFFAGNINO:**  Yes, Sir.

22       **DEPUTY COMMISSIONER MITCHELL:**  Now, can you

23   tell me what your expertise is, like let's say

24   in welding there's the one certificate.  All

25   these are just in (indiscernible).  They're

26   dated June 9th.  You didn't complete all the

27   courses on one day.

36

1        **INMATE GRAFFAGNINO:**  No, Sir.  It was

2    over --

3        **DEPUTY COMMISSIONER MITCHELL:**  How long was

4    it?

5        **INMATE GRAFFAGNINO:**  It's a one-year course

6    if you get the full year in to be able to go

7    through oxi settling, arc, meg, the tig, the

8    healy arc, what is called the plasma cutter, and

9    then you go for the state certification.

10       **DEPUTY COMMISSIONER MITCHELL:**  In that

11   group?

12       **INMATE GRAFFAGNINO:**  Yes.

13       **DEPUTY COMMISSIONER MITCHELL:**  And that's a

14   one-year program basically?

15       **INMATE GRAFFAGNINO:**  Yeah.

16       **DEPUTY COMMISSIONER MITCHELL:**  Let's talk

17   about the building maintenance one.  It's the

18   plumbing, carpentry, roofing.  And they all have

19   the same date essentially.

20       **INMATE GRAFFAGNINO:**  Yes, Sir.

21       **DEPUTY COMMISSIONER MITCHELL:**  In 1998, and

22   then the same dates you might see in 1997 for

23   other ones.

24       **INMATE GRAFFAGNINO:**  Which is --

25       **DEPUTY COMMISSIONER MITCHELL:**

26   (Indiscernible)?

27       **INMATE GRAFFAGNINO:**  What the supervisor

37

1   does is usually he'll build up all the files,

2   and then we does the end of year chronos, or end

3   of, you know -- when he's getting ready to give

4   you a completion in the course, he does all

5   that, sends it over to the clerk.  He types up

6   all the chronos.  And then he places them into

7   the educational file.

8       **DEPUTY COMMISSIONER MITCHELL:**  What I'm

9   curious about, let's just take welding.

10      **INMATE GRAFFAGNINO:**  Right.

11      **DEPUTY COMMISSIONER MITCHELL:**  Welding in

12  the community takes more than a year to become

13  let's say a journeyman welder, or a plumber.

14      **INMATE GRAFFAGNINO:**  Right.

15      **DEPUTY COMMISSIONER MITCHELL:**  How much of

16  the year would you actually be trained in

17  plumbing?

18      **INMATE GRAFFAGNINO:**  Well, this was halfway

19  a refresher course because I also had this in

20  high school.

21      **DEPUTY COMMISSIONER MITCHELL:**  Okay.  What

22  about the carpentry?

23      **INMATE GRAFFAGNINO:**  The carpentry is

24  building maintenance.  It's pretty much a

25  beginner's to get you into an apprenticeship

26  program.

27      **DEPUTY COMMISSIONER MITCHELL:**  So you'd be

38

1   prepared for the community?

2       **INMATE GRAFFAGNINO:** Yes, Sir.

3       **DEPUTY COMMISSIONER MITCHELL:** So as opposed

4   to the welding, which you are certified in --

5       **INMATE GRAFFAGNINO:** Right.

6       **DEPUTY COMMISSIONER MITCHELL:** -- these

7   others, like floor covering, glazing, painting,

8   and roofing, that's to get you prepared to enter

9   a program for more advanced training?

10      **INMATE GRAFFAGNINO:** Yes, Sir.

11      **DEPUTY COMMISSIONER MITCHELL:** Or like a

12  journeyman type program?

13      **INMATE GRAFFAGNINO:** Yes, for

14  apprenticeship.

15      **DEPUTY COMMISSIONER MITCHELL:**

16  (Indiscernible) I should say. All right. That

17  makes more sense. How about the landscape

18  gardening, is that a complete program or also in

19  preparation for --

20      **INMATE GRAFFAGNINO:** That's a complete

21  program, 19 months out there. We work from soil

22  to roses, you know, plants, to tree care. It's

23  full course.

24      **DEPUTY COMMISSIONER MITCHELL:** All right.

25  Very good. Is there anything else in vocational

26  training that I missed?

27      **INMATE GRAFFAGNINO:** No, Sir.

39

1    **DEPUTY COMMISSIONER MITCHELL:**  Okay.  As far
2    as enemies and such, I noticed that you have
3    both confidential and non-confidential enemies.
4    The gang affiliation says Swordsmen member.  And
5    what is that?

6    **INMATE GRAFFAGNINO:**  That is not a gang.  It
7    was --

8    **DEPUTY COMMISSIONER MITCHELL:**  Tell me what
9    that is.

10   **INMATE GRAFFAGNINO:**  It was a Renaissance
11   club that we went to the Renaissance Fair, you
12   know, participation in the tournaments and stuff
13   like that.  It was never a gang.

14   **DEPUTY COMMISSIONER MITCHELL:**  Why do you
15   think they listed as a gang in the probation
16   report or police report?

17   **INMATE GRAFFAGNINO:**  Because the three of us
18   that were involved in this thing were all
19   members.

20   **DEPUTY COMMISSIONER MITCHELL:**  It's just on
21   here.  I didn't look up the specific reference.
22   I could.  But it came from the probation officer
23   report page eight, and I can look that up to see
24   what it says.  The counselor is going to look
25   for that.  Thank you, counselor.

26   **ATTORNEY TARDIFF:**  Yes.

27   **DEPUTY COMMISSIONER MITCHELL:**  In the POR.

40

1      **ATTORNEY TARDIFF:**  I did see something about
2      it being a Renaissance.
3      **DEPUTY COMMISSIONER MITCHELL:**  We might as
4      well clear that up.
5      **ATTORNEY TARDIFF:**  It's a Renaissance club
6      and it's not a gang or a White Supremist group
7      it goes on to state on page eight.
8      **DEPUTY COMMISSIONER MITCHELL:**  And that's in
9      the POR?
10     **ATTORNEY TARDIFF:**  Yes.
11     **DEPUTY COMMISSIONER MITCHELL:**  The
12     institution staff may have missed --
13     **ATTORNEY TARDIFF:**  They list --
14     **DEPUTY COMMISSIONER MITCHELL:**  -- as they
15     stated it.
16     **ATTORNEY TARDIFF:**  -- it as a club.
17     **DEPUTY COMMISSIONER MITCHELL:**  Okay.  And
18     just to clarify, I did find a gang status chrono
19     in your file by Lieutenant Bell at Folsom State
20     Prison, June 5th, 1991.  The lieutenant says, "I
21     reviewed the Central File in regards to his
22     current gang status.  The file does not contain
23     sufficient information to validate you as a
24     member, associate or drop out of any prison
25     gang, let's see, or street gang, neither one."
26     **INMATE GRAFFAGNINO:**  Right.
27     **DEPUTY COMMISSIONER MITCHELL:**  It looks like

41

1    there's no support for the gang (indiscernible).

2    You're currently assigned as a captain's clerk.

3         **INMATE GRAFFAGNINO:** Yes, Sir.

4         **DEPUTY COMMISSIONER MITCHELL:** Okay. I see

5    that you receive exceptional ratings. There's

6    several laudatory chronos from staff and the

7    captain. And you've been in that assignment

8    since June of 2004.

9         **INMATE GRAFFAGNINO:** Yes, Sir.

10        **DEPUTY COMMISSIONER MITCHELL:** Can you type?

11        **INMATE GRAFFAGNINO:** Yes, Sir.

12        **DEPUTY COMMISSIONER MITCHELL:** Where did you

13   get your typing skills at?

14        **INMATE GRAFFAGNINO:** In prison, Sir.

15        **DEPUTY COMMISSIONER MITCHELL:** Okay. Did

16   you take it formally or just on your own?

17        **INMATE GRAFFAGNINO:** On my own.

18        **DEPUTY COMMISSIONER MITCHELL:** From the

19   mental health point of view there's no

20   indication of a severe mental disorder. There's

21   no treatment, no psychotropic medication. The

22   psychologist report notes under the current

23   diagnostic impressions, which is under the

24   DSMIV, Axis I, no contributory clinical

25   disorder. Axis II, no contributory

26   (indiscernible) disorder. Axis III, no

27   contributory physical disorder. Axis IV, life

42

1    term incarceration.  Axis V is a current Global

2    Assessment Functioning, that's a GAF score of

3    90, which is very high.  That means you

4    apparently are doing quite well within the

5    community in here.  You acquired your GED, which

6    was already mentioned, October 13th, 1993.

7        **INMATE GRAFFAGNINO:**  Yes, Sir.

8        **DEPUTY COMMISSIONER MITCHELL:**  We've already

9    covered your (indiscernible) groups.  We've

10   already covered your disciplinary issues.  We're

11   going to review the counselor's report here.

12   The counselor stated in their evaluation that

13   they no longer are supposed to give an

14   assessment of dangerousness.  They simply, in

15   their assessment, said that your parole plans

16   appear to be reasonable.  You plan to acquire

17   updated letters prior the parole consideration

18   hearing.  In the summary section the counselor

19   states that:

20        "Prior to release the prisoner

21        could benefit from remaining

22        disciplinary-free, soliciting

23        updated letters of support from

24        family members, friends and

25        potential employers in the

26        community and maintain his above

27        average to exceptional work

43

1          performance."

2    In the psychological evaluation the

3    psychologist, in addition to (indiscernible)

4    that I mentioned under assessment of

5    dangerousness, says you've been

6    disciplinary-free for the last 11 years.

7    There's no history of participation in riots,

8    possession of weapons, or assaults on others.

9    You did have a fistfight though, right?  That

10   was horseplay.

11        **INMATE GRAFFAGNINO:**  That was, yeah,

12   horseplay.  It was not --

13        **DEPUTY COMMISSIONER MITCHELL:**  You have

14   several chronos in the Central File indicating

15   that he was doing an outstanding job as a

16   captain's clerk.

17          "He's described as stable,

18          hardworking individual who is a

19          positive influence.  His potential

20          for violence is definitely below

21          average in comparison to other

22          inmates.  In considering his

23          potential for dangerous behavior if

24          released to the community at this

25          time, the last evaluator indicated

26          that his potential for dangerous

27          behavior was minimal to none.  I

44

1           agree with that assessment. His
2           potential for violent behavior is
3           essentially nil, and is certainly
4           no greater than the average citizen
5           in the community. There are no
6           significant risk factors in this
7           case."
8  And he concludes by this paragraph:
9           "There are no mental or emotional
10          problems in this case that would
11          interfere with granting a parole
12          date. There are several factors
13          that would indicate a positive
14          adjustment in the community. He
15          has very strong family support in
16          the Salinas area. He has several
17          job offers that are current and
18          viable. He has acquired three
19          trades in the institution. He has
20          very high work ethics. His
21          thinking is prosocial. There's no
22          indication that antisocial thinking
23          or values -- He has no criminal
24          arrest record. The prognosis for
25          successful adjustment in the
26          community is excellent."
27  Again, that's by Dr. Macomber. Counselor, is

45

1    there anything I failed to address, that you

2    wanted to speak to, in this section of the

3    hearing?

4        **ATTORNEY TARDIFF:**  No.

5        **DEPUTY COMMISSIONER MITCHELL:**  Thank you

6    very much.  Chairman we just have about five

7    minutes or less on the tape.

8        **PRESIDING COMMISSIONER SAWYER:**  Do you want

9    to go ahead and flip it?

10       **DEPUTY COMMISSIONER MITCHELL:**  If that's

11   okay I'll turn it off and turn it over.  Thank

12   you.

13     (Thereupon, the tape was changed to side two)

14       **DEPUTY COMMISSIONER MITCHELL:**  We're back on

15   record.  This is side two.

16       **PRESIDING COMMISSIONER SAWYER:**  Thank you.

17   The counselor's report in its comments,

18   recommendations says that you have several job

19   offers that are current and viable.  What are

20   those?

21       **INMATE GRAFFAGNINO:**  I had job offers from

22   Cornett Foods, which is out in Tulare, South

23   Salinas.  I had Mountain Wood Firewood Company,

24   and A Tool Shed.  Well, A Tool Shed changed

25   ownerships.  The guy that offered me the job

26   there was my brother.  He left that place and

27   went up to Washington to work at a different

46

1    took rental place.  The firewood company was

2    seasonal, figuring he didn't have the manpower

3    to run the place up there in Salinas full time,

4    he pulled his thing down to Yuma, Arizona.  The

5    Cornett Foods is still operating and still right

6    here in Tulare, Salinas area.  And that's where

7    I was employed when I was arrested.  And they

8    said that if there's an opening when I get out

9    they will still hire me.  I did not get any

10   letters from them this time.  I did not ask them

11   for letters because they already sent -- three

12   different times they sent letters.  And I felt,

13   you know, asking them consistently for letters

14   is, you know -- was too much to ask for them.

15   So I figured, you know, when I get out I will go

16   and see Mr. Edmund, which is the guy that has

17   the job for me.

18        **PRESIDING COMMISSIONER SAWYER:**  Okay.  So

19   you may have several job offers, and they're

20   current and viable, but we don't have any --

21        **INMATE GRAFFAGNINO:**  No letters.

22        **PRESIDING COMMISSIONER SAWYER:**  --

23   indication, any documentation on that.

24        **INMATE GRAFFAGNINO:**  Right.

25        **PRESIDING COMMISSIONER SAWYER:**  All right.

26   Thank you.  Do you have any questions?

27        **DEPUTY DISTRICT ATTORNEY STORMS:**  I'll just

47

1    state the District Attorney's Office of Monterey
2    County that we've written a few letters over the
3    years, and I've seen that not able to attend
4    because the inmate had complied completely with
5    those letters.  And so we're very impressed with
6    that, and that he's remained disciplinary-free
7    for this time.  I was just wondering, you just
8    hit what I was wondering about, the job offers.
9    The other thing is does the inmate practice any
10   religion?

11       **INMATE GRAFFAGNINO:**  No, Sir.  I am baptized
12   Roman Catholic, but I've not attended church in
13   many, many years.

14       **DEPUTY DISTRICT ATTORNEY STORMS:**  And if he
15   was released, the inmate was released, at this
16   time on parole where does he think he would
17   actually end up living and working?

18       **INMATE GRAFFAGNINO:**  I'd be living out at
19   Lake Drive in Marina, California with my mom.
20   And most likely I would have the job at Cornett
21   Foods if a position is open.

22       **DEPUTY DISTRICT ATTORNEY STORMS:**  That's all
23   I have.

24       **PRESIDING COMMISSIONER SAWYER:**  Okay.  Thank
25   you.  Counsel, do you have any questions?

26       **ATTORNEY TARDIFF:**  I don't.

27       **PRESIDING COMMISSIONER SAWYER:**  Okay.  Would

48

1    you like to close?

2        **DEPUTY DISTRICT ATTORNEY STORMS:** Just

3    basically reiterate the comments that I just

4    said. I won't go through them again. And it

5    seems like this is one of the inmates who's done

6    quite good and commendable job throughout his

7    time here at the Correctional Training Facility.

8    And I don't believe The People would have any

9    opposition to his paroling at this time.

10       **PRESIDING COMMISSIONER SAWYER:** Okay. Thank

11    you. Would you like to close, Ms. Tardiff?

12       **ATTORNEY TARDIFF:** Thank you. In terms of

13    Mr. Graffagnino's pre-incarceration history, it

14    is supportive of release, particularly based on

15    the fact that he has absolutely no criminal

16    history either arrests or convictions. He

17    appeared to have steady stable employment prior

18    to the commitment offense. Since he has been

19    incarcerated he obtained two vocations. He has

20    educationally upgraded with the GED. His work

21    reports are above average to exceptional

22    throughout his incarceration with numerous

23    laudatory chronos from his supervisors. His

24    psych evals, the last three, are supportive of

25    release starting in '94. His violent potential

26    states was significantly diminished, and it's

27    likely to continue in the community. The '99

1    psych eval states that his prognosis is good,
2    and that his violent potential is minimum to
3    none in the community.  Much of that was
4    reiterated in the most current '05 psych.  A lot
5    of that has been read into the record.  Just
6    briefly, there's no mental health disorders.
7    There's no indication that he has a substance
8    abuse history.  While he was drinking at the
9    time of the commitment offense, I went through
10   the documents from the time of the crime, or at
11   the time he pled out, I didn't see any
12   indication that he had a substance abuse issue
13   at that time either.  I think this is something
14   that's kind of been perpetuated and is not in
15   fact true.  But in either event, he has
16   participated in AA/NA at the request of the
17   Board.  He did do a testing procedure, which is
18   noted on page three of the most current psych
19   eval.  And it would show that he's an extremely,
20   extremely low risk score.  What it meant was
21   that if 100 inmates were inmate released on
22   parole his score would place him at above the 99
23   percentile for making a good adjustment.  So all
24   three psych evals, going back 11 years, are
25   supportive of release.  His parole plans, he
26   does have marketable skills, and he does have a
27   place to stay.  So he fulfils the requirements

50

1    for parole plans.  His last disciplinary was 11

2    years ago.  It was -- So enough time has in fact

3    passed that I believe that it should no longer

4    be used against him.  And you'll notice that all

5    those, his 115s, occurred in a two-year period.

6    I would submit that that was somewhat of an

7    adjustment period at that time.  The crime

8    itself, it was a highly situational crime as

9    noted in the most current psych eval.  It's not

10   likely to reoccur.  His set of facts were

11   extremely unique.  At the time in the probation

12   officer's report it stated that he was

13   remorseful.  He even stated that he told -- When

14   he arrived at someone's home he told them that

15   he killed a guy and was very upset.  So he's

16   always had a sense of wrongdoing in terms of

17   this commitment offense.  He pled out early on,

18   which is also another mitigating factor.  There

19   is no opposition to parole from the District

20   Attorney's Office.  I would submit that he is in

21   fact suitable for parole.  Thank you.

22       **PRESIDING COMMISSIONER SAWYER:**  Thank you.

23   This is your opportunity to tell us why you feel

24   you are suitable for parole.

25       **INMATE GRAFFAGNINO:**  Over the past 15 years

26   I have matured.  I know the circumstances of my

27   crime does not justify what I did to the guy,

51

1   the circumstances of what he was doing.  I know

2   I'm responsible for taking a man's life.  I live

3   with this every day of my life now.  This is

4   something that will never occur again.  I don't

5   drink.  I don't do drugs anymore.  I don't drink

6   anymore, do drugs anymore.  I don't plan on

7   doing anything like that again.  Attending

8   programs on the streets, AA, I already looked

9   into some of those programs, serious programs,

10  real close to where my mom lives that are

11  available to me.  I've got a big family in

12  Salinas that they all have no problem assisting

13  me again to work, a place to live, any of

14  that -- programs like that.  All I've got to say

15  is, you know, I appreciate the opportunity to

16  let me speak my case.  I know I'm not going to

17  recommit.  I know I will do when I get back out

18  on the community.  I will adjust to the

19  community, the (indiscernible), not be a burden

20  on the state.  This has been a long 15 years of,

21  you know, having to live with the knowledge that

22  I killed a guy, or assisted in killing a guy.

23  And it's something that I never will forget, and

24  will always live with it, you know.  I thank

25  you.

26      **PRESIDING COMMISSIONER SAWYER:**  Okay.

27  Great.  Thank you.  It's 9:54, and we will --

52

1          **ATTORNEY TARDIFF:**   Recess.

2          **PRESIDING COMMISSIONER SAWYER:**   -- recess.

3     Thank you.   For deliberations.

4                    **R E C E S S**

5                    --o0o--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

53

1       **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                    **D E C I S I O N**

3       **PRESIDING COMMISSIONER SAWYER:** The Panel

4    has reviewed all the information received from

5    the public and relied on the following

6    circumstances in concluding that the prisoner is

7    suitable for parole. He would not pose an

8    unreasonable risk of danger to society or a

9    threat to public safety if released from prison.

10   The prisoner has no juvenile record of

11   assaulting. He has had, up until the commitment

12   offense, has had a stable social history

13   exhibited by a reasonably stable relationship

14   with others. He was working at the time in his

15   community. His family is in the same community.

16   While in prison he's enhanced his ability to

17   function within the law upon release through

18   participation and education programs. He's

19   completed his GED in 1993. Self-help, he's been

20   regularly attending AA as he could, albeit twice

21   a month, but in the particular yard that he's in

22   he has trouble getting anymore AA than that, NA

23   and AA since 1998. He's done two lifer's groups

24   in the year 2000. In '03 he did the impact, the

25   14-week impact group. Most recently has been

26   doing self-study in the area of outrageous math,

27   **S. GRAFFAGNINO   E-89844   DEC PAGE 1    12/9/05**

54

1    whatever that is.  It would be outrageous.  His

2    vocational programs have been outstanding.  He

3    receives above average to exceptional work

4    reports.  He's completed nearly all the building

5    maintenance, is that correct, sir?

6         **INMATE GRAFFAGNINO:**  That's right.

7         **PRESIDING COMMISSIONER SAWYER:**  Which is

8    about 14 different disciplines.  How many

9    different disciplines in building maintenance?

10        **INMATE GRAFFAGNINO:**  I lost count.  I

11   have -- You've got the main chronos of the big

12   ones.  I got like 22 of the smaller ones, which

13   is even more steps of it.  It's close to 40

14   stages.

15        **PRESIDING COMMISSIONER SAWYER:**  Forty.

16        **DEPUTY COMMISSIONER MITCHELL:**  I've got

17   about 11 separate disciplines.  _

18        **INMATE GRAFFAGNINO:**  And then you've the

19   other ones, which are smaller.

20        **PRESIDING COMMISSIONER SAWYER:**  Well, and

21   quite impressive.  I'm not going to read them

22   all, but they're quite impressive, all the

23   different disciplines within that building

24   maintenance program that he's been involved in.

25   And as well as landscape maintenance.  And

26   probably the most impressive, which gives you a

27   **S. GRAFFAGNINO   E-89844   DEC PAGE 2   12/9/05**

55

1   marketable skill, which far outweighs your lack

2   of letters for your job offers, is your welding.

3   You're a certified welder.

4       **INMATE GRAFFAGNINO:**  Yes, Sir.

5       **PRESIDING COMMISSIONER SAWYER:**  And in this

6   community, throughout this entire community,

7   this agriculture community that we're in, that's

8   certainly a marketable skill.

9       **INMATE GRAFFAGNINO:**  Yes, Sir.

10      **PRESIDING COMMISSIONER SAWYER:**  Because it's

11  not just welding.  It's different disciplines

12  within the welding area, and you're certified in

13  that, which certainly makes you very marketable

14  year round marketing, because there is a lot of

15  seasonal work around here.

16      **INMATE GRAFFAGNINO:**  Yes, Sir.

17      **PRESIDING COMMISSIONER SAWYER:**  And I'm sure

18  Cornett has seasonal work, as you came -- when

19  you were working there you were a boxer.  Were

20  you a boxer?

21      **INMATE GRAFFAGNINO:**  What's called forklift

22  driver.

23      **PRESIDING COMMISSIONER SAWYER:**  And a

24  forklift driver.  When the work wasn't here then

25  you didn't work, right?

26      **INMATE GRAFFAGNINO:**  I went onto the

27  **S. GRAFFAGNINO   E-89844   DEC PAGE 3   12/9/05**

56

1    maintenance area when seasonal, five months,

2    that they went down to Yuma.

3        **PRESIDING COMMISSIONER SAWYER:**  But I think

4    you've got some -- You've really taken advantage

5    of the vocational programs in the institution.

6    And your institutional job assignment currently

7    is working as a captain's clerk, and you've

8    received some -- you've received some laudatory

9    chronos for your work and your assisting staff,

10   and recently as this year from Officer Eubanks,

11   which I understand doesn't give out a lot of

12   chronos.

13       **INMATE GRAFFAGNINO:**  Yes, Sir.

14       **PRESIDING COMMISSIONER SAWYER:**  You lack any

15   criminal history of violent crime.  You have no

16   criminal history, not only your juvenile, but

17   your adult criminal history, albeit this crime

18   occurred when you were 21 years old.  You were

19   only technically an adult for three years, but

20   you didn't have any criminal history.  Because

21   of your maturation, growth and greater

22   understanding we feel that that has reduced the

23   probability of recidivism.  You have realistic

24   parole plans.  Again, to reiterate that you have

25   a very marketable -- have marketable skills,

26   more than one, and your family support.  You

27   **S. GRAFFAGNINO    E-89844    DEC PAGE 4    12/9/05**

57

1    have an invalid mother who probably could use

2    your help.  You have a sister who's becoming of

3    age, and they have -- they live in Marina, which

4    is in Monterey County and, again, close to

5    places that you could be working --

6         **INMATE GRAFFAGNINO:**  Yes, Sir.

7         **PRESIDING COMMISSIONER SAWYER:**  -- with your

8    marketable skills.  You have maintained close

9    family ties while in prison.  I read some

10   letters from your family.  They're all very

11   supportive, as well as the letter from your

12   mother and step-father who indicate they would

13   help you any way they can, including housing and

14   transportation.  You maintained positive

15   institutional behavior for the last 11 years.

16        **INMATE GRAFFAGNINO:**  Yes, Sir.

17        **PRESIDING COMMISSIONER SAWYER:**  And that

18   indicates significant self-control, because it's

19   not -- that there was a period of adjustment

20   that you went through in 1992 and '94, or as

21   your attorney says a period of adjustment, where

22   you get yourself into some problems and some

23   trouble.  But the last one being 7/1 of '94,

24   last 115.  And you've had (indiscernible) of

25   four 128s.  Your 115s, there was six of those

26   total, and none in this institution.

27   **S. GRAFFAGNINO   E-89844   DEC PAGE 5   12/9/05**

58

1      **INMATE GRAFFAGNINO:** Yes, Sir.

2      **PRESIDING COMMISSIONER SAWYER:** Okay. You

3    have indicated to us -- You readily talked about

4    the offense. You talked about the offense. We

5    appreciate that. Instead of me reading your

6    version, you gave your version, which is

7    consistent with the -- which was consistent with

8    the crime, and you kept the same story

9    throughout. The crime itself was horrendous.

10   You took a life of a 22-year-old man, Mr. Jose

11   Gonzalez. No matter what he was doing there was

12   other remedies. There was other things -- other

13   ways to handle that. There's no question about

14   that.

15     **INMATE GRAFFAGNINO:** Yes, Sir.

16     **PRESIDING COMMISSIONER SAWYER:** And I think

17   you probably see that now. You had mitigated

18   the problem. You had take the girl away from

19   where, or she got away from him.

20     **INMATE GRAFFAGNINO:** Yes, Sir.

21     **PRESIDING COMMISSIONER SAWYER:** So the

22   problem was over. You didn't need to take the

23   law into your own hands, you and your brother,

24   and your crime partner. But you did show signs

25   of remorse. You indicate you understand the

26   magnitude of this offense. And probably very

27   **S. GRAFFAGNINO   E-89844   DEC PAGE 6   12/9/05**

59

1    importantly it appears that you have real good
2    insight into this by accepting responsibility
3    for this criminal behavior and your desire to
4    change towards good citizenship.
5        **INMATE GRAFFAGNINO:**  Yes, Sir.
6        **PRESIDING COMMISSIONER SAWYER:**  Psychiatric
7    factors, we have a psychologist report dated
8    11/25 of '05.  It's very -- It can't get any
9    fresher than that, authored by Dr. M. Macomber,
10   M-A-C-O-M-B-E-R, Ph.D., at this institution.
11   And in considering your potential for dangerous
12   behavior in the institution, it shows that
13   you've been free from disciplinaries for the
14   last 11 years.  The force and violence in 1992,
15   force and violence 115 you received has been
16   reduced to horseplay.  You've made an excellent
17   institutional adjustment.  No history of
18   participation in riots, possession of weapons or
19   assaults on others.  You had several chronos in
20   your Central File indicating you do an
21   outstanding job as a captain's clerk.  You're
22   described as a stable, hardworking individual
23   who has a positive influence.  Your potential
24   for violence is definitely below average in
25   comparison to other inmates.  And in considering
26   your potential for violence if released to the
27   **S. GRAFFAGNINO    E-89844    DEC PAGE 7    12/9/05**

60

1    community, the last evaluator indicated that

2    your potential was minimal to none.

3    Dr. Macomber would agree with that assessment.

4    His potential for a violent behavior is

5    essentially nil, and it's certainly no greater

6    than the average citizen in the community.

7    There's no significant risk factors in this case

8    according to Dr. Macomber. Also, we did note --

9    Commissioner Mitchell did note that we were

10   going to look into the confidential file, which

11   we did.

12        **INMATE GRAFFAGNINO:** Yes, Sir.

13        **PRESIDING COMMISSIONER SAWYER:** We reviewed

14   the confidential file. We did not use any

15   information from the confidential file. That's

16   for the record. The base term of confinement,

17   the base life offense, which the prisoner has

18   been convicted is murder in the second degree,

19   PC 187. The offense occurred on 10/8 of 1990.

20   The term is derived from the matrix located in

21   the California Code of Regulations Title XV at

22   C3, C is severe trauma, death resulted from

23   severe trauma inflicted with deadly intensity,

24   stabbing in this case. And the three is no

25   prior relationship. The victim had no personal

26   relationship with the prisoner or motivation

27   **S. GRAFFAGNINO    E-89844    DEC PAGE 8    12/9/05**

61

1   (indiscernible) resulting in the death

2   (indiscernible) of another crime.  That would be

3   assault with great bodily injury, and the death

4   resulted from that, the crime taking place.  The

5   Panel assessed 240 months.  We used the middle

6   term, and that is 20 years.  And that broken

7   down is 240 months.  Post-Conviction credits,

8   you receive credit for every year that you are

9   discipline free.  You receive four months of

10  good time.

11      **INMATE GRAFFAGNINO:**  Yes, Sir.

12      **PRESIDING COMMISSIONER SAWYER:**  Okay.  So

13  you have 48 months calculates out to 12 years.

14  Forty-eight months of good time, subtracted from

15  240 is 192 months.  That is your date.  Okay.

16  And you can figure that -- We figured it out as

17  to --

18      **DEPUTY COMMISSIONER MITCHELL:**  Actually 192.

19  I put down the wrong there, so that's two.  So

20  it comes out to about 16 years and two months of

21  total time to serve.  And I calculate you have

22  14 years, five months and 16 days in custody as

23  of today.

24      **PRESIDING COMMISSIONER SAWYER:**  You've still

25  got some time to serve.

26      **DEPUTY COMMISSIONER MITCHELL:**  About a year

27  **S. GRAFFAGNINO   E-89844   DEC PAGE 9   12/9/05**

62

1   and a half.

2       **PRESIDING COMMISSIONER SAWYER:** Okay. Upon

3   your release you'll receive -- there are special

4   conditions that will be placed upon you. You do

5   not use alcoholic beverages. And while we can't

6   -- And we're going to load you up here. Okay.

7   Submit to alcohol testing, submit to

8   anti-narcotic testing, submit to THC testing.

9   That's marijuana.

10      **INMATE GRAFFAGNINO:** Yes, Sir.

11      **PRESIDING COMMISSIONER SAWYER:** Participate

12  in a substance abuse program. Okay. So you

13  need to start tuning up where you're going to be

14  going to NA or AA on the outside. Start working

15  on getting a sponsor and start making a move in

16  that direction. And you'll also be required to

17  attend a parole outpatient clinic, and they'll

18  do an analysis to see whether you need any

19  further treatment or any other special

20  conditions that parole may place on you on the

21  outside. Okay. Here's your copy. You also

22  realize that this has to go before a Decision

23  Review Unit?

24      **INMATE GRAFFAGNINO:** Yes, Sir.

25      **PRESIDING COMMISSIONER SAWYER:** And can be

26  reviewed by the entire Board. And it also goes

27  **S. GRAFFAGNINO   E-89844   DEC PAGE 10   12/9/05**

63

1   to the Governor.

2       **INMATE GRAFFAGNINO:**  Yes, Sir.

3       **PRESIDING COMMISSIONER SAWYER:**  For his --

4   He can reverse this decision if he doesn't feel

5   that it was correct in this.  So there's still

6   some time.  And our advice to you would be to

7   keep this under your hat.

8       **INMATE GRAFFAGNINO:**  Yes, Sir.

9       **PRESIDING COMMISSIONER SAWYER:**  So nobody

10  gets jealous and nobody gets you in trouble,

11  because we also indicate here that you have --

12  that your behavior while still in prison will be

13  no more 115s or 128s.  Earn the positive

14  chronos.  Continue your self-help, particularly

15  AA/NA.

16      **INMATE GRAFFAGNINO:**  Yes, Sir.

17      **PRESIDING COMMISSIONER SAWYER:**  Any other

18  classes you can -- any other self-help you can

19  get would be to your benefit, and remain

20  discipline free.  Okay.

21      **INMATE GRAFFAGNINO:**  Yes, Sir.

22      **DEPUTY COMMISSIONER MITCHELL:**  Just a

23  question for you, the victim's family, do they

24  live in the area that you're going to parole to?

25      **INMATE GRAFFAGNINO:**  No, Sir.  They're on

26  (indiscernible) Country of Mexico.

27  **S. GRAFFAGNINO   E-89844   DEC PAGE 11   12/9/05**

64

1        **ATTORNEY TARDIFF:** Yeah.  It's noted in --

2        **DEPUTY COMMISSIONER MITCHELL:**

3    (Indiscernible) around all that?

4        **INMATE GRAFFAGNINO:** No.

5        **ATTORNEY TARDIFF:** No.  And the probation

6    reports say that the family came up from

7    Mexico --

8        **DEPUTY COMMISSIONER MITCHELL:** All right.

9        **ATTORNEY TARDIFF:** -- after the death of the

10   victim.

11       **DEPUTY DISTRICT ATTORNEY STORMS:** They've

12   never made an impact statement to our office.

13   They've never registered, and they've never

14   shown any interest whatsoever in this case.

15       **DEPUTY COMMISSIONER MITCHELL:** My assumption

16   you won't run into them.  But if you were to run

17   into somehow a member of the family, just think

18   about what you're going to do to respond.

19       **INMATE GRAFFAGNINO:** Yes, Sir.

20       **DEPUTY COMMISSIONER MITCHELL:** Talk to your

21   parole agent.  That's the first thing you've got

22   to do.

23       **INMATE GRAFFAGNINO:** Yes, Sir.

24       **DEPUTY COMMISSIONER MITCHELL:** Stay away

25   from them.  Thank you.  Good luck to you.

26       **PRESIDING COMMISSIONER SAWYER:** Good luck to

27   **S. GRAFFAGNINO    E-89844    DEC PAGE 12    12/9/05**

65

1    you, sir.

2         **INMATE GRAFFAGNINO:**  I thank you guys.

3         **PRESIDING COMMISSIONER SAWYER:**  That

4    concludes this hearing.  It's 10:30.

5                        --o0o--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    **PAROLE GRANTED**

24    **THIS DECISION WILL BE FINAL ON: Apr. 8, 2006**

25    **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26    **DATE, THE DECISION IS MODIFIED.**

27    **S. GRAFFAGNINO    E-89844    DEC PAGE 13    12/9/05**

# E X H I B I T    "C"
# "Indeterminate Sentence Parole Release Review"

## INDETERMINATE SENTENCE PAROLE RELEASE REVIEW
### (Penal Code Section 3041.2)

**SALVATORE GRAFFAGNINO, E-89844**
**SECOND-DEGREE MURDER**

**AFFIRM:** _____

**MODIFY:** _____

**REVERSE:** _____X_____

Around midnight on October 8, 1990, Salvatore Graffagnino and his two crime partners beat and stabbed to death 22-year-old Jose Gonzalez.

According to the probation report, 21-year-old Mr. Graffagnino, his brother, 22-year-old Joe Graffagnino, Chuck Altemeyer, and two female juveniles were partying in a field in Salinas when a girl ran nearby yelling for help. She told them a man tried to rape her, to which Mr. Graffagnino said something like, "this guy's gonna pay." Shortly thereafter, the man said to have attacked the girl, later identified as Mr. Gonzalez, drove his car towards the group. Mr. Graffagnino used his car to push Mr. Gonzalez's car to a place where he could not drive off. Mr. Graffagnino then jumped out of the car and, along with his brother and Mr. Altemeyer, at some point attacked Mr. Gonzalez. Mr. Altemeyer beat him and Mr. Graffagnino stabbed him repeatedly.

After attacking Mr. Gonzalez, the three returned to their cars and ultimately left the scene. Mr. Gonzalez was transported to a medical center after responding officers found him at the scene; he was in his car, slumped over the center console. He died a short time later from his injuries.

Mr. Graffagnino and his two crime partners were arrested approximately two weeks after the attack. Mr. Graffagnino had no other documented criminal history at the time. He pled guilty to second-degree murder and was sentenced to 15 years to life in prison.

Since his incarceration, Mr. Graffagnino has been written-up six times for rules violations, specifically, three times in 1994 for refusing a cell move, conduct/disobeying rules, and threatening staff, and three times in 1992 for stimulants and sedatives, horseplay, and possession of another inmate's property. He has also been counseled four times, most recently in 1997, for minor misconduct.

To his credit, Mr. Graffagnino has worked in prison to enhance his ability to function within the law upon release. He earned his GED in 1993, has completed other educational courses, has completed vocational welding, building maintenance, and landscaping, and has worked in the institutional setting as, among other things, a clerk, teacher's aide, porter, cook, and server. While minimally until 1997, he has also participated in self-help and therapy, including Alcoholics Anonymous, Narcotics Anonymous, Lifer's Group, and the Impact Program. He has

Salvatore Graffagnino, E-89844
Second-Degree Murder
Page 2

received favorable reports, inclusive of some low risk assessments, from correctional and
mental-health professionals, has maintained relationships with family and others, and has made
realistic, confirmed parole plans to live with his mother and sister in Monterey County, his
county of last residence, and work locally at a produce warehouse.

Likewise, Mr. Graffagnino accepts responsibility and expresses remorse for murdering Mr.
Gonzalez. Past evaluators have concluded that his remorse is "quite sincere and genuine." And
the 2005 Board agreed, finding also that he "appears [to have] real good insight" into his crime.

But despite any positive factors tending to support his parole suitability at this time, the second-
degree murder for which Mr. Graffagnino was convicted was especially grave because the
victim, who was in his car at the time of the attack and outnumbered three to one, was especially
vulnerable and the manner in which he was killed was exceedingly brutal. Each of Mr.
Gonzalez's three attackers was armed, Mr. Graffagnino and his brother with knives and Mr.
Altemeyer with a bicycle fork. According to the probation report, the autopsy concluded that
"most of the wounds appeared to be defensive wounds caused by hacking or slashing with an
elongated sharp object." The same reference noted the wounds as being "a 7 inch long cut across
the neck ... a stab wound of the left side of the chest below the armpit and deep cuts to the left
arm, cuts on both hands, cuts to the mid-thigh and lower left leg, and wounds in the area of the
penis." Furthermore, Mr. Graffagnino's own description of the offense, based on statements
contained in the probation report by friends who saw him shortly after the crime—that his
brother "stuck the knife in the guy's neck and then ripped it out sideways and ... had buried his
knife up to the handle when he had stabbed the victim, having difficulty removing it because
Altemeyer was busy hitting the victim in the head with the bicycle forks and kicking him"—
demonstrates not only the extreme brutality of this murder but also the extreme callousness with
which it was carried out. This factor alone is sufficient for me to conclude presently that
Mr. Graffagnino's release from prison would pose an unreasonable public-safety risk.

Additionally, Mr. Graffagnino, after initially leaving, returned to the scene of the attack with a
friend, Mr. Blaylock, and saw that Mr. Gonzalez was still alive—yet left him there a second time
without rendering aid or notifying authorities—demonstrating an exceptionally callous disregard
for human suffering. Before leaving him, however, according to Mr. Blaylock's statements to
police, as documented in the probation report, Mr. Blaylock removed Mr. Gonzalez's wallet
from his pocket and when he did, Mr. Gonzalez moved and moaned. The probation officer
concluded her report by writing, "[t]he fury of the attack as evidenced by the victim's wounds
suggests an act of violence and cruelty that is difficult to attribute to another human being,
exacerbated by [Mr. Graffagnino's] returning to the scene to show a friend his grizzly act and
then coldly leaving the victim to die."

Now age 36, after approximately 15 years in prison, Mr. Graffagnino has made some
encouraging gains. But given the current record before me and after carefully considering the
very same factors the Board must consider, I find the gravity of the murder committed by

Salvatore Graffagnino, E-89844
Second-Degree Murder
Page 3

Mr. Graffagnino presently outweighs the positive factors tending to support his parole suitability.
Accordingly, because I believe his release from prison would pose an unreasonable risk of
danger to society at this time, I REVERSE the Board's 2005 decision to grant parole to
Mr. Graffagnino.

Decision Date:  5/3/2006

ARNOLD SCHWARZENEGGER
Governor, State of California

# E X H I B I T   "D"
## "Probation Officer's Report"

SUPERIOR COURT OF CALIFORNIA, COUNTY OF MONTEREY

STATE OF CALIFORNIA

DEPT. Silver (3/12/91)

CLERK

DEPUTY

vs

ACTION NO. CR16037-A

SALVATORE GRAFFAGNINO
Defendant

PROBATION OFFICER'S REPORT

DATE OFFENSE COMMITTED    10/8/90

DATE OF ARREST           10/23/90

INFORMATION FILED        12/20/90

DATE OF REFERRAL         2/11/90

REPORT FILED             3/5/91

ORIGINAL OFFENSE         187 PC
                         12022(b) PC enhancement

CONVICTED OFFENSE        Defendant pled guilty to violation of
                         Section 187 PC, murder 2nd degree, on
                         condition he receive 15 years to life in
                         prison.

DAYS IN CUSTODY          Actual 141 + 70 Good/Work Time = 211

LEGAL COUNSEL            Richard West

PROBATION OFFICER        Sonja Sheeler

DATE OF BIRTH            7/24/69 (21)

BIRTHPLACE               New York

ADDRESS                  588 Leslie Drive, Salinas

TELEPHONE NUMBER         443-8331

1

PENAL CODE SECTION 2900.5 TIME SERVED CREDITS

|                    | Dates    |         |            |
|--------------------|----------|---------|------------|
| Name of Facility   | From     | To      | Total days |
| Monterey County Jail | 10/23/90 | 3/12/91 | 141        |
|                    |          |         |            |
| ACTUAL TIME        |          |         | 141        |
| GOOD/WORK TIME     |          |         | 70         |
| TOTAL CREDITS      |          |         | 211        |

CIRCUMSTANCES OF THE OFFENSE: (Source: Monterey County Sheriff's Department report #11202-90 and court transcripts.)

On 10-8-90 at approximately 1:54 a.m. a sheriff's deputy was dispatched to the area of Rogge Road and Natividad regarding a victim of a stabbing. The reporting party, Donny Blaylock, and two other subjects were contacted at the pay phones in Bolsa Knolls and led the officer to a location in a strawberry field where the victim was found in the driver's seat of a vehicle. The rear end of the vehicle had gone into the furrows of the field. The victim was slumped sideways across the center console and had a large amount of blood on the front of his shirt and also on his sleeves. A very large laceration in the right side of his neck was noted. He had a very faint pulse and was breathing shallowly, responding to the deputy with weak sounds and grunts. The victim was transported by ambulance to Natividad Medical Center. He was identified by an alien registration card found in his clothing. According to medical personnel the 22 year old victim never regained consciousness, expiring on 10-10-90 as the result of anoxic brain damage due to

2

multiple incised wounds.

The autopsy report states that most of the wounds appeared to be caused by hacking or slashing with an elongated sharp object. Defensive type wounds were present on the left and right hands and back of the left forearm. Also present was a small area of scalp bruising on the top of the left side of the head which did not cause significant damage to the underlying skull or brain. Among the multiple wounds was a 7 inch long cut across the neck extending deeply through the soft tissues and largely severing the neck's musculature attachments to the base of the tongue. There was also a stab wound of the left side of the chest below the armpit and deep cuts to the left arm, cuts on both hands, cuts to the mid-thigh and lower left leg, and wounds in the area of the penis.

The reporting party, his brother, and his brother's girlfriend stated that they had been returning from a party in King City when they saw a car containing four Mexicans leaving the field. While investigating the source of headlights in the field, they found the victim. They provided officers with a description of the vehicle they had seen leaving the area.

On 10-23-90 the brothers told Sheriff's deputies that they had lied. Donny Blaylock stated that on the evening of 10-7-90 he had received a phone call inviting him to a party at Alexander's ( a party area in the strawberry fields off Rogge Road). As he approached the area, Sal and Joe Graffagnino almost ran him off the road and told him to follow them. (They stopped at the Quickie Mart on Natividad Road where he was told that they had killed somebody. They said this guy had tried to rape this girl who was with them.

3

Chuck Altemeyer and his girlfriend had also followed them to the
shopping center in his truck. The co-defendants were in a blue
Mercury Cougar along with the girl who they had picked up in the
field and another girl they had been partying with. They had blood
on their clothing and on the knives they showed him, a Rambo type
knife that belonged to Joe and a Bowie that was Sal's. From what
they told him, he reported that Joe was the one who slashed the
victim's neck, Sal stabbed him under the arm, and Chuck beat his
face in with a pipe. As he did not believe them, he drove back to
the scene in his truck with Sal Graffagnino. He then dropped Sal
off at his house and returned home where he told his brother what
had happened. After taking his brother to the scene, they decided
to call 911.

Struck 3-14-9.

The defendants were taken into custody on 10-23-90 while driving
a 1980 blue Mercury Cougar. A search of the vehicle and their
residence produced several knives, two of which matched the
descriptions given by witnesses of the knives held by the defendants
on the evening of the killing. Chuck Altemeyer was also taken into
custody at his residence. None of the suspects admitted any
knowledge of the killing.

Deputies learned from friends of the co-defendants that Sal had
arrived at their house on 10-8-90 at approximately 12:30 a.m. with
blood on his hands and arms. He told one of them that he had killed
a guy and was very upset. His statement to them was the same as he
had told the original reporting party. Sal had stated that Joe
stuck the knife in the guy's neck and then ripped it out sideways

4

and he had buried his knife up to the handle when he had stabbed the
victim, having difficulty removing it because Altemeyer was busy
hitting him in the head with the bicycle forks and kicking him.   He
had washed up at the house, changed his clothes, and left.

On 10-24-90 the sixteen year old girlfriend of suspect Altemeyer
told deputies that she had witnessed the stabbing while seated in
the Graffagnino vehicle.   She and the co-defendants, her boyfriend
Chuck, and another girl had been partying near Rogge Road and were
leaving when a girl came running down the road yelling for help.
She told them that a guy had tried to rape her which made Sal angry.
He was saying something like "this guy's gonna pay."   When the
victim drove his vehicle toward them, Sal pushed him off into the
field and Sal and Chuck jumped out of the car.   Chuck punched him
and Sal was stabbing him.   Joe came up behind and stabbed him.   She
saw the knives in the Graffagnino brothers' hands, describing them
and stating that they wear them in sheaths all the time.   The girl
they had picked up was also seated in the front seat of the vehicle
driven by Sal and saw the stabbing.   They drove to Natividad Plaza
where the girl was told to leave.   This witness later heard that Sal
was bragging about the stabbing.

The 15 year old girl who was also in the car confirmed the
sixteen year old's statement.   She saw Altemeyer hitting and kicking
the victim while Joe and Sal were using their knives, although she
could not see the actual stabbing.   She wiped the blood off Sal with
her sweatshirt and at Quik Mart Joe and Sal wrapped their knives in
it and put it in the trunk of their car.   She went to Joe's house
with him where Joe put the knives in a metal box behind a wall.

5

When Sal and Blaylock, who followed them to the shopping center,
arrived, she went with them back to the crime scene. Blaylock
nudged the victim with his foot and said words to the effect, "hey
dude, que paso". He tried to remove the victim's wallet from his
hip pocket and, as he did, the man slid out of the car and moaned.
They looked through the wallet and then threw it out the window as
they were driving away. She described the knives and the
co-defendants' clothing which included a jacket and a vest with
Swordsman colors, a club to which they belong.

Kim Bartlebaugh told deputies that on 10-7-90 she had been
working the streets in Chinatown when a Mexican male offered her ten
dollars for a "screw" but she did not agree to this price. As it
was getting late, approximately midnight, and she was tired, she
asked him for a ride home. Instead of driving her to her motel, the
subject drove her out to Natividad and Rogge Roads where he
attempted to rape her. She got out of the car in the strawberry
field and tried to run away, but was caught by him twice. On the
third attempt she ran towards two vehicles driving down the dirt
road. She yelled for help and told the occupants that this guy was
trying to rape her, then joined them in their car. They said "We'll
kill him" and turned the vehicles around and headed towards her
attacker's car, eventually ramming it and forcing it into a field.
The driver of the car she was in exited the vehicle w̶i̶t̶h̶ ̶a̶ knife in
his hand ̶a̶n̶d̶ ̶r̶a̶n̶ ̶t̶o̶ ̶t̶h̶e̶ ̶v̶i̶c̶t̶i̶m̶'̶s̶ ̶c̶a̶r̶. She saw two subjects at the
car making up and down motions with their hands but did not realize
they were stabbing the victim until the driver returned with the
knife in his hand. The headlights of both vehicles were on and she

6

ΝΟΤ
could see the victim while he was being stabbed. The two subjects got back into the car and one of them said something like "he's dead". The one who was driving was devastated by what he had done and said "I killed him" and something about shoving it to the hilt. They said they cut his "thing" off. The other guy just kept saying calm down. They drove to Natividad Plaza where she was let out of the vehicle.

<u>VICTIM'S STATEMENT AND CONDITION</u>: (Source: Sheriff's Department report and District Attorney.)

The victim's parents traveled from Mexico to see their son at Natividad Medical Center and retrieved some of his personal belongings. They returned to Mexico without his body and were never interviewed.

<u>STATEMENT OF DEFENDANT</u>: (Source: Interview with defendant on 2-27-91.)

Salvatore Graffagnino states that he does not remember much of what happened because it happened so fast. The victim almost hit his brother who was walking and he pushed the victim's bumper as he was backing up. The defendant jumped out of his car and hit the victim with his fist on the left side of his jaw. He does not
and
remember taking a knife out and stabbing him. At the time he was just going to bring him into jail or "kick his butt." He took the plea because he knew they had caused the death. He felt bad when he

7

heard the victim had died and wishes it had never happened.

He denies any prejudices against minorities, claiming friends of
Mexican descent. The club he belongs to the Swordsmen is a
Renaissance Club and is not a gang or a white supremacist group.
The defendant wants to get into school and a work program while in
state prison.

JUVENILE RECORD:    (Confidential)

None.

PRIOR CRIMINAL RECORD: (Source: Department of Justice
CII #A09584943.)

None.

PRIOR TRAFFIC RECORD: (Source: Department of Motor Vehicles.)

None.

SOCIAL HISTORY

(Source: Interview with defendant on 2-27-91.)

FAMILY HISTORY DATA:

    Father: Salvatore Graffagnino, age 46, resides in San Jose,
            truck driver.

    Mother: Ilona Moss, age 43, resides at 588 Leslie Drive,
            Salinas, disabled.

    Siblings: Two brothers:
            Joseph, age 22, co-defendant instant offense.
            Tony, age 17, resides with mother, student.
            One half-sister:
            Heather Moss, age 7, resides with mother, student.

8

FAMILY CRIMINALITY: The defendant reports that his father was in federal prison for one year, approximately 1978, for hijacking.

DEFENDANT'S MENTALITY: The defendant completed the eleventh grade at Fernley High School in Nevada. He appears to be of average intelligence.

EMPLOYMENT HISTORY: (Social Security #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.)

| | |
|---|---|
| Boxer | August to October 1990 - Coronet Foods, Salinas - $7.80 an hour. |
| Fueling trucks | May to July 1990 - Inman Distributing, Salinas - $5.00 an hour. |
| Splitting/delivery | January 1989 to February 1990 - Joy's Wood, Reno, Nevada - $500 a week net. |
| Security guard | June to December 1988 - Burns Security, Reno, Nevada - $5.25 an hour. |

MARITAL HISTORY: The defendant has never been married and has no children.

HEALTH AND HABITS: The defendant claims good health. While living in Fernley, Nevada, he was doing some heavy drinking on weekends between 1988 and 1990. Since May 1990 he only drinks occasionally. He smokes about one marijuana joint a week, has tried cocaine twice, crank three or four times. The night of the offense he shared three cases of beer and 1 1/2 fifths of Jack Daniels with nine people.

MILITARY HISTORY: None.

EVALUATION: This 21 year old defendant has pled guilty to 2nd degree

9

murder on the condition that he receive a fifteen year to life term. He has no prior record. He verbalizes regret over the death of the victim and accepts responsibility, even though he claims to have little recall of the event. From the statements of witnesses it appears that his recall was far better when he was telling his friends that he had killed a Mexican. The fury of the attack as evidenced by the victim's wounds suggests an act of violence and cruelty that is difficult to attribute to another human being, exacerbated by his returning to the scene to show a friend his grizzly act and then coldly leaving the victim to die. The motive for this behavior escapes understanding. Society knows no other way to protect itself from such an individual aside from long term incarceration in state prison.

## SENTENCING CONSIDERATIONS

PROBATION ELIGIBILITY: The defendant is statutorily ineligible for probation.

POSSIBLE FACTORS IN AGGRATVATION: (Rule 421)

Facts relating to the crime:

1. The crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness or callousness, whether or not charged or chargeable as an enhancement under section 12022.7.

2. The defendant was armed with or used a weapon at the time of the commission of the crime, whether or not charged or chargeable as an enhancement under section 12022 or 12022.5.

10

3.  The victim was particularly vulnerable.

4.  The defendant used or involved minors in the commission of the crime.

POSSIBLE FACTORS IN MITIGATION:   (Rule 423)

Facts relating to the crime, including the fact that:

1.  He has no prior record or an insignificant record of criminal conduct considering the recency and frequency of prior crimes.

BASE TERM SENTENCING RANGE:

187 PC, 2nd degree, felony        15 years to life

ENHANCEMENTS: 12022(b) PC charged not pled or proven.

STATE RESTITUTION FUND:

    a.  Restitution Fine:  The defendant be required to pay a restitution fine of $100.

    b.  Restitution:  The defendant not be required to pay restitution to the victim's family.

    c.  Compelling and Extraordinary Reasons:  No restitution is recommended in view of the negotiated plea for state prison and the whereabouts of the victim's family being unknown.

RECOMMENDATION: It is respectfully recommended that the defendant be committed to the California Department of Corrections for the term prescribed by law.

11

SS:sa

Respectfully submitted,

VINCENT J. LOSTETTER
CHIEF PROBATION OFFICER

Dated this 4th day of March, 1991.

I have read and considered the
foregoing report of the
Probation Officer

Sonja Sheeler
Deputy Probation Officer

_____
Judge of the Superior Court

_____
Approved for filing

12